## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| ANAND ROY, derivatively on behalf of HERTZ GLOBAL HOLDINGS, INC., | |
| Plaintiff, | Case No. |
| v. | **DEMAND FOR A JURY TRIAL** |
| STEPHEN M. SCHERR, ALEXANDRA BROOKS, COLIN FARMER, JENNIFER FEIKIN, MARK FIELDS, VINCENT J. INTRIERI, MICHAEL GREGORY O'HARA, ANDREW SHANNAHAN, THOMAS WAGNER, and EVAGELINE VOUGESSIS, | |
| Defendants, | |
| and | |
| HERTZ GLOBAL HOLDINGS, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Anand Roy ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Hertz Global Holdings, Inc. ("Hertz Global" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Stephen M. Scherr ("Scherr"), Alexandra Brooks ("Brooks"), Colin Farmer ("Farmer"), Jennifer Feikin ("Feikin"), Mark Fields ("Fields"), Vincent J. Intrieri ("Intrieri"), Michael Gregory O'Hara ("O'Hara"), Andrew Shannahan ("Shannahan"), Thomas Wagner ("Wagner"), and Evageline

Vougessis ("Vougessis") (collectively, the "Individual Defendants," and together with Hertz Global, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Hertz Global, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and against Defendants Scherr and Brooks for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Hertz Global, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from April 27, 2023, through April 24, 2024, both dates inclusive (the "Relevant Period").

2.     Hertz Global is a Delaware corporation based in Estero, Florida that provides rental vehicles and services. Specifically, the Company provides worldwide internal combustion engine ("ICE") vehicle and electric vehicle ("EV") rental services from Company-operated, licensee, and franchisee locations. Additionally, Hertz Global sells vehicles and value-added services.

3.     The Company conducts its operations through two reportable business segments: the "Americas RAC" and "International RAC." While International RAC offers rental services along with sales of vehicles and value-added services to other international locations, the Americas RAC business segment offers rental services, as well as sales of vehicles and value-added services, in the United States, Canada, Latin America, and the Caribbean.

4.     As a car rental business, one of the primary indicators of Hertz Global's performance is the precise measurement of vehicle depreciation. Indeed, the Company often cites "Depreciation Per Unit Per Month" as a vital key metric to management and investors, since one of the Company's largest expenses is the depreciation of revenue-earning vehicles and lease costs.

5.     In October 2021, the Company reported that it made "a significant investment to offer the largest EV rental fleet in North America and one of the largest in the world [,]" including "an initial order of 100,000 Teslas by the end of 2022 and new EV charging infrastructure across the Company's global operations" based on "consumer interest in [EVs] skyrocket[ing]." In conjunction with this large investment in EVs, the Company also announced it had entered into several

strategic partnerships with cities, among other entities, to further bolster the Company's EV rental venture.

6.     Throughout the Relevant Period, the Individual Defendants breached their fiduciary duties by making, and/or causing the Company to make, a series of false and misleading statements and/or omissions that failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the true negative financial impact of vehicle depreciation on the Company and the Company's inability to accurately assess vehicle depreciation; (2) the Individual Defendants materially overstated the market demand for EVs; (3) as a result, the Company's fleet of vehicles featured too many EVs to be profitable; (4) as a further result, the Company would suffer large losses from the sale of both ICE vehicles and EVs which would materially and negatively affect the Company's overall financial results; and (5) the Company failed to maintain internal controls.

7.     The truth began to emerge on January 11, 2024, when the Company filed a current report on Form 8-K with the SEC, in which the Company disclosed a shift in business strategy. Hertz Global revealed it would sell roughly 20,000 EVs from its U.S. fleet, or about one-third of its worldwide EV fleet, "to better balance supply against expected demand of EVs" which would ultimately "result in the recognition, during the fourth quarter of 2023, of approximately $245 million of incremental net depreciation expense related to the sale [,]" which "represents the write down of the EV's carrying values as of December 31, 2023 to their fair values,

less related expenses associated with the disposition of the vehicles." The Company went on to predict that "Adjusted Corporate EBITDA for the fourth quarter of 2023 will be negatively impacted by the incremental net depreciation expense associated with the EV sales plan, and further burdened by higher depreciation expense in the ordinary course as residual values for vehicles generally fell throughout the quarter greater than previously expected."

8.   On this news, the Company's stock price fell $0.40 per share, or 4.28%, to close at $8.95 per share on January 11, 2024.

9.   Roughly two months later, the truth continued to emerge on March 15, 2024, the Company announced that its Chief Executive Officer ("CEO"), Defendant Scherr, would be resigning as the CEO and Chairman of the Board of Directors (the "Board") by the end of the month, and that Wayne Gilbert West ("West") was the newly appointed CEO of the Company.

10.   On April 25, 2024, the truth fully emerged when the Company disclosed its financial results for the first quarter of the fiscal year ending on December 31, 2024 (the "2024 Fiscal Year") in a press release (the "1Q24 Press Release"). In the 1Q24 Press Release, the Company reported adjusted diluted earnings-per-share ("EPS") of -$1.28 for the quarter, which was significantly lower than the adjusted diluted EPS of $0.39 the Company had achieved in the same period last year and well short of the consensus estimate of -$0.43. When disclosing these results, the Company also divulged the sudden increase of $588 million, or $339 on a per-unit basis, in vehicle depreciation in the quarter. Hertz

Global attributed the sudden increase mainly to deterioration in estimated forward residual values and disposition losses on ICE vehicles compared to gains in the prior-year quarter. Hertz Global also revealed that $119 of the $339 per unit increase was attributed to EVs that were being held for sale. Further, the Company disclosed a $195 million charge to vehicle depreciation to write down EVs held for sale that still in inventory at quarter-end to fair value and to acknowledge the disposition losses on EVs sold in the period.

11.    On this news, the price of Hertz Global's common stock fell $1.12 per share, or approximately 19.31%, from a closing price of $5.80 per share on April 24, 2024, to close at $4.68 per share on April 25, 2024.

12.    Also, during the Relevant Period, the Individual Defendants further breached their fiduciary duties by causing Hertz Global to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between April 2023 and December 2023, approximately ***13,642,512 shares[1]*** of Hertz Global's common stock were repurchased, costing the Company over ***$190.8 million***. As the Company's stock was actually only worth $4.68 per share, the price at which it was trading when markets closed on April 25, 2024, the Company overpaid for repurchases of its own stock by ***over $127 million*** in total.

13.    Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

---

[1] Unless otherwise noted, all emphasis is added.

14.    In light of the Individual Defendants' misconduct—which has subjected the Company, its former CEO and Chair of the Board, and its Executive Vice President and Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Middle District of Florida (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

15.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

16.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of various of the directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation against themselves on

behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and Hertz is headquartered in this District.

## PARTIES

### Plaintiff

21.     Plaintiff is a current shareholder of Hertz Global. Plaintiff has continuously held Hertz Global common stock since first purchasing the stock on January 3, 2022.

### Nominal Defendant Hertz Global

22.     Nominal Defendant Hertz Global is a Delaware corporation with its principal executive offices located at 8501 Williams Road, Estero, Florida 33928. Hertz Global's shares trade on the NASDAQ under the ticker symbol "HTZ."

### Defendant Brooks

23.     Defendant Brooks served as the Company's Executive Vice President and Chief Financial Officer ("CFO") from July 2023 to June 2024. Prior to that, Defendant Brooks served as the Company's interim CFO from April 2023 to July 2023, the Company's Senior Vice President and Chief Accounting Officer from October 2020 to July 2023, and as Senior Vice President, Internal Audit at Hertz Global from June 2020 to October 2020. According to the Company's proxy statement filed on Schedule 14A with the SEC on April 9, 2024 (the "2024 Proxy Statement"), as of March 25, 2024, Defendant Brooks beneficially owned 59,978 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2024, was $7.70, Defendant Brooks beneficially owned approximately $461,831 worth of Hertz Global stock as of that date.

24.     For the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"), Defendant Brooks received $1,272,218 in total compensation from the Company. This included $515,769 in salary, $505,485 in stock awards, $206,301 in non-equity incentive plan compensation, and $43,662 in all other compensation.

25.     The Company's filing of a Form 8-K on July 28, 2023, stated the following about Defendant Brooks:

> Ms. Brooks, a certified public accountant, joined the Company in June 2020 as its Senior Vice President, Internal Audit, was promoted to Senior Vice President and Chief Accounting Officer in October 2020, and has been serving as interim Chief Financial Officer since April 1, 2023. Prior to joining the Company, Ms. Brooks was the Vice President, Internal Audit at Aptiv PLC ("Aptiv"), a global technology company from 2015 to 2020. Before joining Aptiv, Ms. Brooks was the Chief Financial Officer for Champion Windows and Home Exteriors, a home improvement company, from 2013 to 2015.

### **Defendant Farmer**

26.     Defendant Farmer has served as Company director since June 2021 and as Chair of the Board since April 2024. He also previously served as the Board's Lead Director from August 2022 to April 2023. He also serves as Chair of the Compensation and Member of Governance Committee.

27.     For the 2023 Fiscal Year, Defendant Farmer received $7,884 in total compensation from the Company. This included $1 in salary and $7,883 in all other compensation.

28.     The Company's website states the following about Defendant Farmer:

<u>Colin Farmer</u>

Mr. Farmer (50) has served as a director of the company since June 2021. He served as the Board's Lead Director from August 2022 to April 2024 and has served as the Board's Chair since April 2024.

Mr. Farmer has served as Senior Managing Director and Head of the Management Committee of Certares Management, an investment services firm, since 2014, and also serves on its Investment Committees. Mr. Farmer also serves on the boards of several private companies, including Internova Travel Group, AmaWaterways, Guardian Alarm, Mystic Invest, Avoya Travel and Certares Holdings. Prior to joining Certares, Mr. Farmer was Managing Director of One Equity Partners and, prior to that, a Principal at Harvest Partners. Mr. Farmer began his career as an analyst at Robertson Stephens & Company.

We believe that Mr. Farmer is qualified to serve on our Board in light of his expertise in capital markets and financial matters, as well as his governance experience achieved through service on other company boards.

Mr. Farmer is Chair of Hertz [Global]'s Compensation Committee and a member of its Governance Committee.

### **Defendant Feikin**

29.     Defendant Feikin has served as a Company director since July 2021. Defendant Feikin also serves as a member of the Audit Committee and the Governance Committee. According to the 2024 Proxy Statement, as of March 25, 2024, Defendant Feikin beneficially owned 38,621 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2024, was $7.70, Defendant Feikin beneficially owned approximately $297,382 worth of Hertz Global stock as of that date.

30.     For the 2023 Fiscal Year, Defendant Feikin received $276,879 in total compensation from the Company. This included $100,00 in fees earned or paid in cash, $174,994 in stock awards, and $1,885 in all other compensation.

31.     The Company's 2024 Proxy Statement stated the following about Defendant Feikin:

<u>Jennifer Feikin</u>

Ms. Feikin (56) has served as a director of the company since July 2021.

Ms. Feikin was an independent business advisor, focusing on advising non-profits, start-up companies and large media companies, from 2007 until 2020. Prior to that, Ms. Feikin served as Director of Google Video at Google, Inc. (now Alphabet, Inc.), and previously held various roles at AOL Time Warner, 20th Century Fox and Fox Searchlight, Morgan Creek Productions and McKinsey & Company.

Ms. Feikin has been a mutual fund board member, serving on the boards of directors of American Funds Insurance Funds, American Funds Fund of Funds, and American Funds Fixed Income Funds since 2023 and Capital Group Exchange Traded Funds since their inception in 2021. Ms. Feikin also served on the board of directors of Capital Group Private Client Services Funds, Capital Group U.S. Equity Fund, American Funds International Vantage Fund, American Funds Global Insight Fund, and Emerging Markets Growth Fund from 2019 through 2022. Ms. Feikin currently serves on the Board of Trustees of The Nature Conservancy of Utah.

We believe that Ms. Feikin is qualified to serve on our Board because of her expertise in digital technology, innovation and consumer development, her experience in strategic development, and her corporate governance experience achieved through service as an independent mutual fund director.

Ms. Feikin is a member of Hertz Global's Audit Committee and Governance Committee.

**Defendant Fields**

32.     Defendant Fields has served as a Company director since June 2021, and Interim CEO from October 2021 to February 2022. According to the 2024 Proxy Statement, as of March 25, 2024, Defendant Fields beneficially owned 340,923 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2024 was $7.70, Defendant Fields beneficially owned approximately $2,625,107 worth of Hertz Global stock as of that date.

33.     For the 2023 Fiscal Year, Defendant Fields received $281,520 in total compensation from the Company. This included $100,000 in fees earned or paid in cash, $174,994 in stock awards, and $6,526 in all other compensation.

34.     The Company's 2024 Proxy Statement stated the following about Defendant Fields:

Mark Fields

Mr. Fields (63) has served as a director of the company since June 2021. He served as our Interim Chief Executive Officer from October 2021 to February 2022.

Mr. Fields is a Senior Advisor at TPG Capital LP, a private equity firm, a role he has held since 2017. He previously served as President and Chief Executive Officer of Ford Motor Company from 2014 to 2017. Mr. Fields joined Ford in 1989 and held various senior leadership roles throughout his tenure, including Chief Operating Officer, Executive Vice President & President of the Americas, Executive Vice President and Chief Executive Officer of the Premier Automotive Group and Ford Europe, Chairman and Chief Executive Officer of the Premier Automotive Group, and President and Chief Executive Officer of Mazda Motor Corporation, where he also served as a director.

Mr. Fields serves as a director of QUALCOMM, Incorporated, since 2018. Previously, Mr. Fields served as a director of TPG Pace

Beneficial II Corp. from 2021 to 2023, TPG Pace Solutions Corp. in 2021, Ford Motor Company from 2014 to 2017, and IBM Corp. from 2016 to 2018. In addition to his public company directorships, Mr. Fields serves as Lead Independent Director of Tanium, a privately held cybersecurity and systems management company, a board he joined in 2020, and has served on the boards of Planview and Boomi, both of which are privately held software companies, since 2022.

We believe that Mr. Fields is qualified to serve on our Board because of his expertise in the automotive industry on a global scale, his extensive experience as a senior executive at a large, multinational company, and his corporate governance experience achieved through service as an independent director on a variety of public company boards.

### **Defendant Intrieri**

35.    Defendant Intrieri has served as a Company director since June 2016. He also serves as Chair of the Audit Committee. According to the 2024 Proxy Statement, as of March 25, 2024, Defendant Intrieri beneficially owned 71,753 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2024, was $7.70, Defendant Intrieri beneficially owned approximately $552,498 worth of Hertz Global stock as of that date.

36.    For the 2023 Fiscal Year, Defendant Intrieri received $328,450 in total compensation from the Company. This included $150,000 in fees earned or paid in cash, $174,994 in stock awards, and $3,456 in all other compensation.

37.    The Company's 2024 Proxy Statement stated the following about Defendant Intrieri:

Vincent J. Intrieri

Mr. Intrieri (67) has served as a director of the company since June 2016.

Mr. Intrieri is Chief Executive Officer and founder of VDA Capital Management LLC, a private investment fund founded in 2017. Mr. Intrieri was previously employed by entities associated with Carl Icahn from 1998 to 2016 in various investment-related capacities, including most recently as Senior Managing Director of Icahn Capital LP from 2008 to 2016, and as Senior Managing Director of Icahn Offshore LP from 2004 to 2016. Prior to that, Mr. Intrieri was a partner at Arthur Andersen LLP.

Mr. Intrieri has served as a director of Transocean Ltd. since 2014. Mr. Intrieri also served as a director of Navistar International Corporation from 2012 to 2021. Mr. Intrieri served as a director of numerous other publicly traded companies prior to 2019, including Energen Corporation, Conduent Incorporated, Chesapeake Energy Corporation, CVR Refining, LP, Forest Laboratories, Inc., CVR Energy, Inc. and Federal-Mogul Corporation, among others.

We believe that Mr. Intrieri is qualified to serve on our Board because of his expertise in finance and accounting matters, as well as international operations, strategy and public company governance.

Mr. Intrieri is Chair of Hertz Global's Audit Committee.

**Defendant O'Hara**

38.     Defendant O'Hara has served as a Company director since January 19, 2024. He also previously served as a Company director from June 2021 to January 2023.

39.     For the 2023 Fiscal Year, Defendant O'Hara received $27,658 in total compensation from the Company. This included $1 in fees earned or paid in cash and $27,657 in all other compensation.

40.     The Company's 2024 Proxy Statement stated the following about Defendant O'Hara:

Michael Gregory O'Hara

Mr. O'Hara (58) has served as a director of the company since January 2024 after previously serving on the Board from June 2021 to January 2023. Mr. O'Hara was originally appointed to the Board in connection with the Emergence, resigned from the Board due to his professional obligations, and rejoined the Board to fill a vacancy created upon the resignation of another director in January 2024.

Mr. O'Hara is Founder and Senior Managing Director of Certares Management, a firm that invests in the travel, tourism and hospitality sectors founded in 2012, and also serves as a member of its Management Committee. Mr. O'Hara co-founded GO Acquisition Corp., a special purpose acquisition company, and served as its Co-Chief Executive Officer and a member of its board of directors from 2020 to 2022. Prior to forming Certares, Mr. O'Hara served as Chief Investment Officer of JPMorgan Chase's Special Investments Group and Managing Director of One Equity Partners, the private equity arm of JPMorgan. Before that, he served as an executive and a director at Worldspan Corporation, a privately held provider of travel technology and content.

Mr. O'Hara has served as a director of TripAdvisor, Inc. since March 2020 and served as its Vice Chairman from 2020 to 2023. He has also served as the Chairman of American Express Global Business Travel since 2014. In addition to his public company directorships, Mr. O'Hara has served as director of the World Travel & Tourism Council since 2019 and has been its Chair since 2023. He also serves on the board of Certares Holdings, where he is the Head of its Investment Committee and a member of its Management Committee. He is also a member of the Investment Committee and Management Committee of CK Opportunities Fund and Certares Real Estate Holdings.

We believe that Mr. O'Hara is qualified to serve on our Board because of his in-depth knowledge of the travel industry, his extensive background in investment analysis and management and his governance experience achieved through service with other companies.

**Defendant Shannahan**

41.     Defendant Shannahan has served as a Company director since June 2021. He also serves as Chair of the Governance Committee and as a member of the Compensation Committee.

42.     For the 2023 Fiscal Year, Defendant Shannahan received $273 in total compensation from the Company. This included $1 in fees earned or paid in cash and $272 in all other compensation.

43.     The Company's 2024 Proxy Statement stated the following about Defendant Shannahan:

<u>Andrew Shannahan</u>

Mr. Shannahan (43) has served as a director of the company since June 2021.

Mr. Shannahan is Head of Research and a Partner at Knighthead, an event-driven and deep value focused SEC registered investment advisor founded in 2008 that specializes in investing in companies that need financial and operational restructuring since 2008, and serves as a member of the Investment Committee of certain funds managed by Knighthead. Prior to joining Knighthead, Mr. Shannahan served as a research analyst at Litespeed Partners, an event-driven hedge fund. Mr. Shannahan has served as a director of ATI Physical Therapy, Inc. since 2023. In addition to this public company directorship, Mr. Shannahan also has served on the board of private companies Homer City Generating since 2019, Bowhunter Holdings, LLC since 2022, Knighthead Holdings Ltd. and its subsidiaries since 2023, and Birmingham City Football Club since 2023.

We believe that Mr. Shannahan is qualified to serve on our Board because of his expertise in complex investment opportunities, finance and capital markets matters, as well as his governance experience achieved through service on other company boards.

Mr. Shannahan is Chair of Hertz Global's Governance Committee and a member of its Compensation Committee.

**Defendant Wagner**

44.     Defendant Wagner has served as a Company director and Vice Chair of the Board since June 2021.

45.     For the 2023 Fiscal Year, Defendant Wagner received $3,690 in total compensation from the Company. This included $1 in fees earned or paid in cash and $3,689 in all other compensation.

46.     The Company's 2024 Proxy Statement stated the following about Defendant Wagner:

Thomas Wagner

Mr. Wagner (54) has served as a director of the company and Vice Chair of the Board since June 2021.

Mr. Wagner is co-founder and Managing Member of Knighthead. Prior to forming Knighthead in 2008, Mr. Wagner served as Managing Director at Goldman Sachs and held roles at Credit Suisse First Boston and Ernst & Young, LLP.

Mr. Wagner serves on the boards of several private entities, including Knighthead Annuity & Life Assurance Company since 2014, serving as its Co-Chairman since 2014, Trinity Cyber, Inc. ("Trinity Cyber") since 2016, serving as its Chairman since 2018 and Singer Vehicle Design since 2021. He also serves on the Board of Trustees of Villanova University, the National Advisory Board for Youth Inc. and the National Leadership Council for the Navy SEAL Foundation.

We believe that Mr. Wagner is qualified to serve on our Board because of his knowledge of business restructurings and his significant financial and strategic expertise.

**Defendant Vougessis**

47.     Defendant Vougessis has served as a Company director since September 2021. She also serves as a member of the Audit Committee and as a

member of the Governance Committee. According to the 2024 Proxy Statement, as of March 25, 2024, Defendant Vougessis beneficially owned 41,753 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2024, was $7.70, Defendant Vougessis beneficially owned approximately $321,498 worth of Hertz Global stock as of that date.

48.    For the 2023 Fiscal Year, Defendant Vougessis received $279,705 in total compensation from the Company. This included $100,000 in fees earned or paid in cash, $174,994 in stock awards and $4,711 in all other compensation.

49.    The Company's 2024 Proxy Statement stated the following about Defendant Vougessis:

> Ms. Vougessis (53) has served as a director of the company since September 2021.
>
> Ms. Vougessis is the co-founder and Chief Executive Officer of Moneikos Global Asset Management (Monaco) ("Moneikos"), an independent asset management company. She has held this role since April 2014. In addition to her role as co-founder and CEO of Moneikos, Ms. Vougessis is the co-founder of MaxInvest Holdings, a single-family office that invests in startups and early-stage companies. Prior to founding Moneikos, Ms. Vougessis served in various roles in the European and UK financial sectors. Among them, Ms. Vougessis served as Country Analyst for the Greek Equities Market at ABN AMRO UK and as Investor Relations & Strategy Director at Marfin Investment Group and subsequently at Marfin Popular Bank Group.
>
> We believe that Ms. Vougessis is qualified to serve on our Board because of her significant capital markets expertise, including within the European financial markets.

Ms. Vougessis is a member of Hertz Global's Audit Committee and Governance Committee.

### **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

50.    By reason of their positions as officers and/or directors of Hertz Global, and because of their ability to control the business and corporate affairs of Hertz Global, the Individual Defendants owed Hertz Global and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Hertz Global in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Hertz Global and its shareholders so as to benefit all shareholders equally.

51.    Each director and officer of the Company owes to Hertz Global and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

52.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Hertz Global, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

53.    To discharge their duties, the officers and directors of Hertz Global were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

54.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Hertz Global, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

55.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

56.     To discharge their duties, the officers and directors of Hertz Global were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Hertz Global were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Florida, Delaware, and the United States, and pursuant to Hertz Global's own Standard of Business Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Hertz Global conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Hertz Global and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Hertz Global's operations would comply with all applicable laws and Hertz Global's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

57.     Each of the Individual Defendants further owed to Hertz Global and the shareholders the duty of loyalty requiring that each favor Hertz Global's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

58.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Hertz Global and were at all times acting within the course and scope of such agency.

59.     Because of their advisory, executive, managerial, and directorial positions with Hertz Global, each of the Individual Defendants had access to adverse, non-public information about the Company.

60.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Hertz Global.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

61.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

62.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

63. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Hertz Global was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

64. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

65. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, and of Hertz Global, and was at all times acting within the course and scope of such agency.

## HERTZ GLOBAL'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### *Hertz Global's Code of Conduct*

66.    According to the Company's Code of Conduct "Our Standards of Business Conduct (also known as our "Code") serves as our guide, helping us understand common risks our Company faces and how we should respond to them."

67.    The Code of Conduct states that, "Our Code applies to all of us—employees, officers and directors. By following its principles, we are able to uphold the commitments we have made to our Company's stakeholders, including each other, our customers, our investors, our business partners and the communities where we do business."

68.    The Code of Conduct provides, under the heading "Our Code Applies Across the Globe" that:

> Hertz [Global]'s business spans the globe, as does our commitment to acting ethically and fairly. Regardless of where we do business, we must uphold our Code's principles, all Company policies and procedures and any laws and regulations that apply to our work. When local laws, regulations or practices are less restrictive than our Code, we must follow the guidance in our Code.

69.    The Code of Conduct provides, under the heading "Investigations and Discipline," that:

> As part of our commitment to acting honestly, ethically and fairly, Hertz [Global] is committed to investigating all reports of misconduct. When an investigation reveals that there has been a violation of our Code, the individuals involved will be subject to discipline, up to and including termination of employment. At Hertz [Global], we have zero tolerance for acts of misconduct, and anyone who violates our Code may also be subject to legal action, depending on the situation.

70.    The Code of Conduct further provides, in a section titled "Waivers," that, "Any waiver of our Code for any of our directors or executive officers may be made only by the Board of Directors and must be disclosed to our shareholders, along with the reasons for the waiver, when and as required by applicable law and regulations."

71.    The Company addresses "Dealing Fairly with Others," in the Code of Conduct in detail, stating, in relevant part:

> Being a good corporate citizen means that we deal fairly, ethically and honestly with our customers, competitors and business partners. We must represent our products and services accurately, and we never make dishonest statements about pricing, availability or any other aspect of our business. This means that our marketing and sales materials must be accurate and clear, and follow all related Company policy requirements. When we differentiate our products and services from our competitors', we must do so fairly, avoiding disparaging or untrue statements or misrepresentations.
>
> For those of us whose job responsibilities include gathering information about our competitors, we must take care to use only legal, honest means.

72.    The Code of Conduct provides, under the heading "Avoiding Conflicts of Interest," the following, in relevant part:

> Acting with integrity is central to our Company's values, which we are expected to uphold each day. We act with integrity when we first take into account the best interests of our Company. This includes avoiding situations that could lead to a conflict of interest, or even merely the appearance of one. A conflict of interest is a situation where our personal interests might interfere with our ability to make objective decisions on behalf of Hertz [Global]. Although it is impossible to describe every situation that could cause a conflict of interest, some of the most common types are discussed below.

73.     In a section titled "Protecting Company Assets," the Code of Conduct

provides the following, relevant part:

> Each day, we use a variety of Company assets to perform our job responsibilities and help Hertz [Global] remain an industry leader. These assets may vary depending on the work we do, but they generally include Company facilities, equipment, vehicles, supplies and funds. We must safeguard this property and use it only for the purposes for which it was provided. We have a responsibility to do our part to protect Company property from theft, damage, misuse or loss.

74.     The Company addresses how to appropriately handle "Company

Information" in the Code of Conduct in detail, stating, in relevant part:

> One of our Company's most prized assets is its information that is generally not available to the public. At Hertz [Global] this is known as Company Information and includes confidential and proprietary information, as well as Inventions, such as creations, inventions, ideas, designs, copyrightable materials, trademarks and other technology and rights (and any related improvements or modifications, whether or not subject to patent or copyright protection). This information sets us apart from our competitors, and it is key to our Company's success. As such, we are expected to exercise care when handling Company Information.

75.     In a section titled "Keeping Accurate Books and Records," the Code of

Conduct provides, in relevant part:

> No matter what job we do for Hertz [Global], we all create corporate records in connection with our work. These records include expense reports, time records and ledgers. Many times, information from these records is used to create our Company's financial disclosures. Because our Company and our investors rely on our records to make good financial decisions, we must always be certain that the records we create are complete, accurate and truthful.
>
> Those of us who work on Hertz [Global]'s financial disclosures hold special responsibilities. We must ensure that our Company's disclosures are full, fair, timely and understandable. When creating our Company's financial disclosures, we should always follow all

related policies and procedures, as well as all related generally accepted accounting principles.

### *Hertz Global's Corporate Governance Guidelines*

76.     The Company also maintains Corporate Governance Guidelines (the "Governance Guidelines"). Under the section titled "Overall Purpose and Responsibilities of the Board" the Governance Guidelines state the following, in relevant part:

> The overall purpose of the Board is to oversee the Company's efforts to create long-term value for its stockholders, as well as other stakeholders. As part of this purpose, the Board adheres to what it believes to be sound governance principles, as set forth in these Guidelines. In its oversight role, the Board maintains a sense of responsibility to the Company's stockholders, customers, employees, suppliers and the communities in which it operates. The Board acts as the ultimate decision-making body of the Company and advises and oversees management, who are responsible for the day-to-day operations and management of the Company.

> In order to create long-term value for stockholders and other stakeholders, the Board's core responsibilities include:

> - identifying, reviewing and, where appropriate, approving the financial and business strategies and major corporate actions of the Company and monitoring their implementation and results;
> - regularly monitoring the effectiveness of management policies and decisions, including the execution of the Company's strategies;
> - identifying, selecting, evaluating and compensating the Chief Executive Officer (the "CEO") and reviewing management succession planning;
> - providing oversight as to major risks facing the Company and strategies for their management and mitigation;
> - overseeing corporate culture and management's efforts to align culture with the Company's purpose and values;
> - overseeing efforts to ensure that the Company's business is conducted with the highest standards of ethical conduct and in compliance with applicable laws and regulations;

- overseeing the Company's financial statements and financial reporting process and internal controls; and
- shaping effective corporate governance including nominating the Company's director candidates and appointing committee members and overseeing the Company's environmental, social and governance practices, policies and activities.

77.    Under the heading "Board Leadership" the Governance Guidelines

include the following, in relevant part:

> The Board believes it is important to periodically review its leadership structure and to modify it as needed from time to time.
>
> A. Chairperson of the Board and CEO The Board believes it is important to retain flexibility to allocate the responsibilities of the offices of the Chairperson of the Board and CEO in any way that is in the best interests of the Company at a given point in time.
>
> B. Lead Director Whenever the Chairperson of the Board is not an Independent Director, the Governance Committee shall provide its recommendation to the full Board as to which Independent Director should be elected to serve as the Lead Director. The Lead Director has the following responsibilities (in addition to any other responsibilities approved by the Board):
>
> - presiding at all meetings of the Board at which the Chairperson of the Board or any Vice Chairperson is not present, including the executive sessions of Independent Directors;
> - acting as a liaison between the Independent Directors and the Chairperson of the Board as he or she deems appropriate, including by providing the Chairperson with feedback from executive sessions of Independent Directors and with respect to meeting schedules, agendas and information to be provided to the Board; and
> - if requested by major shareholders, ensuring that he or she is available for consultation and direct communication.

78.    The Governance Guidelines outline the obligations of the Directors

under the heading "Duties of Directors." A sub-section under this heading includes

"Director Responsibilities", in which the Governance Guidelines state the following, in relevant part:

- As part of their duty to exercise their business judgment to act in a manner they reasonably believe to be in the best interest of the Company and its stockholders, directors are expected to be active and engaged in discharging this duty by:
  - o devoting sufficient time and effort to learn, and keep themselves informed about, the business and operations of the Company and the industries in which it operates;
  - o making every effort to attend meetings of the Board and the committees on which they serve and to spend the time needed to prepare for these meetings, including reviewing all materials that are provided in advance of the meetings;
  - o ensuring other existing and future commitments do not materially interfere with their service as a director; and
  - o meeting as frequently as necessary to discharge their

    responsibilities

79.    Under the heading "Standards of Business Conduct," the Governance Guidelines state the following:

Directors will comply with the Company's Standards of Business Conduct (the "Standards of Business Conduct"), which affirm the Company's high standards of business conduct and ethics. The Standards of Business Conduct are part of the Company's continuing effort to comply with all applicable laws, provide an effective program to prevent and detect violations of law, and conduct its business with fairness, honesty and integrity. In the unlikely event of a request for a waiver from compliance, any such request of waiver will be subject to approval by the Board (any director requesting a waiver will not be entitled to vote on such request) and such waiver will be promptly disclosed to stockholders as required by law.

80.    The Governance Guidelines outline the function and operations of the Company's committees under the heading "Board Committees." A sub-section

under this heading includes "Committee Structure and Charters", in which the

Governance Guidelines state the following:

> The Board currently has three standing committees: Audit Committee, Compensation Committee, and Governance Committee. The Board may establish additional committees as necessary or appropriate. Committee members and chairpersons will be appointed by the Board upon the recommendation of its Governance Committee. Each committee will have its own charter setting forth the purpose, membership requirements, responsibilities and procedures of the committee, which shall include an annual self-evaluation.

81.    Within the same section, under the sub-heading "Annual Board

Performance Evaluation, the Governance Guidelines speak on Company

accountability, stating,

> It is expected that the Board will conduct an annual self-evaluation to determine whether it and its committees are functioning effectively. It is expected that this process will also include annual self assessments by each Board committee, relying on a review process similar to that used by the Board, with performance criteria for each committee established on the basis of its charter.

82.    In violation of the Code of Conduct and the Governance Guidelines,

the Individual Defendants (as key officers and as members of the Company's

Board) conducted little, if any, oversight of the Company's engagement in the

Individual Defendants' scheme to issue materially false and misleading statements

to the public, and to facilitate and disguise the Individual Defendants' violations of

law, including breaches of fiduciary duty, gross mismanagement, abuse of control,

waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

Also, in violation of the Code of Conduct, the Individual Defendants failed to

comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## AUDIT COMMITTEE CHARTER

83.   The Hertz Global's Audit Committee Charter (the "Audit Committee Charter") defines the oversight responsibilities of the Company's Audit Committee.

84.   Per the Audit Committee Charter, the purpose of the Audit Committee is generally to "assist the Board in fulfilling certain of the Board's oversight responsibilities."

85.   Specifically, "the primary purpose of the Committee is to assist the Board in overseeing" the following:

- the accounting, financial, and external reporting policies and practices of the Company and the audit of the Company's financial statements;
- the integrity of the Company's financial statements;
- the effectiveness of the Company's systems of internal controls;
- the independence, qualifications and performance of the Company's independent auditor
- the authority, scope, access and performance of the Company's internal audit function
- the Company's compliance with legal and regulatory requirements;
- treasury and finance matters; and
- enterprise-wide risk management, including cybersecurity risks.

In discharging its duties under this Charter, the Committee shall have the authority, in its sole discretion, to select, retain, terminate and obtain the advice of any independent legal, accounting, or other advisors as it deems necessary or appropriate to fulfill its duties and responsibilities. The Committee shall approve the terms of any engagement, including compensation, and oversee the work, of any such independent legal, accounting, or other advisors. The Company shall provide appropriate funding, as determined by the Committee, for payment of (i) compensation to the independent accountants for

the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company and to any advisors employed by the Committee; and (ii) ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties. Any accounting, legal or other consultant retained by the Committee may, but need not, be, in the case of an outside accountant, the same accounting firm employed by the Company for the purpose of rendering or issuing an audit report on the Company's annual financial statements or, in the case of an outside legal or other advisors, otherwise engaged by the Company for any other purpose.

86.   The   Audit   Committee   Charter   lists,   under   the   heading "Responsibilities" the following, in relevant part:

**1. <u>Oversight of Financial Reporting, Disclosure and Internal Controls</u>**

- Discuss generally the Company's earnings reports, as well as any written financial information and earnings guidance provided to analysts and ratings agencies. The Committee need not discuss in advance each earnings release or each instance in which the Company may provide earnings guidance.

- Review and discuss with management and the independent auditor the quarterly, unaudited financial statements, including disclosures made in management's discussion and analysis of financial condition and results of operations, major underlying issues and the results of the independent auditor's review prior to filing each quarterly report on Form 10-Q.

- Review and discuss with management and the independent auditor the annual audited financial statements, including disclosures made in management's discussion and analysis of financial condition and results of operations, and major underlying issues prior to filing each annual report on Form 10-K.

- Review and discuss with the Chief Executive Officer (the "CEO") and the Chief Financial Officer (the "CFO") the procedures undertaken in connection with the CEO and CFO certifications in periodic reports, including their evaluation of the Company's disclosure controls and procedures and internal controls.

- Prepare the report required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual Proxy Statement.

*         *         *

- Review and discuss quarterly reports from the independent auditor on all critical accounting policies and practices to be used; all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

- Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies.

## 2. **Oversight of Independent Auditor**

- Review the conduct and results of the audit of the consolidated financial statements and solicit concerns from the independent auditor, including any audit problems, difficulties encountered in the course of audit work, including any restrictions on the scope of activities or access to requested information, disagreements with management and management's response and communications between the audit team and the audit firm's national office with respect to difficult auditing or accounting issues presented by the engagement.

*         *         *

- Obtain and review a report from the independent auditor at least annually detailing: (i) the independent auditor's internal quality-control procedures; (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the independent auditor, or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; and

35

(iii) all relationships between the independent auditor and the Company.

### 3. Oversight of Internal Audit

- Review, in consultation with the CAE, the annual internal audit scope and risk-based plan, performance related to the plan and any changes required during the year.

- At least quarterly, review internal audit results, including any difficulties encountered in the course of internal audit activities, and management's responses thereto.

### 4. Oversight of Compliance, Legal and Regulatory Matters

- Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or audit matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters. This includes overseeing management's arrangements for the prevention and deterrence of fraud.

- Conduct any investigation that the Committee deems appropriate, with full access to all of the Company's records, facilities, personnel and outside advisors. This includes ensuring that appropriate action is taken against known perpetrators of fraud or related misconduct.

### 5. Oversight of Treasury and Finance Matters

- Review, as appropriate, the Company's and its subsidiaries' capital markets and financing plans consistent with the prior approvals of the Board, including with respect to the Company's debt, equity or other financing arrangements (including re-financings);

- Review, as appropriate, the material terms and conditions of the Company's long-term debt financings and its subsidiaries' long-term debt and equity issuances consistent with the prior approvals of the Board, including with respect to bank loans, letter of credit facilities, securitization facilities (including medium term note issuances and variable funding note issuances), collateral security or pledge agreements, promissory notes, commercial paper, and guarantees;

### 6. <u>**Oversight of Risk**</u>

- Oversee, review and discuss with management, including the CAE, the Company's enterprise-wide risk management process including management's implementation and maintenance of an appropriate risk governance structure, risk assessment and risk management practices and guidelines.

- Oversee, review and discuss with management, including the senior technology officer, the quality, effectiveness and matters related to the Company's security of information technology systems, capabilities for disaster recovery, data protection, cyber threat detection and cyber incident response, and management of technology-related compliance risks.

- Provide oversight on significant risk exposures and control issues, including fraud risks, governance issues, and other matters needed or requested by senior management and the Board. This includes considering the effectiveness of the Company's control framework, including information technology security and control.

- Provide oversight of the adequacy of the combined assurance being provided.

- Oversee, review and provide advice on the risk management processes established and maintained by management and the procedures in place to ensure that they are operating

87.   In violation of the Audit Committee Charter, the Individual Defendants (as key officers, and members of the Company's Board) conducted little, if any oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations Section 14(a) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants

failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

88.     Hertz Global is a Delaware corporation based in Estero, Florida which provides ICE and EV rental services from Company-operated, licensee, and franchisee locations. The "Americas RAC" and "International RAC" are the two business segments under which Hertz Global operates, with Americas RAC covering operations in the U.S., Canada, Latin America and the Caribbean and International RAC covering operations in other international locales. Hertz Global is one of the largest international vehicle rental companies and has garnered significant global recognition over time.

89.     The Company's two business segments both engage primarily in vehicle rentals, as well as sales of vehicles and value-added services. Additional operations of the Company include corporate operations regarding performance assessment and resource allocations based upon the financial information provided for Hertz Global's operating segments.

90.     Hertz Global's two business segments are primarily operated through the Company's three largest brands – Hertz, Dollar, and Thrifty. Hertz provides several options of brands for customers to choose from, so customers have a full

range of rental services at different price points, levels of service, offerings, and products. The Company recognizes Hertz as its top-tier brand, claiming it offers premium customer service and multiple innovative offerings. The Company recognizes Dollar as its smart value brand, marketed as a smart choice for fiscally conscious travelers looking for a dependable and affordable rental vehicle. Additionally, the Company recognizes Thrifty as its deep value brand, considering it the most cost-effective offering for travelers.

91.     As the Company boasts a vast fleet of vehicles numbering in the hundreds of thousands, identifying, monitoring, and tracking the deprecation of each vehicle is critical to the Company's business. For this reason, one of Hertz Global's main financial performance indicators is "Depreciation Per Unit Per Month."

92.     In October 2021, Hertz disclosed that the Company made a substantial investment to "offer the largest EV rental fleet in North America and one of the largest in the world [,]" and soon after established several strategic partnerships with cities and others. Both efforts were purportedly made by the Company to meet "skyrocket[ing]" demand for EVs, according to the Individual Defendants.

## FALSE AND MISLEADING STATEMENTS

### *April 27, 2023 Q123 Press Release*

93.     On April 27, 2023, the Company announced its financial results for the first quarter of the 2023 Fiscal Year ("Q123 Press Release"). In the Q123 Press

Release, Defendant Scherr touted the first quarter's strong results, stating they were "reflecting continued growth in demand across all customer segments and sustained pricing both in the U.S. and abroad." Defendant Scherr further represented that the Company's investments were profitable, stating "[o]ur continued investments in the business, particularly in the areas of technology and electrification, are improving our operational cadence, extending our reach in rideshare, and enabling the revitalization of our value brands, all with a view toward delivering sustainable returns for our shareholders."

94.    Additionally, the Q123 Press Release emphasized the demand for the Company's rental services. However, the Q123 Press Release failed to disclose the negative effects that vehicle depreciation had on the Company's financial results, stating, in pertinent part:

> First quarter revenue was $2.0 billion, up 13% year over year, characterized by continued strength in leisure and corporate demand. Transaction days increased 10% year over year while average fleet was up 5%. Monthly revenue per unit in the quarter of $1,409, was up 7% year over year and benefited from a 280-basis point improvement in utilization and pricing strength.

> Adjusted Corporate EBITDA was $237 million in the quarter. Fleet depreciation was $381 million, or $252 per unit per month. Fleet depreciation in the first quarter of 2022 reflected outsized gains on sale of vehicles. Adjusted Corporate EBITDA in the quarter included $88 million of gains from the monetization of interest rate caps associated with the Company's HVFIII U.S. ABS facility.

### *April 27, 2023 Q123 Form 10-Q*

95.    On April 27, 2023, the Company filed with the SEC its Form 10-Q for the period ended March 31, 2023 ("Q123 Form 10-Q"). The Q123 Form 10-Q was

signed by Defendant Brooks and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Brooks and Scherr attesting to the accuracy of the 1Q23 Form 10-Q.

96.    The Q123 Form 10-Q reassured the investing public that the Company actively modified the number of vehicles in its fleet to reflect variations in demand, stating, in pertinent part:

> Our vehicle rental operations are a seasonal business, with decreased levels of business in the winter months and heightened activity during the spring and summer months ("our peak season") for the majority of countries where we generate our revenues. To accommodate increased demand, we increase our available fleet and staff. As demand declines, fleet and staff are decreased accordingly.

97.    The Q123 Form 10-Q discussed the effects of vehicle depreciation on the Company's holistic financial results for the first quarter of the 2023 Fiscal Year, stating, in pertinent part:

> Depreciation of revenue earning vehicles and lease charges, net increased $440 million in the first quarter of 2023 compared to 2022 of which $443 million can be attributed to our Americas RAC segment and is due primarily to lower per unit gains recognized on vehicle dispositions and higher vehicle acquisition costs, partially offset by the impact of an extension of the estimated holding period on various portions of our fleet in the first quarter of 2023. This resulted in lower gross depreciation of revenue earning vehicles and lease charges, net over the estimated holding period[.]

98.    The Q123 Form 10-Q specifically discussed the effects of vehicle depreciation on the Company's Americas RAC business segment for the first quarter of the 2023 Fiscal Year, stating, in pertinent part:

Depreciation of revenue earning vehicles and lease charges, net for Americas RAC increased $443 million in the first quarter of 2023 compared to 2022. Depreciation Per Unit Per Month increased to $282 in the first quarter of 2023 compared to a negative expense of $78 in the first quarter of 2022 due primarily to lower per unit gains recognized on vehicle dispositions and higher vehicle acquisition costs, partially offset by the impact of an extension of the estimated holding period on various portions of our fleet in the first quarter of 2023. This resulted in lower gross depreciation of revenue earning vehicles and lease charges, net over the estimated holding period . . . . Average Vehicles increased in the first quarter of 2023 compared to 2022 due to travel demand.

99.    The Q123 Form 10-Q specifically discussed the effects of vehicle depreciation on the Company's International RAC business segment for the first quarter of the 2023 Fiscal Year, stating, in pertinent part:

Depreciation of revenue earning vehicles and lease charges, net for International RAC in the first quarter of 2023 was comparable to 2022. Average Vehicles for International RAC increased in the first quarter of 2023 due to increased travel demand. Depreciation Per Unit Per Month for International RAC decreased to $115 for the first quarter of 2023 compared to $129 for the first quarter of 2022 due in part to continued strength in residual values and increased vehicle dispositions.

### *May 11, 2023 Press Release*

100.    On May 11, 2023, the Company issued a press release ("May 2023 Press Release"), publicizing the launch of its partnership with the City of Orlando. The partnership was formed to, *inter alia*, further develop EV rentals and EV charging infrastructure. Its alleged goal was to "accelerat[e] the adoption of [EVs] and expand [] the environmental and economic benefits of electrification across Orlando." The May 2023 Press Release expressly stated that, "[a]s part of the partnership, Hertz aims to add up to 6,000 rental EVs to its existing fleet in

Orlando, for availability to leisure and business customers as well as rideshare drivers."

### *July 27, 2023 Q223 Press Release*

101.   On July 27, 2023, the Company issued a press release ("Q223 Press Release") disclosing the Company's financial results for the second quarter of the 2023 Fiscal Year. The Q223 Press Release contained a quote from Defendant Scherr that highlighted the Company's "strong" second quarter results, and further represented that the results "reflect[ed] continued high demand for our services and elevated levels of fleet utilization," and that "[o]ur focus on asset returns continues to yield tangible results, enabling us to advance the growth of our rideshare business and . . . [inter alia] facilitate[e] ongoing investments in technology and electrification."

102.   The Q223 Press Release also indicated that demand for Hertz Global's rental services remained strong, while continuing to conceal the negative effects of vehicle depreciation on Hertz Global's financial results, stating, in pertinent part:

> Second quarter revenue of $2.4 billion was characterized by continued strength in demand. Volume increased 12% year over year while average fleet was up 9%. Monthly revenue per unit in the quarter of $1,516 benefited from utilization of 82%, an increase of 230 bps relative to Q2 2022. Fleet depreciation was $329 million, reflecting a year over year increase of $223 million attributable to a reduction in vehicle disposition gains which were at elevated levels in 2022.
>
> Adjusted Corporate EBITDA was $347 million in the quarter, reflecting a healthy 14% margin.

Adjusted free cash outflow of $423 million in the quarter reflected an investment in fleet to meet spring and summer demand.

### *July 27, 2023 Q223 Form 10-Q*

103.   On July 27, 2023, the Company filed with the SEC its Form 10-Q for the quarterly period ended June 30, 2023 (the "Q223 Form 10-Q"). The Q223 Form 10-Q was signed by Defendant Brooks and contained attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Scherr and Brooks attesting to the accuracy of the Q223 Form 10-Q.

104.   The Q223 Form 10-Q included identical statements from the Q123 Form 10-Q, reassuring investors that the Company aggressively altered its vehicle fleet size in accordance with fluctuations in demand. Concerning the vehicle's depreciation impact on the Company's overall financial performance for the quarter, the Q223 Form 10-Q detailed, in relevant part:

> Depreciation of revenue earning vehicles and lease charges, net increased $223 million in the second quarter of 2023 compared to 2022 of which $211 million is attributed to our Americas RAC segment due primarily to lower per unit gains recognized on vehicle dispositions. Depreciation of revenue earning vehicles and lease charges, net for our International RAC segment increased $12 million due primarily to higher vehicle acquisition costs and fleet levels, partially offset by a higher volume of vehicle dispositions.

105.   Concerning the vehicle's depreciation impact on the Company's Americas RAC results for the quarter, the Q223 Form 10-Q detailed, in relevant part:

> Depreciation of revenue earning vehicles and lease charges, net for Americas RAC increased $211 million in the second quarter of 2023 compared to 2022 due primarily to lower per unit gains recognized on vehicle dispositions. Average Vehicles increased in the second quarter of 2023 compared to 2022 due to travel demand.

106.   Concerning the vehicle's depreciation impact on the Company's International RAC results for the quarter, the Q223 Form 10-Q detailed, in relevant part:

> Depreciation of revenue earning vehicles and lease charges, net for International RAC in the second quarter of 2023 increased $12 million compared to 2022 due primarily to higher vehicle acquisition costs and fleet levels, partially offset by a higher volume of vehicle dispositions. Average Vehicles for International RAC increased in the second quarter of 2023 due to increased travel demand.

### *September 20, 2023 Press Release*

107.   On September 20, 2023, the Company issued a press release declaring that "New York City Mayor Eric Adams launched 'Hertz Electrifies New York City,' a public-private partnership aimed at increasing [EV] adoption and extending the environmental and economic benefits of electrification across neighborhoods ("September 20th Press Release")." In relevant part, the September 20th Press Release stated "[t]hrough the initiative, Hertz intends to add up to 1,700 rental EVs to its local fleet"; and that, "[t]o date, more than 50,000 rideshare drivers across the country have rented EVs from Hertz, logging more than 260 million electric miles."

### *October 26, 2023 Press Release*

108.    On October 26, 2023, the Company issued a press release stating its third quarter 2023 financial outcomes ("Q323 Press Release"). Defendant Scherr indicated in the press release that ""Hertz produced record revenue in the quarter, reflecting ongoing strength in demand and stability in pricing"; that "we saw further growth in our rideshare business and progress in reinvigorating our value brands"; and that "[w]e nonetheless remain focused on the cost side to improve margins[.]"

109.    The Q323 Press Release emphasized the demand for the Company's rental services, while concurrently minimizing the adverse impact of vehicle deprecation on the Company's financial outcomes, indicating, in relevant part:

> Third quarter revenue of $2.7 billion was a quarterly record for the Company and was characterized by continued strength in demand, particularly in leisure and rideshare channels, coupled with pricing that was well above pre-pandemic levels. Volume increased 16% year over year while average fleet was up 11%, reflecting continued fleet management optimization. Monthly revenue per unit in the quarter of $1,596 benefited from utilization of 83%, an increase of 320 basis points relative to the prior year quarter. Monthly fleet depreciation per unit was $282, reflecting a year over year increase of 52%, attributable to a reduction in net vehicle disposition gains which were at elevated levels in 2022.

### *October 26, 2023 Q323 Form 10-Q*

110.    On October 26, 2023, the Company filed with the SEC its Form 10-Q for the quarterly period ended September 30, 2023 (the "Q323 Form 10-Q"). The Q323 Form 10-Q was signed by Defendant Brooks and contained attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act

and SOX signed by Defendants Scherr and Brooks attesting to the accuracy of the Q323 Form 10-Q.

111.   The Q323 Form 10-Q included identical statements from the Q123 Form 10-Q, reassuring investors that the Company aggressively altered its vehicle fleet size in accordance with fluctuations in demand.

112.   Concerning the vehicle's depreciation's impact on the Company's financial performance for the quarter, the Q323 Form 10-Q detailed, in relevant part:

> Depreciation of revenue earning vehicles and lease charges, net increased $207 million in the third quarter of 2023 compared to 2022 of which $162 million is attributed to our Americas RAC segment due primarily to lower per unit gains recognized on vehicle dispositions and an increase in Average Vehicles, partially offset by longer vehicle holding periods resulting in lower depreciation rates. Depreciation of revenue earning vehicles and lease charges, net for our International RAC segment increased $45 million due primarily to an increase in Average Vehicles, lower per unit gains recognized on vehicle dispositions and increased vehicle acquisition costs.

113.   Concerning the vehicle's depreciation's impact on the Company's Americas RAC results for the quarter, the Q323 Form 10-Q detailed, in relevant part:

> Depreciation of revenue earning vehicles and lease charges, net for Americas RAC increased $162 million in the third quarter of 2023 compared to 2022 due primarily to lower per unit gains recognized on vehicle dispositions and an increase in Average Vehicles, partially offset by longer vehicle holding periods resulting in lower depreciation rates. Average Vehicles increased in the third quarter of 2023 compared to 2022 due to sustained travel demand.

114.    Concerning the vehicle's depreciation's impact on the Company's International RAC results for the quarter, the Q323 Form 10-Q detailed, in relevant part:

> Depreciation of revenue earning vehicles and lease charges, net for International RAC in the third quarter of 2023 increased $45 million compared to 2022 due primarily to an increase in Average Vehicles, lower per unit gains recognized on vehicle dispositions and increased vehicle acquisition costs. Depreciation of revenue earning vehicles and lease charges, net were also impacted by a favorable $6 million fx [foreign exchange] impact in the third quarter of 2023. Average Vehicles for International RAC increased in the third quarter of 2023 due to sustained travel demand.

115.    The statements referenced in ¶¶ 93-114 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the true negative financial impact of vehicle depreciation on the Company and the Company's inability to accurately assess vehicle depreciation; (2) the Individual Defendants materially overstated the market demand for EVs; (3) as a result, the Company's fleet of vehicles featured too many EVs to be profitable; (4) as a further result, the Company would suffer large losses from the sale of both ICE vehicles and EVs which would materially and negatively affect the Company's overall financial results; and (5) the Company failed to maintain internal controls.

## **The Truth Begins to Emerge as False and Misleading Statements Continue**

### ***January 11, 2024 Press Release***

116.   On January 11, 2024, before the market opened, the Company filed a current report on Form 8-K with the SEC, disclosing it would sell approximately one third of its global EV fleet or approximately 20,000 EVs ("January 11th 8-K"). Specifically, the January 11th 8-K stated the reasoning as "to better balance supply against expected demand of EVs[,]" stating, in relevant part:

> Hertz . . . has made the strategic decision to sell approximately 20,000 [EVs] from its U.S. fleet, or about one-third of the global EV fleet. These vehicle dispositions, which were initiated in December 2023 and are expected to take place in an orderly fashion over the course of 2024, will cover multiple makes and models. EVs held for sale will remain eligible for rental within the Company's fleet during the sales process. The Company expects to reinvest a portion of the proceeds from the sale of EVs into the purchase of [ICE] vehicles to meet customer demand.
>
> The Company's decision to reduce its EV fleet will result in the recognition, during the fourth quarter of 2023, of approximately $245 million of incremental net depreciation expense related to the sale. This non-cash charge represents the write down of the EVs' carrying values as of December 31, 2023 to their fair values, less related expenses associated with the disposition of the vehicles. This charge is in addition to the depreciation expense that the Company will report for the fourth quarter in the ordinary course with respect to the remainder of its fleet. Future depreciation expense on the specific vehicles held for sale is expected to be limited to impacts from changes in the vehicles' condition and general market factors. Any gain or loss associated with the ultimate disposition of any specific EV will be recognized in the period of sale.
>
> * * *
>
> The Company expects this action to better balance supply against expected demand of EVs.
>
> * * *
>
> Adjusted Corporate EBITDA for the fourth quarter of 2023 will be negatively impacted by the incremental net depreciation expense

associated with the EV sales plan, and further burdened by higher depreciation expense in the ordinary course as residual values for vehicles generally fell throughout the quarter greater than previously expected . . . . The Company expects to report a negative Adjusted Corporate EBITDA (excluding the impact of the non-cash charge related to the EV sales plan) for the fourth quarter in the range of ($120 million) to ($130 million).

117.    The January 11th 8-K emphasized the predicted benefits of the Company's EV disposition strategy, while minimizing the adverse impacts of the Company's remaining EV fleet on its financial and business outcomes, stating, in relevant part:

This [EV disposition strategy] will position the Company to eliminate a disproportionate number of lower margin rentals and reduce damage expense associated with EVs. The Company will continue to execute its strategy around EV mobility and offer customers a wide selection of vehicles. The Company continues to implement a series of initiatives that it anticipates will continue to improve the profitability of the remaining EV fleet. These initiatives include the expansion of EV charging infrastructure, growing relationships with EV manufacturers, particularly related to more affordable access to parts and labor, and continued implementation of policies and educational tools to help enhance the EV experience for customers. Going forward, the Company will continue to actively manage the total size of its EV fleet, as well as the allocation of EVs among customer segments, including leisure, corporate, government and rideshare.

It is expected that the planned reduction in the EV fleet and reinvestment in additional ICE vehicles will improve Adjusted Corporate EBITDA across 2024, as vehicles are rotated, and in 2025, by which time all of the vehicles included in this plan are expected to be sold. By year end 2025, it is expected that the aggregate two-year benefit to Adjusted Corporate EBITDA related to the sale will approximate the incremental net depreciation expense to be recognized in the fourth quarter of 2023. It is expected that this benefit to the Company's financial results will be derived from higher revenue per day and lower depreciation and operating expenses related to its remaining fleet. The Company further anticipates that incremental free cash flow generation related to this action will

approximate $250 million to $300 million in the aggregate over 2024 and 2025.

118.    On this news, Hertz Global's stock price dropped 4.28%, or $0.40 per share, to close at $8.95 per share on January 11, 2024.

### February 6, 2024 Press Release

119.    On February 6, 2024, the Company issued a press release stating its fourth quarter and 2023 Fiscal Year full year financial outcomes. Defendant Scherr was cited in the press release as asserting that "[o]ur business benefitted from solid demand and a stable rate environment in the fourth quarter," while promising investors that, though "we continued to face headwinds related to our [EV] fleet and other costs throughout the quarter[,]" "[w]e have taken steps to address those challenges and heading into 2024, we are confident that our planned reduction in EVs and cost base, along with the ongoing execution of our enhanced profitability plan, will enable us to regain our operational cadence and improve our financial performance with increasing effect into 2025."

120.    The press release also emphasized the demand for the Company's rental services, while concurrently minimizing the adverse impact of vehicle depreciation on the Company's financial results, stating in relevant part:

> Fourth quarter 2023 revenue was $2.2 billion, up 7% from the fourth quarter of 2022 driven by increased volume across leisure, corporate and rideshare customer channels. Strong fourth quarter 2023 RPD [revenue per transaction day] of $58.09 reflected continued price discipline and a moderating trend relative to prior quarterly comparisons. The Company prioritized rate over utilization, purposely forgoing lower margin business.

Depreciation per unit per month of $498 reflected the impact of the write down of EVs held for sale to their fair value and a decline in residual values, as well as a modestly higher than expected fleet.

Adjusted Corporate EBITDA was negative $382 million in the quarter, a negative 17% margin, which includes $245 million of incremental net depreciation expense related to the EVs held for sale.

### *February 12, 2024 Form 10-K*

121.    On February 12, 2024, the Company filed its annual report with the SEC for the fourth quarter of the 2023 Fiscal Year and the full 2023 Fiscal Year  on Form 10-K (the "2023 10-K"). The 2023 10-K was signed by Defendants Scherr, Brooks, Bermanzohn, Farmer, Feikin, Fields, Intrieri, O'Hara, Shannahan, Vougessis, and Wagner and contained SOX certifications signed by Defendant Scherr and Defendant Brooks attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

122.    The 2023 10-K stated how the Company attained certain fleet vehicles via purchase programs with automobile manufacturers to help control vehicle depreciation and associated risks to the Company, asserting, in relevant part:

> Program vehicles are purchased under repurchase or guaranteed depreciation programs with vehicle manufacturers wherein the manufacturers agree to repurchase vehicles at a specified price or guarantee the depreciation rate on the vehicles during established repurchase periods, subject to, among other things, certain vehicle condition, mileage and holding period requirements. Repurchase prices under repurchase programs are based on the original cost less a set daily depreciation amount. These repurchase and guaranteed depreciation programs limit our residual risk with respect to vehicles

purchased under the programs and allow us to reduce the variability of depreciation expense for each vehicle . . . . Program vehicles generally provide us with flexibility to increase or reduce the size of our fleet based on market demand. When we increase the percentage of program vehicles, the average age of our fleet decreases since the average holding period for program vehicles is shorter than for nonprogram vehicles.

123.   Additionally, the 2023 10-K reassured investors the Company consistently monitored the depreciation rates for its vehicles, stating, in relevant part:

> We . . . estimate the residual value of the applicable revenue earning vehicles at the expected time of disposal, considering factors such as make, model and options, age, physical condition, mileage, sale location, time of the year, channel disposition (e.g., auction, retail, dealer direct), historical sales experience for similar vehicles, third-party expectations of resale value and market conditions. The vehicle is depreciated using a rate based on these estimates. Depreciation rates are reviewed on a quarterly basis based on management's ongoing assessment of present and estimated future market conditions, their effect on residual values at the expected time of disposal and any changes to the estimated holding period of the vehicle.

124.   The 2023 10-K forewarned of general and hypothetical risks that "could" or "can" arise with respect to declining residual values for certain Company vehicles, while minimizing these risks by concurrently pushing the programs the Company had in place to control specific vehicle depreciation rates, maintaining, in relevant part:

> ***The mix of program and non-program vehicles in our fleet, as well as declining values of our non-program vehicles, can subject us to an increased residual value risk.***
>
> We use program and non-program vehicles in our fleet. With program vehicles, vehicle manufacturers agree to repurchase the vehicles at a

specified price or guarantee the depreciation rate on the vehicles during a specified time period. Using program vehicles in our fleet can often alleviate our residual value risk because of the terms of our agreements with the vehicle manufacturer for repurchases and guaranteed depreciation on those vehicles. Additionally, program vehicles provide flexibility because we may be able to sell certain program vehicles shortly after having acquired them at a higher value than what we could for a similar non-program vehicle at that time, which is useful in managing demand for vehicles. These benefits diminish when there are fewer program vehicles in our fleet, which has generally been the case in recent years.

The significant majority of vehicles in our fleet are non-program vehicles. Overall, the percentage of non-program fleet that we hold exposes us to residual value risk. Decreases in residual values of our non-program vehicles, or the failure of residual values to follow historical patterns, could result in a substantial loss on the sale of such vehicles, or accelerated depreciation while we own the vehicles. Each of these outcomes can materially adversely affect our results of operations, financial condition, liquidity and cash flows.

125.    Frankly, the former risk warnings were a generic catch-all provision that was not adapted the Company's actual known risks concerning the financial impact of vehicle depreciation, let alone the unnecessary number of vehicles in the Company's fleet, both of which would require the Company to dispose of ICE vehicles and EVs at a material loss.

126.    Relatedly, the 2023 10-K warned about risks that "could" happen "if," *inter alia*, the Company experienced significant losses on vehicle sales and experienced raised vehicle depreciation rates, discussing, in relevant part:

> ***Forward estimates on vehicle residual values have recently declined, subjecting us to greater risk of losses on vehicle sales, increased depreciation or challenges in meeting collateral requirements in our fleet financing facilities.***

Recent data for used vehicles has shown a sudden downward trend in residual values. This data has also suggested that prices in the used vehicle market *could* decrease further in 2024. A further reduction in residual values for non-program vehicles in our fleet, or the failure of residual values to improve, *could* cause us to hold vehicles longer, sustain a substantial loss on the sale for such vehicles or require us to depreciate those vehicles at a more accelerated rate than currently anticipated while we own them.

* * *

*If* we sustain substantial losses on sale of vehicles[ or, *inter alia*,] depreciation is accelerated . . . it *could* have a material adverse effect on our results of operations, financial condition, liquidity and cash flows.

127.   Concerning the vehicle depreciations' effect on the Company's overall financial performance for the year, the 2023 10-K detailed, in relevant part:

Depreciation of revenue earning vehicles and lease charges, net increased $1.3 billion in 2023 compared to 2022, of which $1.2 billion is attributed to our Americas RAC segment. The increase in our Americas RAC segment was due to several factors, primarily (i) reduced per unit gains on vehicle dispositions, (ii) an increase in Average Vehicles and (iii) a lower volume of vehicle dispositions. The increase in Americas RAC was partially offset by longer vehicle holding periods. Additionally, depreciation of revenue earning vehicles and lease charges, net increased compared to 2022 due to the $245 million write-down of the carrying values of the EV Disposal Group resulting from its classification as held for sale in December 2023. Depreciation of revenue earning vehicles and lease charges, net in our International RAC segment increased $116 million in 2023 compared to 2022 due primarily to higher vehicle acquisition costs, an increase in Average Vehicles and reduced per unit gains on vehicle dispositions, partially offset by a higher volume of vehicle dispositions in 2023. Depreciation of revenue earning vehicles and lease charges, net in our Americas RAC segment is expected to be impacted in 2024 by several factors: (i) lower per unit depreciation that will be incurred on the EV Disposal Group, (ii) a larger average fleet compared to that held in 2023, (iii) the intended sale of older vehicles during 2024 and (iv) an uncertain residual environment.

128.    Concerning the vehicle's depreciation's impact on the Company's

Americas RAC results for the quarter, the 2023 10-K detailed, in relevant part:

> Depreciation of revenue earning vehicles and lease charges, net for
> Americas RAC increased $1.2 billion in 2023 compared to 2022 due
> primarily to (i) reduced per unit gains on vehicle dispositions, (ii) an
> increase in Average Vehicles and (iii) a lower volume of vehicle
> dispositions, partially offset by longer vehicle holding periods.
> Additionally, depreciation of revenue earning vehicles and lease
> charges, net increased due to the $245 million write-down of the
> carrying value of EV Disposal Group resulting from its classification
> as held for sale in December 2023. The increase in Average Vehicles
> was driven in part by decisions, primarily during the fourth quarter of
> 2023, to delay planned fleet sales in light of an unfavorable used
> vehicle market. We expect depreciation of revenue earning vehicles
> and lease charges, net in our Americas RAC segment to be impacted
> in 2024 by several factors: (i) lower per unit depreciation that will be
> incurred on the EV Disposal Group, (ii) a larger average fleet
> compared to that held in 2023, (iii) the intended sale of older vehicles
> during 2024 and (iv) an uncertain residual environment.

129.    Concerning, the vehicle's depreciation's impact on the Company's

International RAC results for the quarter, the 2023 10-K detailed, in relevant part:

> Depreciation of revenue earning vehicles and lease charges, net for
> International RAC increased $116 million in 2023 compared to 2022
> due primarily to higher vehicle acquisition costs, an increase in
> Average Vehicles and reduced per unit gains on vehicle dispositions,
> partially offset by a higher volume of vehicle dispositions in 2023.
> Depreciation of revenue earning vehicles and lease charges, net was
> also impacted by a favorable $10 million fx impact in 2023. Average
> Vehicles for International RAC increased in 2023 due in part to
> increased travel demand.

130.    The statements referenced in ¶¶ 119-124 and 126-129 above were

materially false and misleading and failed to disclose material facts necessary to

make the statements made not false and misleading. Specifically, the Individual

Defendants failed to disclose, *inter alia*, that: (1) the true negative financial impact

of vehicle depreciation on the Company and the Company's inability to accurately assess vehicle depreciation; (2) the Individual Defendants materially overstated the market demand for EVs; (3) as a result, the Company's fleet of vehicles featured too many EVs to be profitable; (4) as a further result, the Company would suffer large losses from the sale of both ICE vehicles and EVs which would materially and negatively affect the Company's overall financial results; and (5) the Company failed to maintain internal controls.

### The Truth Continues to Emerge as False and Misleading Statements Continue

#### *March 15, 2024 Press Release*

131.   On March 15, 2024, the Company revealed in a press release that Defendant Scherr would be resigning from his roles at CEO and Chairman of the Board by the end of the month. Additionally, the press release revealed Defendant Scherr's successor as CEO, West.

#### *April 9, 2024 Proxy Statement*

132.    On April 9, 2024, the Company filed the 2024 Proxy Statement. Defendants Brooks, Farmer, Feikin, Fields, Intrieri, O'Hara, Scherr, Shannahan, Vougessis, and Wagner solicited the 2024 Proxy Statement, which contained material misstatements and omissions.

133.    The 2024 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Farmer and Shannahan to the Board; (2) approve, on a non-binding advisory basis, certain executive compensation; (3) and

ratify the appointment of Ernst & Young LLP ("E&Y") as the Company's independent registered public accounting firm for the 2024 Fiscal Year.

134.   Regarding the Board's role in "Risk Oversight," the 2024 Proxy Statement stated the following:

> Our senior leadership is responsible for identifying, assessing, and managing our exposure to risk. The Board and its committees play an active role in overseeing management's activities and evaluating whether management's operating and financial plans are balanced from a risk/reward perspective. The Board and its committees perform this oversight through a variety of mechanisms. For example, at the full Board level, the Board receives a strategic plan presentation from management each year, and this presentation generally covers management's expectations for the upcoming three-year period. The Board also reviews management's proposed annual operating plan each year. By engaging with management on both strategic and annual planning, the Board can evaluate risk across multiple time-horizons, including long-term (e.g., risks and opportunities related to the future of mobility generally), medium term (e.g., risks and opportunities across the rolling three-year periods generally aligned with our strategic planning cycle), and shorter periods (e.g., risks and opportunities more relevant to our current year plans).
>
> Presentations from and discussions with management are the primary means by which the Board oversees risk. However, the Board also engages in discussions with outside advisors from time-to-time. The Board also relies on the work of its various committees, where more focused risk oversight can occur. Additional detail on the role of the Board's committees in risk oversight follows.

135.   Defendants Brooks, Farmer, Feikin, Fields, Intrieri, O'Hara, Scherr, Shannahan, Vougessis, and Wagner caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the true negative financial impact of vehicle depreciation on the Company and the Company's inability to accurately assess vehicle depreciation; (2) the Individual Defendants materially

overstated the market demand for EVs; (3) as a result, the Company's fleet of vehicles featured too many EVs to be profitable; (4) as a further result, the Company would suffer large losses from the sale of both ICE vehicles and EVs which would materially and negatively affect the Company's overall financial results; and (5) the Company failed to maintain internal controls.

136.   The 2024 Proxy Statement also was false and misleading because it failed to disclose that: (1) through the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

137.   As a result of Defendants Brooks, Farmer, Feikin, Fields, Intrieri, O'Hara, Scherr, Shannahan, Vougessis, and Wagner causing the 2024 Proxy Statement to be false and misleading, shareholders voted to, *inter alia*, reelect Defendants Brooks, Farmer, Feikin, Fields, Intrieri, O'Hara, Scherr, Shannahan, Vougessis, and Wagner to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, and to appoint E&Y as the Company's independent registered public accounting firm for the 2024 Fiscal Year.

## **The Truth Fully Emerges**

### *April 25, 2024 Press Release*

138.   On April 25, 2024, before the market opened, the Company disclosed its financial results for the first quarter of the 2024 Fiscal Year in (the "1Q24 Press Release"). In the 1Q24 Press Release, the Company revealed adjusted diluted EPS of -$1.28 for the quarter, which was significantly lower than the adjusted diluted EPS of $0.39 the Company had achieved in the same period last year and well short of the consensus estimate of -$0.43. When disclosing these results, the Company also divulged the sudden increase of $588 million, or $339 on a per-unit basis, in vehicle depreciation in the quarter:

> In the first quarter, the Company upsized its EV disposition plan by 10,000 vehicles, for a total of 30,000 EVs intended for sale in 2024. The Company incurred a $195 million charge to vehicle depreciation to write down the EVs held for sale which were remaining in inventory at quarter-end to fair value and recognize the disposition losses on EVs sold in the period.
>
> Vehicle depreciation in the first quarter of 2024 increased $588 million, or $339 on a per unit basis, primarily driven by deterioration in estimated forward residual values and disposition losses on ICE vehicles compared to gains in the prior year quarter. Additionally, of the $339 per unit increase, $119 was related to EVs held for sale.
>
> * * *
>
> Adjusted Corporate EBITDA was negative $567 million in the quarter driven mainly by a $588 million increase in vehicle depreciation compared to the first quarter of 2023, of which $195 million related to EVs held for sale. The Company commenced a broad fleet refresh during the quarter and has revenue and cost initiatives in place to enhance the Company's future profitability.

139.   The 1Q24 Press Release also revealed, through a quote from new CEO West, that admitted that the Company's EV fleet was too big to be profitable, stating the following, in relevant part:

Fleet and direct operating costs weighed on this quarter's performance . . . . We're tackling both issues - getting to the right supply of vehicles at an acceptable capital cost while at the same time driving productivity up and operating costs down . . . . We've put the right strategy in place, and I see a clear path for Hertz to generate sustainable and higher earnings for our shareholders.

### *April 25, 2024 Earnings Call*

140.   On that same day, before the market opened, the Company held an earnings call with investors and analysts to announce the first quarter of the 2024 Fiscal Year financial outcomes (the "1Q24 Earnings Call"). West, during this call, recognized that "[o]ur quarterly results were unacceptable and reflected the impact of a decline in forward residual values used to determine vehicle depreciation, coupled with our EV rationalization and elevated cost structure." Additionally, he emphasized that the Company needs to decrease its overall fleet to remain lucrative. Specifically, he stated in relevant part:

> [T]here are a number of key priorities I'm focused on. It starts with having the right fleet. So, balancing short-term decisions with long-term implications to drive a better return on assets. This includes making sure that we have the right supply and demand balance of our fleet, at the appropriate capital cost.
>
> Decisions around our fleet are based on return on assets and the discipline of fleeting inside the projected demand curve to ensure we achieve favorable revenue per day and revenue per unit performance along with better managing our residual value risk.

141.   On the 1Q24 Earnings Call, the Company's Chief Operating Officer, Justin Keppy ("Keppy"), repeated the need to decrease the Company's fleet size to remain lucrative. Specifically, he stated, in relevant part:

We depleted [our vehicle fleet size] throughout the quarter and, by March, our core rental fleet was tighter, up only 2% year-over-year. We plan to maintain tighter as we move into the summer season, which we expect to correlate with improved RPD performance, coupled with easier year-over-year compares.

Looking at the composition of our fleet, we are addressing the mix to lower the average cap cost and reduce the tail of higher mileage vehicles.

\*\*\*

Within our RAC fleet, we expect to reduce vehicles with higher mileage by 75% and complete the rotation out of preowned vehicles by early 2025. This fleet refresh is expected to result in lowered vehicle depreciation, lower direct operating expenses, and deliver an improved customer experience.

142.    Defendant Brooks on the 1Q24 Earnings Call declared, in relevant part:

We recorded an adjusted corporate EBITDA loss of $567 million, which is disappointing and unacceptable.

Although we continue to be impacted by elevated costs . . . the key driver of the loss is the increased vehicle depreciation, which has increased $588 million year-over-year.

For the first quarter, DPU [depreciation per unit] was $592, of which $119 was due to incremental vehicle depreciation expense related to the EVs held for sale. We recorded a charge of $195 million to recognize a fair value adjustment for EVs remaining in our inventory at quarter-end, and to recognize losses on those units sold. DPU, excluding the EV charge of $473, is elevated due to declining forward residual estimates.

\*\*\*

Overall, for the quarter, our adjusted corporate EBITDA reflected elevated vehicle depreciation, which was further burdened by the nonrecurring EV charges and an elevated cost structure that does not yet include the benefit of our various cost initiatives.

143.   On the 1Q24 Earnings Call, an analyst questioned the management of the Company for further clarification on what caused the vehicle depreciation recorded during the quarter, comprised of ICE vehicle depreciation versus EV depreciation, and the upsized EV disposition plan. Defendant Brooks responded by stating, among other things, that EV depreciation was more drastic than ICE vehicle depreciation, while repeating the Company had excess inventory of EVs in relation to demand for those rentals. Specifically, the analyst asked the following question:

> [C]an you guys just maybe briefly talk about what you're seeing of ICE versus EV performance, maybe from a depreciation perspective, direct OpEx [operating expenses], how are they kind of tracking with each other, are they not?
>
> And then as far as the divestiture of the implemented 10,000 vehicles, what kind of precipitated that? Is it a more liquid market than you had thought? Are you getting higher prices than expected? Maybe help us understand what's driving that. Thank you.

To which Defendant Brooks replied, in relevant part:

> Why don't I . . . kick off with the question on ICE versus EV residuals, and then what kind of tag-team here and kick it over to [Keppy]? So, we did see EV residuals declining at a more severe rate than ICE vehicles during the quarter. And I think you saw that in the adjustments we made to the EVs held for sale.
>
> So, we recognized a loss on the EVs that were disposed of during the quarter relative to what we marked them at the end of the year. And we also had to recognize a mark-to-market loss on the EVs that we were holding in inventory. The combination of those was about $81 million and is accounted for in depreciation expense for the quarter. So, that's the impact you see there.

And of course, we would have made appropriate adjustments to the EV fleet that is part of our regular fleet and that held for inventory as we look at forward residuals. With that, I'll turn it over to Justin to comment on the on the movement of the 10,000 vehicles.

144.   Keppy, in response to the analyst's question, was more direct regarding the necessity to right-size the Company's EV fleet, in relevant part:

[O]ur mantra has been our ROA [return on assets] mindset and keeping supply inside of demand. And we're moving forward with the further rightsizing, the incremental 10,000 -- bringing the total population of EVs that are being looked at to sell to 30,000.

* * *

And as we right-size this EV fleet, we expect a couple of things. One, it will be better aligned with demand, which we expect to improve both utilization as well as RPD as we align it with customers that are seeking out the EVs.

* * *

So, again, with the benefit from a reduction of fleet carrying costs, the lower operating costs also are with maintenance and transport, as you think about things with remote charging, we see a combination of benefits by further taking down an additional 10,000 that will rightsize demand with our supply.

145.   On this news, the price of Hertz Global's common stock fell $1.12 per share, or approximately 19.31%, from a closing price of $5.80 per share on April 24, 2024, to close at $4.68 per share on April 25, 2024.

## **SUBSEQUENT DEVELOPMENTS**

146.   The day after the 1Q24 Earnings Call and Press Release, on April 26, 2024, Bank of America demoted Hertz from a "Neutral" rating to "Underperform"

and slashed its price target on the Company's stock by a significant 67%, to $3.00, declaring:

> Our forecasts subsequently drop. Liquidity is also an increasing concern among investors, as HTZ has an older fleet that will need to be refreshed at a time when used vehicles are dropping and new vehicle prices are softening only modestly. The company has multiple levers to manage its liquidity, but we expect the company is likely to end up with more leverage

### **REPURCHASES DURING THE RELEVANT PERIOD**

147.   During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its Class B common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of ***over $190.89 million*** to repurchase approximately 13,642,512 shares of its own common stock at artificially inflated prices from April 2023 through December 2023.

148.   According to the Form 10-Q the Company filed with the SEC on July 27, 2023 ("the 2Q 2023 10-Q"), between April 1, 2023, and April 30, 2023, the Company purchased 3,940,251 shares of its common stock for approximately $61,389,110.58 at an average price of $15.58 per share.[2]

149.   As the Company's stock was actually only worth $4.68 per share, the price of closing on April 25, 2024, the Company overpaid by approximately $42,948,735.90 for repurchases of its own stock between April 1, 2023, and April 30, 2024.

---

[2] Upon information and belief, these shares were repurchased during the Relevant Period.

150.    According to the 2Q 2023 10-Q, between May 1, 2023, and May 31, 2023, the Company purchased 1,330,688 shares of its common stock for approximately $21,291,008 at an average price of $16.00 per share.

151.    As the Company's stock was actually only worth $4.68 per share, the price of closing April 25, 2024, the Company overpaid by approximately $15,063,388.16 for repurchases of its own stock between May 1, 2023, and May 31, 2023.

152.    According to the 2Q 2023 10-Q, between June 1, 2023, and June 30, 2023, the Company purchased 995,668 shares of its common stock for approximately $17,334,579.88 at an average price of $17.41 per share.

153.    As the Company's stock was actually worth $4.68 per share, the price of closing April 25, 2024, the Company overpaid by approximately $12,674,853.64 for repurchases of its own stock between June 1, 2023, and June 30, 2023.

154.    According to the Form 10-Q the Company filed with the SEC on October 26, 2023 ("the 3Q 2023 10-Q"), between July 1, 2023, and July 31, 2023, the Company purchased 873,550 shares of its common stock for approximately $15,872,403.50 at an average price of $18.71 per share.

155.    As the Company's stock was actually worth $4.68 per share, the price of closing April 25, 2024, the Company overpaid by approximately $11,784,189.50 for repurchases of its own stock between July 1, 2023, and July 31, 2023.

156.    According to the 3Q 2023 10-Q, between August 1, 2023, and August 31, 2023, the Company purchased 1,079,722 shares of its common stock for approximately $18,279,693.46 at an average price of $16.93 per share.

157.    As the Company's stock was actually worth $4.68 per share, the price of closing April 25, 2024, the Company overpaid by approximately $13,226,594.50 for repurchases of its own stock between August 1, 2023, and August 31, 2023.

158.    According to the 3Q 2023 10-Q, between September 1, 2023, to September 30, 2023, the Company purchased 1,069,113 shares of its common stock for approximately $15,919,092.57 at an average price of $14.89 per share.

159.    As the Company's stock was actually worth $4.68 per share, the price of closing April 25, 2024, the Company overpaid by approximately $10,915,643.73 for repurchases of its own stock between September 1, 2023, and September 30, 2023.

160.    150.    According to the Form 10-K the Company filed with the SEC on February 12, 2024 (the "2023 10-K"), between October 1, 2023, and October 31, 2023, the Company purchased 1,646,589 shares of its common stock for approximately $17,289,184.50 at an average price of $10.50 per share.

161.    As the Company's stock was actually worth $4.68 per share, the price of closing April 25, 2024, the Company overpaid by approximately $9,583,147.98 for repurchases of its own stock between October 1, 2023, and October 31, 2023.

162.     According to the 2023 10-K, between November 1, 2023, and November 30, 2023, the Company purchased 2,367,562 shares of its common stock for approximately $20,455,735.68 at an average price of $8.64 per share.

163.     As the Company's stock was actually worth $4.68 per share, the price of closing April 25, 2024, the Company overpaid by approximately $9,375,545.52 for repurchases of its own stock between November 1, 2023, and November 30, 2023.

164.     According to the 2023 10-K, between December 1, 2023, and December 31, 2023, the Company purchased 339,369 shares of its common stock for approximately $3,054,321 at an average price of $9.00 per share.

165.     As the Company's stock was actually worth $4.68 per share, the price of closing April 25, 2024, the Company overpaid by approximately $1,466,074.08 for repurchases of its own stock between December 1, 2023, and December 31, 2023.

166.     Thus, in total during the Relevant Period, the Company overpaid for repurchases of its own stock by ***over $127.04 million***.

### DAMAGES TO HERTZ GLOBAL

167.     As a direct and proximate result of the Individual Defendants' conduct, Hertz Global has lost and expended, and will continue to lose and expend, many millions of dollars.

168.     Such expenditures include, but are not limited to, legal fees, costs and any payments for resolution of or to satisfy a judgement associated with the

Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

169.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

170.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defendant any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

171.    Such losses include the Company's overpayment of more than $127.04 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

172.    As a direct and proximate result of the Individual Defendants' conduct, Hertz Global has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## **DERIVATIVE ALLEGATIONS**

173.    Plaintiff brings this action derivatively and for the benefit of Hertz Global to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as officers and directors of Hertz Global, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a), 10(b), and 20(a) of the Exchange Act.

174.    Hertz Global is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

175.    Plaintiff is and has been at all relevant times, a shareholder of Hertz Global. Plaintiff will adequately and fairly represent the interests of Hertz Global in enforcing and prosecuting its rights, and to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

176.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

177.    A pre-suit demand on the Board of Hertz Global is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Farmer, Feikun, Fields, Intrieri, O'Hara, Shannahan, Wagner, and Vougessis ("Director Defendants"), along with non-party West (together with the Director Defendants, the "Directors"). Plaintiff needs only

to allege demand futility as to five of nine Directors who are on the Board at the time this action is commenced.

178.    Demand is excused as to all the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material facts. This renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

179.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein. Specifically, the Director-Defendants knowingly or recklessly made material misrepresentations and/or omissions for the purpose and effect of concealing Hertz Global's financial well-being and prospects from the investing public and supporting the artificially inflated price of Hertz Global's securities. Moreover, the Director Defendants caused the Company to fail to maintain internal controls. In addition, Director Defendants solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Farmer and Shannahan, allowing them to continue to breach their fiduciary duties to the Company. As a result of the foregoing, demand would be futile, and thus excused, as to all the Director Defendants, since they all breached

their fiduciary duties, face a substantial likelihood of liability, and are not disinterested.

180.   Additional reasons that demand on Defendant Farmer is futile follow. Defendant Farmer has served as a Company director since June 2021 and as Chair of the Board since April 2024. He also previously served as the Board's Lead Director from August 2022 to April 2023. He also serves as Chair of the Compensation and as a member of the Governance Committee. Defendant Farmer solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the reelection of himself and Defendant Shannahan to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Additionally, Defendant Farmer personally signed the 2023 10-K, which contained materially false and misleading statements. As a trusted Company director, Defendant Farmer conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Farmer faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

181.     Additional reasons that demand on Defendant Feikin is futile follow. Defendant Feikin has served as a Company director since July 2021. She also serves as a member of both the Audit Committee and the Governance Committee. Defendant Feikin solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the reelection of Defendants Farmer and Shannahan to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Additionally, Defendant Feikin personally signed the 2023 10-K, which contained materially false and misleading statements. As a trusted Company director, Defendant Feikin conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Feikin faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

182.     Additional reasons that demand on Defendant Fields is futile follow. Defendant Fields has served as a Company director since June 2021, and Interim CEO from October 2021 to February 2022. Defendant Fields solicited the 2024 Proxy Statement, which contained false and misleading statements and

contributed to the reelection of Defendants Farmer and Shannahan to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Additionally, Defendant Fields personally signed the 2023 10-K, which contained materially false and misleading statements. As a trusted Company director, Defendant Fields conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Fields faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

183.   Additional reasons that demand on Defendant Intrieri is futile follow. Defendant Intrieri has served as a Company director since June 2016. He also serves as the Chair of the Audit Committee. Defendant Intrieri solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the reelection of Defendants Farmer and Shannahan to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Additionally, Defendant Intrieri personally signed the 2023 10-K, which contained materially false and misleading statements. As a trusted Company director, Defendant Intrieri conducted little, if any, oversight of the schemes to cause the

Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Intrieri faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

184.   Additional reasons that demand on Defendant O'Hara is futile follow. Defendant O'Hara has served as a Company director since January 19, 2024. He also previously served as Company director from June 2021 to January 2023. Defendant O'Hara solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the reelection of Defendants Farmer and Shannahan to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Additionally, Defendant O'Hara personally signed the 2023 10-K, which contained materially false and misleading statements. As a trusted Company director, Defendant O'Hara conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant

Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant O'Hara faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

185.   Additional reasons that demand on Defendant Shannahan is futile follow. Defendant Shannahan has served as a Company director since June 2021. He also serves as Chair of the Governance Committee and as a member of the Compensation Committee. Defendant Shannahan solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the reelection of himself and Defendant Farmer to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Additionally, Defendant Shannahan personally signed the 2023 10-K, which contained materially false and misleading statements. As a trusted Company director, Defendant Shannahan conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Shannahan faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

186.    Additional reasons that demand on Defendant Wagner is futile follow. Defendant Wagner has served as a Company director and Vice Chair of the Board since June 2021.  He also serves as Chair of the Governance Committee and as a member of the Compensation Committee. Defendant Wagner solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the reelection of Defendants Farmer and Shannahan to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Additionally, Defendant Wagner personally signed the 2023 10-K, which contained materially false and misleading statements. As a trusted Company director, Defendant Wagner conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Wagner faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

187.    Additional reasons that demand on Defendant Vougessis is futile follow. Defendant Vougessis has served as a Company director since September 2021. She also serves as a member of the Audit Committee and as a member of the Governance Committee. Defendant Vougessis solicited the 2024 Proxy Statement,

which contained false and misleading statements and contributed to the reelection of Defendants Farmer and Shannahan to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Additionally, Defendant Vougessis personally signed the 2023 10-K, which contained materially false and misleading statements. As a trusted Company director, Defendant Vougessis conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Vougessis faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

188.    Additional reasons that demand on the Board is futile follow.

189.    Each of the Director Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by approximately $127.04 million for its own common stock during the Relevant Period. The Director Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director Defendants breached their fiduciary duties,

face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

190.    Director Defendants Intrieri (as Chair), Feikin, and Vougessis served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, Defendants Intrieri, Feikin, and Vougessis breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

191.    In violation of the Code of Conduct, the Director Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. In addition, the Director Defendants violated the Code of

Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

192.    Hertz Global has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Hertz Global any part of the damages Hertz Global suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

193.    The acts complained of herein constitute violations of fiduciary duties owed by Hertz Global's officers and directors, and these acts are incapable of ratification.

194.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's Audit Committee Charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein

and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

195.  The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Hertz Global. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Hertz Global, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

196.  If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Hertz Global to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

197.   Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least five of the Directors cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**
### **Against Individual Defendants for Violations of Section 14(a) of the Exchange Act**

198.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth in the foregoing paragraphs one (1) through one hundred ninety-seven (197), as though fully set forth herein for this paragraph one hundred ninety-eight (198).

199.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

200.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact

necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

201.   Under the direction and watch of the Individual Defendants, the 2024 Proxy Statement failed to disclose that: (1) through the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

202.   The 2024 Proxy Statement failed to disclose that: (1) the true negative financial impact of vehicle depreciation on the Company and the Company's inability to accurately assess vehicle depreciation; (2) the Individual Defendants materially overstated the market demand for EVs; (3) as a result, the Company's fleet of vehicles featured too many EVs to be profitable; (4) as a further result, the Company would suffer large losses from the sale of both ICE vehicles and EVs which would materially and negatively affect the Company's overall financial results; and (5) the Company failed to maintain internal controls.

203.   In exercise of reasonable care, Defendants Farmer, Feikun, Fields, Intrieri, O'Hara, Shannahan, Wagner, and Vougessis, should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading.

204.    The Company was damaged as a result of Defendants Farmer, Feikun, Fields, Intrieri, O'Hara, Shannahan, Wagner, and Vougessis material misrepresentations and omissions in the 2024 Proxy Statement.

205.    Plaintiff on behalf of Hertz Global has no adequate remedy at law.

**SECOND CLAIM**
**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

206.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in the foregoing paragraphs one (1) through one hundred ninety-seven (197), as though fully set forth herein for this paragraph two hundred six (206).

207.    The Individual Defendants, by virtue of their positions with Hertz Global and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Hertz Global and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Hertz Global to engage in the illegal conduct and practices complained of herein.

208.    Plaintiff, on behalf of Hertz Global, has no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

209.    Plaintiff incorporates by reference and realleges each and every allegation set forth above in the foregoing paragraphs one (1) through one hundred

ninety-seven (197), as though fully set forth herein for this paragraph two hundred nine (209).

210.   The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Hertz Global. Not only is Hertz Global now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Hertz Global by the Individual Defendants. Defendants caused by the Company to repurchase more than 13,642,512 of its own shares at artificially inflated prices, damaging Hertz Global.

211.   The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Hertz Global not misleading.

212.   The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers and directors of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Hertz Global.

213.   The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

214.   By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

215.   Plaintiff, on behalf of Hertz Global, has no adequate remedy at law.

### FOURTH CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

216.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth in the foregoing paragraphs one (1) through one hundred ninety-seven (197), as though fully set forth herein for this paragraph two hundred sixteen (216).

217.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Hertz Global's business and affairs.

218.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

219.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Hertz Global.

220.   In breach of their fiduciary duties owed to Hertz Global, the Individual Defendants willfully or recklessly made and/or caused the Company to make materially false and misleading statements that failed to disclose, *inter alia*, that: (1) the true negative financial impact of vehicle depreciation on the Company and the Company's inability to accurately assess vehicle depreciation; (2) the Individual Defendants materially overstated the market demand for EVs; (3) as a result, the Company's fleet of vehicles featured too many EVs to be profitable; (4) as a further result, the Company would suffer large losses from the sale of both ICE vehicles and EVs which would materially and negatively affect the Company's overall financial results; and (5) the Company failed to maintain internal controls.

221.   The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, thus rendering them personally liable to the Company for breaching their fiduciary duties.

222.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

223.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

224.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

225.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Hertz Global has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

226.    Plaintiff on behalf of Hertz Global has no adequate remedy at law.

### FIFTH CLAIM
### Against the Individual Defendants for Unjust Enrichment

227.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth in the foregoing paragraphs one (1) through one hundred

ninety-seven (197) above, as though fully set forth herein in this paragraph two hundred twenty-seven (227).

228.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Hertz Global.

229.   The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Hertz Global that was tied to the performance or artificially inflated valuation of Hertz Global, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

230.   Plaintiff, as a shareholder and representative of Hertz Global, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

231.   Plaintiff on behalf of Hertz Global has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

232.   Plaintiff incorporates by reference and realleges each and every allegation set forth above in the foregoing paragraphs one (1) through one hundred

ninety-seven (197), as though fully set forth herein for this paragraph two hundred thirty-two (232).

233.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

234.   In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

235.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

236.   Plaintiff on behalf of Hertz Global has no adequate remedy at law.

**SEVENTH CLAIM**
**Against the Individual Defendants for Abuse of Control**

237.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in the foregoing paragraphs one hundred ninety-seven (197), as though fully set forth herein for this paragraph two hundred thirty-seven (237).

238.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Hertz Global, for which they are legally responsible.

239.   As a direct and proximate result of the Individual Defendants' abuse of control, Hertz Global has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Hertz Global has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

240.   Plaintiff on behalf of Hertz Global has no adequate remedy at law.

<strong><u>EIGHTH CLAIM</u></strong><br><strong>Against the Individual Defendants for Gross Mismanagement</strong>

241.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in the foregoing paragraphs one (1) through one hundred ninety-seven (197), as though fully set forth herein for this paragraph two hundred forty-one (241).

242.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Hertz Global in a manner consistent with the operations of a publicly held corporation.

243.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Hertz Global has sustained and will continue to sustain significant damages.

244.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

245.   Plaintiff on behalf of Hertz Global has no adequate remedy at law.

### NINTH CLAIM
**Against Defendants Scherr and Brooks for Contribution Under Sections 10(b) and Section 21D of the Exchange Act**

246.   Plaintiff incorporates by reference and realleges each and every allegation set forth above in the foregoing paragraphs one (1) through one hundred ninety-seven (197), as though fully set forth herein for this paragraph two hundred forty-six (246).

247.   Hertz Global and Defendants Scherr and Brooks are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Scherr and Brooks' willful and/or reckless violations of their obligations as officers and/or directors of Hertz Global.

248.   Defendants Scherr and Brooks because of their positions of control and authority as officers and/or directors of Hertz Global, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Hertz Global, including the wrongful acts complained of herein and in the Securities Class Action.

249.    Accordingly, Defendants Scherr and Brooks are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

250.    As such, Hertz Global is entitled to receive all appropriate contribution or indemnification from Defendants Scherr and Brooks.

**<u>PRAYER FOR RELIEF</u>**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Hertz Global, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Hertz Global;

(c)    Determining and awarding to Hertz Global the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Hertz Global and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Hertz Global and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for

amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Hertz Global to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Hertz Global restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Respectfully submitted this 14th day of August, 2024

**LAW OFFICE OF JOSE D. SOSA, P.C.**
1141 Via Jardin
Palm Beach Gardens, FL 33418
Tel.: (561) 670-8237
E-Mail: pepe@pepesosalaw.com
        sosalaw@yahoo.com

 **/s/ JOSE D. SOSA**
JOSE D. SOSA
Florida Bar No.: 150878

and

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Tel: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff*
*Pro Hac Vice Motion to Be Filed After Filing*