**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

ANAND ROY, derivatively on behalf of HERTZ GLOBAL HOLDINGS, INC.,

Plaintiff,

v.

STEPHEN M. SCHERR, ALEXANDRA BROOKS, COLIN FARMER, JENNIFER FEIKIN, MARK FIELDS, VINCENT J. INTRIERI, MICHAEL GREGORY O'HARA, ANDREW SHANNAHAN, THOMAS WAGNER, EVAGELINE VOUGESSIS, FRAN BERMANZOHN, and JEFFREY NEDELMAN

Defendants,

and

HERTZ GLOBAL HOLDINGS, INC.,

Nominal Defendant.

Case No. 2:24-cv-00744-JLB-KCD

**DEMAND FOR A JURY TRIAL**

# VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Anand Roy and Plaintiff Davis Aiken Yaun (collectively, "Plaintiffs"), by Plaintiffs' undersigned attorneys, derivatively and on behalf of nominal defendant Hertz Global Holdings, Inc. ("Hertz Global" or the "Company"), file this Verified Amended Consolidated Shareholder Derivative Complaint against defendants Stephen M. Scherr ("Scherr"), Alexandra Brooks ("Brooks"), Colin Farmer ("Farmer"), Jennifer Feikin ("Feikin"), Mark Fields

("Fields"), Vincent J. Intrieri ("Intrieri"), Michael Gregory O'Hara ("O'Hara"), Andrew Shannahan ("Shannahan"), Thomas Wagner ("Wagner"), Evangeline Vougessis ("Vougessis"), Fran Bermanzohn ("Bermanzohn"), and Jeffrey Nedelman ("Nedelman") (collectively, the "Individual Defendants," and together with Hertz Global, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Hertz Global, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiffs' amended consolidated complaint against the Individual Defendants, Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of internal corporate documents produced by Defendants to Plaintiffs' counsel,[1] a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Hertz Global, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe

---

1 References to HERTZ220-00_____ are to the internal Books and Records.

that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants which has caused significant harm to the Company.

2. Hertz Global is a Delaware corporation based in Estero, Florida that provides rental vehicles and services. Specifically, the Company provides worldwide internal combustion engine ("ICE") vehicle and electric vehicle ("EV") rental services from Company-operated, licensee, and franchisee locations. Additionally, Hertz Global sells vehicles and value-added services.

3. In October 2021, the Company made a bold decision to acquire enough EVs to comprise 25% of Hertz Global's overall fleet by the end of 2024. This goal was set to fulfill the Company's expectation of becoming "the largest EV rental fleet in North America and one of the largest in the world."

4. Although early market testing showed that while consumers expressed some interest in renting EVs, overall demand was projected to fall well short of Hertz Global's target, the Individual Defendantsnonetheless moved forward aggressively, purchasing large volumes of EVs, primarily from Tesla, at premium prices throughout 2022 and 2023.

5. Witnesses confirmed that demand for EV rentals was weak from the outset and declined further by the summer of 2022. Customers were reluctant to

rent EVs due to a shortage of charging infrastructure and unfamiliarity or discomfort with operating them. As a result, Hertz Global's EV fleet utilization remained low, around 50% to 60%, in stark contrast to the typically high utilization rates of over 90% for traditional ICE vehicles. Despite the Individual Defendants' attempts to boost EV usage through discounts and efforts to steer ICE vehicle renters toward EVs, demand remained persistently low.

6. Despite the clear lack of consumer demand for EVs, the Individual Defendants repeatedly misled investors by claiming that "EV rental demand is very strong and strong across all aspects of our business," that Hertz Global had an adequate charging infrastructure to support EV demand, and that the Company would "always keep our commitment to fleeting within the confines of demand." However, the Individual Defendants were fully aware—through internal systems such as Tableau and CapGuard, as well as internal meetings, reports, and emails—that demand for EV rentals was low, utilization rates were weak, and customers largely avoided renting EVs. Nevertheless, they withheld this information from investors, motivated in part by the fact that their compensation was tied to Hertz Global's stock performance.

7. At all relevant times, the Individual Defendants breached their fiduciary duties by making, and/or causing the Company to make, a series of false and misleading statements and/or omissions that failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Individual

Defendants materially overstated the market demand for EVs; (2) the Individual Defendants' purchases of vehicles failed to match the confines of the actual demand; (3) the capacity of Hertz Global's electric vehicle charging infrastructure was inadequate; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

8. The truth began to emerge in October 2023, less than two years after launching the Company's EV initiative. At this time, it was admitted that the Company needed to "tight[en] the EV supply in that channel and more accurately match[] the fleet to demand."

9. On this news, the Company's stock price fell $1.08 per share, or approximately 10.68%, from a closing price of $10.12 per share on October 25, 2023, to close at $9.04 per share on October 26, 2023, and continued to decline to $8.62 per share on October 27, 2023.

10. The truth continued to emerge when it was announced in January 2024 that Hertz Global would sell 20,000 EVs, or approximately one-third of its EV fleet, due to insufficient demand. Alongside this announcement, it was revealed the Company would incur a substantial $245 million write-off, reflecting the inflated carrying values of Tesla EVs that had been purchased at premium prices.

11. On this news, the Company's stock price fell $1.01 per share, or approximately 10.81%, from a closing price of $9.35 per share on January 10, 2024, to close at $8.34 per share on January 12, 2024.

12. Roughly two months later, the truth continued to emerge on March 15, 2024, when the Company announced that its Chief Executive Officer ("CEO"), Defendant Scherr, would be resigning as the CEO and Chairman of the Board of Directors (the "Board") by the end of the month, and that Wayne Gilbert West ("West") would become the newly appointed CEO of the Company.

13. On April 25, 2024, the truth fully emerged when the Company disclosed its financial results for the first quarter of the fiscal year ending on December 31, 2024 (the "2024 Fiscal Year") in a press release and subsequent earnings call. The Individual Defendants disclosed that the Company would sell an additional 10,000 EVs, bringing total EV disposals to 30,000, or approximately half of the EV fleet, in order to "bring supply in line with natural demand that's being expressed" and to "bring our fleet inside the demand curve." Hertz Global also recorded a further $195 million write-down to reflect the market value of the overvalued EVs being sold.

14. The Individual Defendants also acknowledged that, over the past two years, "***[w]e realized lower utilization than what we really want to be at on the EV fleet that we have***,"[2] and explained that the decision to rotate EVs out of the fleet and replace them with ICE vehicles was based on the expectation of higher utilization rates. As a result, the Individual Defendants conceded that the Company's earlier plan to expand EVs to comprise 25% of Hertz

---

[2] Unless otherwise noted, all emphasis is added.

Global's total fleet by 2024 lacked a reasonable foundation. The Individual Defendants further confirmed the Company was no longer pursuing a fixed target for EV adoption, with the Company's CEO admitting that they had "been ahead of ourselves in the context of how quickly that will happen."

15. On this news, the price of Hertz Global's common stock fell $1.12 per share, or approximately 19.31%, from a closing price of $5.80 per share on April 24, 2024, to close at $4.68 per share on April 25, 2024.

16. Meanwhile, the Individual Defendants further breached their fiduciary duties by causing Hertz Global to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between January 2023 and December 2023, approximately ***19,381,160 shares*** of Hertz Global's common stock were repurchased, costing the Company over ***$290.9 million***. As the Company's stock was actually only worth $4.68 per share, the price at which it was trading when markets closed on April 25, 2024, the Company overpaid for repurchases of its own stock by ***over $200.2 million*** in total.

17. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

18. In light of the Individual Defendants' misconduct—which has subjected the Company, its former CEO and Chair of the Board, and its former Executive Vice President ("VP") and Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Middle District of Florida (the "Securities Class Action") and which has further

subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

19. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

20. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of various of the directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R.

§ 240.14a-9), Section 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder. Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

22. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

23. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and Hertz Global is headquartered in this District.

## PARTIES

### Plaintiffs

25. Plaintiffs are current shareholders of Hertz Global. Plaintiffs have continuously held Hertz Global common stock at all relevant times. Plaintiffs will adequately and fairly represent the interests of Hertz Global and its shareholders in prosecuting this action and enforcing the rights of the Company.

**Nominal Defendant Hertz Global**

26. Nominal Defendant Hertz Global is a Delaware corporation with its principal executive offices located at 8501 Williams Road, Estero, Florida 33928. Hertz Global's shares trade on the NASDAQ under the ticker symbol "HTZ."

**Defendant Scherr**

27. Defendant Scherr served as the Company's CEO and as a Company director from February 2022 to March 2024. He also served as the Chair of the Board from January 2023 to March 2024.

28. The Company's proxy statement filed on Schedule 14A with the SEC on April 5, 2023 (the "2023 Proxy Statement"), stated the following about Defendant Scherr:

> Mr. Scherr (58) has served as Chief Executive Officer and a director of the company since February 2022 and has served as Chair of the Board since January 2023.
>
> Mr. Scherr was previously employed by Goldman Sachs, a leading global financial institution, for more than 28 years. He served as the firm's Chief Financial Officer from November 2018 through December 2021. Prior to serving in that role, Mr. Scherr was the Chief Executive Officer of Goldman Sachs Bank USA.
>
> We believe that Mr. Scherr is qualified to serve on our Board because of his in-depth understanding of Hertz's business as its CEO, and because of his extensive leadership, management and finance experience gained from his service with Goldman Sachs.

**Defendant Brooks**

29. Defendant Brooks served as the Company's Executive VP and CFO from July 2023 to June 2024. Prior to that, Defendant Brooks served as the Company's interim CFO from April 2023 to July 2023, the Company's Senior VP

and Chief Accounting Officer from October 2020 to July 2023, and as Senior VP, Internal Audit at Hertz Global from June 2020 to October 2020.

30. The Company's filing of a Form 8-K on July 28, 2023, stated the following about Defendant Brooks:

> Ms. Brooks, a certified public accountant, joined the Company in June 2020 as its Senior Vice President, Internal Audit, was promoted to Senior Vice President and Chief Accounting Officer in October 2020, and has been serving as interim Chief Financial Officer since April 1, 2023. Prior to joining the Company, Ms. Brooks was the Vice President, Internal Audit at Aptiv PLC ("Aptiv"), a global technology company from 2015 to 2020. Before joining Aptiv, Ms. Brooks was the Chief Financial Officer for Champion Windows and Home Exteriors, a home improvement company, from 2013 to 2015.

**Defendant Farmer**

31. Defendant Farmer has served as Company director since June 2021 and as Chair of the Board since April 2024. He also previously served as the Board's Lead Director from August 2022 to April 2023. He also serves as Chair of the Compensation and Member of Governance Committee.

32. The Company's proxy statement filed on Schedule 14A with the SEC on April 8, 2025 (the "2025 Proxy Statement"), states the following about Defendant Farmer:

> Mr. Farmer has served as a director of the Company since June 2021. He was the Board's Lead Director from August 2022 to April 2024, and he has served as the Board's Chair since April 2024.
>
> Mr. Farmer, since December 2014, has been the Senior Managing Director and Head of the Management Committee of Certares Management, an investment services firm focused primarily on the travel, tourism, and hospitality sectors. He is also a member of the Investment Committee and the Management Committee for the

> following funds: Certares Holdings, Certares Holdings II, Certares Real Estate Holdings, Certares Real Estate Holdings II, and CK Opportunities.
>
> Prior to joining Certares, from 2006 to 2014, Mr. Farmer was a Managing Director of OEP, and from 1998 to 2006, he was a Principal at Harvest Partners, LP, both of which are middle-market private equity firms. Mr. Farmer began his career as an analyst at Robertson Stephens & Company, a middle market investment bank.
>
> In addition, Mr. Farmer serves on the boards of several private companies, including Internova, Guardian Alarm, Mystic Invest, Avoya Travel, Magna Hospitality, and Certares Holdings. He also previously served on the board of AmaWaterways, a private company.
>
> Mr. Farmer is Chair of the Board. In addition, Mr. Farmer is Chair of the Board's Compensation Committee and is a member of the Board's Governance Committee.
>
> **We believe that Mr. Farmer is qualified to serve on our Board because of his significant knowledge of the travel industry, his expertise in capital markets and financial matters, and because of the governance experience he has gained by serving on other company boards.**

**<u>Defendant Feikin</u>**

33. Defendant Feikin has served as a Company director since July 2021. Defendant Feikin also serves as a member of the Audit Committee and the Governance Committee.

34. The Company's 2025 Proxy Statement stated the following about Defendant Feikin:

> Ms. Feikin has served as a director of the Company since July 2021.
>
> Ms. Feikin was, from 2007 to 2020, an independent business advisor, focusing on advising non-profits, start-up companies, and large media companies. Prior to becoming an independent business advisor, Ms. Feikin was Director of Google Video at Google, Inc. (now Alphabet, Inc.). She also worked in business development at AOL

> Time Warner, as well as in business affairs at 20th Century Fox, Fox Searchlight, and Morgan Creek Productions. Ms. Feikin began her career at McKinsey & Company, where she was a management consultant.
>
> Ms. Feikin has been an independent mutual fund board member, serving, since 2023, on the boards of American Funds Insurance Funds, American Funds Fund of Funds, and American Funds Fixed Income Funds; additionally, she has served on the boards of Capital Group Exchange Traded Funds since its inception in 2021. Ms. Feikin also served, from 2019 through 2022, on the boards of Capital Group Private Client Services Funds, Capital Group U.S. Equity Fund, American Funds International Vantage Fund, American Funds Global Insight Fund, and Emerging Markets Growth Fund.
>
> Since October 2024, Ms. Feikin has served on the board of Youth Sports Alliance in Park City, Utah. She was on the Board of Trustees of The Nature Conservancy of Utah from 2021 to 2024.
>
> Ms. Feikin is a member of the Board's Audit Committee and the Board's Governance Committee.
>
> **We believe that Ms. Feikin is qualified to serve on our Board because of her experience in strategic development and her expertise in digital technology, innovation, and consumer development, and due to the governance experience she has gained by serving as an independent mutual fund director.**

**<u>Defendant Fields</u>**

35. Defendant Fields has served as a Company director since June 2021. Previously, Defendant Fields served as Interim CEO from October 2021 to February 2022.

36. The Company's 2025 Proxy Statement stated the following about Defendant Fields:

> Mr. Fields has served as a director of the Company since June 2021. In addition, he served as the Company's Interim CEO from October 2021 to February 2022.

Mr. Fields is a Senior Advisor of TPG Capital LP, a private equity firm, a role he has held since October 2017. From 2014 to 2017, he served as President and CEO of Ford Motor Company ("Ford"). Mr. Fields joined Ford in 1989 and held various senior leadership roles throughout his tenure, including the following: President and CEO, Ford; Chief Operating Officer ("COO"), Ford; Executive Vice President, Ford and President, The Americas; Executive Vice President and CEO, Premier Automotive Group and Ford Europe; Chair and CEO, Premier Automotive Group; and President and CEO, Mazda Motor Corporation ("Mazda"), where he also served as a director.

Mr. Fields has served on the board of Lam Research Corporation (Nasdaq: LRCX) since August 2024 and on the board of Qualcomm Incorporated (Nasdaq: QCOM) since June 2018. In addition, he served previously on the boards of the following public companies: TPG Pace Beneficial II Corp. from 2021 to 2023; TPG Pace Solutions Corp. in 2021; International Business Machines (IBM) Corporation from 2016 to 2018; Ford from 2014 to 2017; and Mazda from 1999 to 2002.

In addition to his public company directorships, Mr. Fields serves as Lead Independent Director of Tanium Inc., a privately held cybersecurity and systems management company, a board he joined in 2020, and since 2022, he has served on the boards of Planview, Inc. and Boomi, L.P., both of which are privately held software companies. In addition, he has served on the board of Classic Collision LLC, a national collision repair multi-site operator, since 2024. He also recently served on other private company boards, including Transplace Holdings, Inc. and Ellucian Company LLC, and he served as Chair of the board of CLEAResult Consulting, Inc.

**We believe that Mr. Fields is qualified to serve on our Board because of his expertise in the automotive industry on a global scale, his extensive experience as a senior executive at a large, multinational company, and due to the corporate governance experience he has gained through his current and prior service as an independent director on a variety of public company boards.**

**Defendant Intrieri**

37. Defendant Intrieri has served as a Company director since June 2016. He also serves as Chair of the Audit Committee.

38. The Company's 2025 Proxy Statement stated the following about Defendant Intrieri:

> Mr. Intrieri has served as a director of the Company since June 2016.
>
> Mr. Intrieri is CEO and Founder of VDA Capital Management LLC, a private investment fund founded in 2017. From 1998 to 2016, Mr. Intrieri was employed, in various investment-related capacities, by entities associated with Carl Icahn, serving from 2008 to 2016, as Senior Managing Director of Icahn Capital LP and from 2004 to 2016, as Senior Managing Director of Icahn Offshore LP. Prior to that, Mr. Intrieri was a partner at Arthur Andersen LLP. He was also previously a Certified Public Accountant.
>
> Mr. Intrieri has served as a member of the board of International Flavors & Fragrances, Inc. (NYSE: IFF) since January 2025. In addition, he has served as Non-Executive Chair of SandRidge Energy, Inc. (NYSE: SD) since October 2024 and as a director of Transocean Ltd. (NYSE: RIG) since May 2014. Mr. Intrieri also served as a director of Navistar International Corporation from 2012 to 2021 and as a director of numerous other publicly traded companies prior to 2019, including the following: Energen Corporation; Conduent Incorporated; Chesapeake Energy Corporation; CVR Refining, LP; Forest Laboratories, Inc.; CVR Energy, Inc.; Federal-Mogul Corporation; and others.
>
> Mr. Intrieri is Chair of the Board's Audit Committee.
>
> **We believe Mr. Intrieri is exceptionally qualified to serve on our Board because of his expertise in financial and accounting matters, as well as his strategic insight into global operations. As a former Certified Public Accountant and accounting partner, and as the current CEO of a private investment fund, Mr. Intrieri has a robust understanding of finance and capital markets. In addition, with current and prior service on more than 10 public company boards, he brings a wealth of knowledge and perspective that is invaluable to our organization.**

**<u>Defendant O'Hara</u>**

39. Defendant O'Hara has served as a Company director since January 19, 2024. He also previously served as a Company director from June 2021 to January 2023.

40. The Company's 2025 Proxy Statement stated the following about Defendant O'Hara:

> Mr. O'Hara has served as a director of the Company since January 2024, after previously serving on the Board from June 2021 to January 2023. Mr. O'Hara was originally appointed to the Board in connection with the Emergence, resigned from the Board due to his professional obligations, and then rejoined the Board in January 2024 after he was recommended by the Governance Committee, made up of non-management directors of the Board, to fill a vacancy created by the resignation of another director.
>
> Mr. O'Hara is the Founder and a Senior Managing Director of Certares Management, an investment services firm focused primarily on the travel, tourism, and hospitality sectors. Prior to forming Certares Management, he served as Chief Investment Officer of JPMorgan Chase's Special Investments Group ("JPM SIG"). Prior to JPM SIG, Mr. O'Hara was a Managing Director of One Equity Partners ("OEP"), the private equity arm of JPMorgan. Before joining OEP in 2005, he served as Executive Vice President and as a member of the board of Worldspan Corporation, a privately held provider of travel technology and content.
>
> Mr. O'Hara has served as a director of TripAdvisor, Inc. (Nasdaq: TRIP) since March 2020; in addition, he was its Vice Chair from 2020 to 2023. He has also served as the Chair of American Express Global Business Travel ("Amex GBT") (NYSE: GBTG) since 2014. From 2020 to 2023, Mr. O'Hara was on the board of Liberty TripAdvisor Holdings, Inc. and served as its Vice Chair. He co-founded GO Acquisition Corp., a special purpose acquisition company, in 2020 and served as its Co-CEO and as a member of its board from 2020 to 2022.
>
> In addition to his public company directorships, Mr. O'Hara has served as a director of the World Travel & Tourism Council since 2019

> and has been its Chair since 2023. He is also on the board of Certares Holdings, where he is the Head of its Investment Committee and is a member of its Management Committee. Additionally, he is a member of the Investment Committee and Management Committee of both CK Opportunities Fund and Certares Real Estate Holdings. Mr. O'Hara was also a director of Mystic Invest from 2019 to 2020 and of Internova ("Internova") from 2008 to 2020.
>
> **We believe Mr. O'Hara is qualified to serve on our Board because of his profound knowledge of, and experience in, the travel industry, his extensive background in investment analysis and management, and the governance experience he has gained by serving on other public company boards.**

**Defendant Shannahan**

41. Defendant Shannahan has served as a Company director since June 2021. He also serves as Chair of the Governance Committee and as a member of the Compensation Committee.

42. The Company's 2025 Proxy Statement stated the following about Defendant Shannahan:

> Mr. Shannahan has served as a director of the Company since June 2021.
>
> Mr. Shannahan, since 2008, has been Head of Research and a Partner of Knighthead, an event-driven and deep value-focused SEC-registered investment advisor, which specializes in investing in companies that need financial and operational restructuring. He currently serves as a member of the Investment Committee of certain funds managed by Knighthead. Prior to joining Knighthead, from 2002 to 2008, Mr. Shannahan was a senior research analyst at Litespeed Partners, an event-driven hedge fund.
>
> Since 2023, Mr. Shannahan has been a director of ATI Physical Therapy, Inc. (OTCPK: ATIP); he serves on the board's Nominating and Corporate Governance Committee.
>
> In addition to his public company directorship, Mr. Shannahan currently serves on the boards of a number of private entities,

> including the following: Knighthead Annuity and certain of its affiliates since 2024; Birmingham City Football Club Limited and certain of its affiliates since 2023; Shelby Companies Limited since 2023; and Homer City Generating since 2019.
>
> Mr. Shannahan is Chair of the Board's Governance Committee and is a member of the Board's Compensation Committee.
>
> **We believe that Mr. Shannahan is qualified to serve on our Board because of his expertise in complex investment opportunities, finance, and capital markets, and due to the governance experience he has gained by serving on other company boards.**

<u>**Defendant Wagner**</u>

43. Defendant Wagner has served as a Company director and Vice Chair of the Board since June 2021.

44. The Company's 2025 Proxy Statement stated the following about Defendant Wagner:

> Mr. Wagner has served as a director of the Company and as Vice Chair of the Board since June 2021.
>
> Mr. Wagner co-founded Knighthead, an event-driven and deep value-focused SEC-registered investment advisor in September 2008, which specializes in investing in companies that need financial and operational restructuring; he currently serves as Managing Member. Prior to forming Knighthead, Mr. Wagner was a Managing Director at Goldman, Sachs & Co., and he also held roles at Credit Suisse First Boston and Ernst & Young LLP ("EY").
>
> Mr. Wagner serves on the boards of several private entities, including as board Chair of Birmingham City Football Club Limited and certain of its affiliates since 2023; Singer Vehicle Design since 2021; Trinity Cyber, Inc. since 2016, serving as its Chair since 2018; and Knighthead Annuity & Life Assurance Company ("Knighthead Annuity") since 2014, serving as its Co-Chair since 2014. In addition, he serves on the Investment Committee of Villanova University as an advisor (and is a former member of the Board of Trustees), the National Advisory Board

> for Youth, Inc., and the National Leadership Council for the Navy SEAL Foundation, where he has been a board member since 2024.
>
> **We believe Mr. Wagner is qualified to serve on our Board because of his deep strategic expertise in capital markets, in investment management, and in the transportation sector, as well as his significant knowledge of business restructurings.**

**<u>Defendant Vougessis</u>**

45. Defendant Vougessis has served as a Company director since September 2021. She also serves as a member of the Audit Committee and as a member of the Governance Committee.

46. The Company's 2025 Proxy Statement stated the following about Defendant Vougessis:

> Ms. Vougessis has served as a director of the Company since September 2021.
>
> Ms. Vougessis is the Founder and CEO of Moneikos Global Asset Management (Monaco) ("Moneikos"), an independent asset management company; she has held this role since April 2014. In addition, Ms. Vougessis is the Co-Founder of MaxInvest Holdings, a single-family office that invests in startups and early-stage companies. She also serves on the board of each of Moneikos and MaxInvest. Prior to founding and co-founding Moneikos and MaxInvest, respectively, Ms. Vougessis served in the European financial sectors in various roles. Among them, she was Country Analyst for the Greek Equities Desk at ABN AMRO Ltd., London, United Kingdom. She also served as Investor Relations Manager at the Commercial Bank of Greece, a subsidiary of Credit Agricole Bank of France, and as Investor Relations and Strategy Director at Marfin Investment Group and subsequently at Marfin Popular Bank Group, a multi-billion dollar pan-European investment company headquartered in Athens, Greece.
>
> Ms. Vougessis is a member of the Board's Audit Committee and the Board's Governance Committee.

**Defendant Bermanzohn**

47. Defendant Bermanzohn served as a Company director from January 2023 to March 2024. She also served as a member of the Audit Committee.

48. The Company's 2023 Proxy Statement stated the following about Defendant Bermanzohn:

> Ms. Bermanzohn (64) has served as a director of the company since January 2023.
>
> Ms. Bermanzohn retired in 2018 after serving 27 years in legal and leadership roles, including Partner, with The Goldman Sachs Group, Inc., or Goldman Sachs, a leading global financial institution. Prior to joining Goldman Sachs, Ms. Bermanzohn spent approximately 10 years practicing law at two law major firms and the Public Securities Association (the international trade association for the bond industry). During her tenure with Goldman Sachs, Ms. Bermanzohn served on numerous senior firmwide committees, including the Capital Committee, the Investment Policy Committee, and the Partnership Committee. At the time of her retirement, she was the firm's Deputy General Counsel with responsibility for all its trading and investment banking businesses, as well as the merchant banking and consumer on-line banking businesses.
>
> We believe that Ms. Bermanzohn is qualified to serve on our Board because of her deep expertise in finance and capital market matters, as well as her understanding of compliance and risk.
>
> Ms. Bermanzohn is a member of Hertz 's Audit Committee.

**Defendant Nedelman**

49. Defendant Nedelman served as a Company director from January 2023 to January 2024.

50. The Company's 2023 Proxy Statement stated the following about Defendant Nedelman:

> Mr. Nedelman (56) has served as a director of the company since January 2023.
>
> Mr. Nedelman has been Senior Managing Director of Certares Management since 2020. He is a member of the Investment Committee and Management Committee of Certares Management, as well as a member of the Investment Committee and the Management Committee of the CK Opportunities Fund.
>
> Prior to joining Certares Management, Mr. Nedelman spent over 25 years at Goldman Sachs where most recently he was the Co-Head of Global Equities and a member of the Firmwide Client and Business Standards Committee and the Securities Division Executive Committee.
>
> We believe that Mr. Nedelman is qualified to serve on our Board because of his expertise in finance and capital market matters.

**<u>Relevant Non-Parties</u>**

51. The Securities Class Action captioned *Doller v. Hertz Global Holdings, Inc. et al.*, Case No. 2:24-cv-00513-JLB, in the United States District Court for the Middle District of Florida, includes statements from former employees of Hertz Global who offered their experiences. The following are the former employees and confidential witnesses whose statements are referenced through this amended consolidated complaint before this Court.

***CW1***

52. Confidential Witness ("CW") 1 served as a Revenue Management Analyst who worked at Hertz Global from before the wrongful course of conduct described herein through the third quarter of 2023. CW1 was responsible for managing the Company's fleet across the Western Region, which included parts of California, Oregon, Washington, and Hawaii. In this role, CW1 set rental car

pricing, managed inventory levels based on demand at various locations, and determined which locations should remain open or closed depending on available fleet. CW1 reported to a manager, who reported to Director Michael Cangialosi. Cangialosi reported to VP Adam Brady ("Brady"), who in turn reported to Darren Arrington ("Arrington"), a VP overseeing both Revenue Management and Fleet Management, who ultimately reported to the CEO.

***CW2***

53. CW2 held multiple roles at Hertz Global, beginning as a Revenue Management Coordinator prior to the wrongful course of conduct described herein, then serving as a Revenue Management Analyst until February 2023, and later working as a Security Project Manager during the first three quarters of 2023. In the Revenue Management Coordinator role, CW2 was responsible for relocating vehicles to areas where they were most needed. As a Revenue Management Analyst, CW2 oversaw fleet management and utilization across the Midwest region—which included Arkansas, Missouri, Indiana, Ohio, West Virginia, Virginia, Kentucky, Michigan, Wisconsin, Minnesota, Kansas, Iowa, and Oklahoma—managing a fleet of over 6,000 vehicles and generating approximately $20 million in revenue per quarter.

***CW3***

54. CW3 was employed at Hertz Global as an Outside Wholesale Remarketing Representative from before the wrongful course of conduct described herein until January 2024. In this role, CW3 was responsible for contacting car

dealerships to sell vehicles that Hertz Global had removed from its rental fleet. CW3 was part of a team that handled sales to dealerships nationwide, specifically those purchasing fewer than 100 vehicles per month. A separate "Nationals" team managed sales to high-volume dealerships buying over 100 vehicles monthly. CW3 reported to Midwestern Regional Manager Andre LaRosa ("LaRosa"), who reported to a Program Manager. The Program Manager, in turn, reported to a VP, both of whom were based in Chicago.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

55. By reason of their positions as officers and/or directors of Hertz Global, and because of their ability to control the business and corporate affairs of Hertz Global, the Individual Defendants owed Hertz Global and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Hertz Global in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Hertz Global and its shareholders to benefit all shareholders equally.

56. Each director and officer of the Company owes to Hertz Global and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

57. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Hertz Global, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

58. To discharge their duties, the officers and directors of Hertz Global were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

59. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Hertz Global, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

60. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management,

earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Amended Consolidated Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

61. To discharge their duties, the officers and directors of Hertz Global were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Hertz Global were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Florida, Delaware, and the United States, and pursuant to Hertz Global's own Standards of Business Conduct (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Hertz Global conducted its operations, and, upon receipt of notice or information of imprudent or unsound

conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Hertz Global and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Hertz Global's operations would comply with all applicable laws and Hertz Global's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

62. Each of the Individual Defendants further owed to Hertz Global and the shareholders the duty of loyalty requiring that each favor Hertz Global's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

63. At all times relevant hereto, the Individual Defendants were the agents of each other and of Hertz Global and were at all times acting within the course and scope of such agency.

64. Because of their advisory, executive, managerial, and directorial positions with Hertz Global, each of the Individual Defendants had access to adverse, non-public information about the Company.

65. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Hertz Global.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

66. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

67. The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

68. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Hertz Global was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

69. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the

accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

70. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, and of Hertz Global, and was at all times acting within the course and scope of such agency.

## HERTZ GLOBAL'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### *Hertz Global's Code of Conduct*

71. According to the Company's Code of Conduct "Our Standards of Business Conduct (also known as our "Code") serves as our guide, helping us understand common risks our Company faces and how we should respond to them."

72. The Code of Conduct states that, "Our Code applies to all of us—employees, officers and directors. By following its principles, we are able to uphold the commitments we have made to our Company's stakeholders, including each other, our customers, our investors, our business partners and the communities where we do business."

73. The Code of Conduct provides, under the heading "Our Code Applies Across the Globe" that:

> Hertz [Global]'s business spans the globe, as does our commitment to acting ethically and fairly. Regardless of where we do business, we must uphold our Code's principles, all Company policies and procedures and any laws and regulations that apply to our work. When local laws, regulations or practices are less restrictive than our Code, we must follow the guidance in our Code.

74. The Code of Conduct provides, under the heading "Investigations and Discipline," that:

> As part of our commitment to acting honestly, ethically and fairly, Hertz [Global] is committed to investigating all reports of misconduct. When an investigation reveals that there has been a violation of our Code, the individuals involved will be subject to discipline, up to and including termination of employment. At Hertz [Global], we have zero tolerance for acts of misconduct, and anyone who violates our Code may also be subject to legal action, depending on the situation.

75. The Code of Conduct further provides, in a section titled "Waivers," that, "Any waiver of our Code for any of our directors or executive officers may be made only by the Board of Directors and must be disclosed to our shareholders, along with the reasons for the waiver, when and as required by applicable law and regulations."

76. The Company addresses "Dealing Fairly with Others," in the Code of Conduct in detail, stating, in relevant part:

> Being a good corporate citizen means that we deal fairly, ethically and honestly with our customers, competitors and business partners. We must represent our products and services accurately, and we never make dishonest statements about pricing, availability or any other aspect of our business. This means that our marketing and sales materials must be accurate and clear, and follow all related Company policy requirements. When we differentiate our products and services from our competitors', we must do so fairly, avoiding disparaging or untrue statements or misrepresentations.
>
> For those of us whose job responsibilities include gathering information about our competitors, we must take care to use only legal, honest means.

77. The Code of Conduct provides, under the heading "Avoiding Conflicts of Interest," the following, in relevant part:

> Acting with integrity is central to our Company's values, which we are expected to uphold each day. We act with integrity when we first take into account the best interests of our Company. This includes avoiding situations that could lead to a conflict of interest, or even merely the appearance of one. A conflict of interest is a situation where our personal interests might interfere with our ability to make objective decisions on behalf of Hertz [Global]. Although it is impossible to describe every situation that could cause a conflict of interest, some of the most common types are discussed below.

78. In a section titled "Protecting Company Assets," the Code of Conduct provides the following, relevant part:

> Each day, we use a variety of Company assets to perform our job responsibilities and help Hertz [Global] remain an industry leader. These assets may vary depending on the work we do, but they generally include Company facilities, equipment, vehicles, supplies and funds. We must safeguard this property and use it only for the purposes for which it was provided. We have a responsibility to do our part to protect Company property from theft, damage, misuse or loss.

79. The Company addresses how to appropriately handle "Company Information" in the Code of Conduct in detail, stating, in relevant part:

> One of our Company's most prized assets is its information that is generally not available to the public. At Hertz [Global] this is known as Company Information and includes confidential and proprietary information, as well as Inventions, such as creations, inventions, ideas, designs, copyrightable materials, trademarks and other technology and rights (and any related improvements or modifications, whether or not subject to patent or copyright protection). This information sets us apart from our competitors, and it is key to our Company's success. As such, we are expected to exercise care when handling Company Information.

80. In a section titled "Keeping Accurate Books and Records," the Code of Conduct provides, in relevant part:

> No matter what job we do for Hertz [Global], we all create corporate records in connection with our work. These records include expense

> reports, time records and ledgers. Many times, information from these records is used to create our Company's financial disclosures. Because our Company and our investors rely on our records to make good financial decisions, we must always be certain that the records we create are complete, accurate and truthful.
>
> Those of us who work on Hertz [Global]'s financial disclosures hold special responsibilities. We must ensure that our Company's disclosures are full, fair, timely and understandable. When creating our Company's financial disclosures, we should always follow all related policies and procedures, as well as all related generally accepted accounting principles.

***Hertz Global's Corporate Governance Guidelines***

81. The Company also maintains Corporate Governance Guidelines (the "Governance Guidelines"). Under the section titled "Overall Purpose and Responsibilities of the Board" the Governance Guidelines state the following, in relevant part:

> The overall purpose of the Board is to oversee the Company's efforts to create long-term value for its stockholders, as well as other stakeholders. As part of this purpose, the Board adheres to what it believes to be sound governance principles, as set forth in these Guidelines. In its oversight role, the Board maintains a sense of responsibility to the Company's stockholders, customers, employees, suppliers and the communities in which it operates. The Board acts as the ultimate decision-making body of the Company and advises and oversees management, who are responsible for the day-to-day operations and management of the Company.
>
> In order to create long-term value for stockholders and other stakeholders, the Board's core responsibilities include:
>
> - identifying, reviewing and, where appropriate, approving the financial and business strategies and major corporate actions of the Company and monitoring their implementation and results;
>
> - regularly monitoring the effectiveness of management policies and decisions, including the execution of the Company's strategies;

- identifying, selecting, evaluating and compensating the Chief Executive Officer (the "CEO") and reviewing management succession planning;

- providing oversight as to major risks facing the Company and strategies for their management and mitigation;

- overseeing corporate culture and management's efforts to align culture with the Company's purpose and values;

- overseeing efforts to ensure that the Company's business is conducted with the highest standards of ethical conduct and in compliance with applicable laws and regulations;

- overseeing the Company's financial statements and financial reporting process and internal controls; and

- shaping effective corporate governance including nominating the Company's director candidates and appointing committee members and overseeing the Company's environmental, social and governance practices, policies and activities.

82. Under the heading "Board Leadership" the Governance Guidelines include the following, in relevant part:

> The Board believes it is important to periodically review its leadership structure and to modify it as needed from time to time.
>
> A. Chairperson of the Board and CEO
> The Board believes it is important to retain flexibility to allocate the responsibilities of the offices of the Chairperson of the Board and CEO in any way that is in the best interests of the Company at a given point in time.
>
> B. Lead Director
>
> Whenever the Chairperson of the Board is not an Independent Director, the Governance Committee shall provide its recommendation to the full Board as to which Independent Director should be elected to serve as the Lead Director. The Lead

Director has the following responsibilities (in addition to any other responsibilities approved by the Board):

- presiding at all meetings of the Board at which the Chairperson of the Board or any Vice Chairperson is not present, including the executive sessions of Independent Directors;

- acting as a liaison between the Independent Directors and the Chairperson of the Board as he or she deems appropriate, including by providing the Chairperson with feedback from executive sessions of Independent Directors and with respect to meeting schedules, agendas and information to be provided to the Board; and

- if requested by major shareholders, ensuring that he or she is available for consultation and direct communication.

83. The Governance Guidelines outline the obligations of the Directors under the heading "Duties of Directors." A sub-section under this heading includes "Director Responsibilities", in which the Governance Guidelines state the following, in relevant part:

> As part of their duty to exercise their business judgment to act in a manner they reasonably believe to be in the best interest of the Company and its stockholders, directors are expected to be active and engaged in discharging this duty by:
>
> - devoting sufficient time and effort to learn, and keep themselves informed about, the business and operations of the Company and the industries in which it operates;
>
> - making every effort to attend meetings of the Board and the committees on which they serve and to spend the time needed to prepare for these meetings, including reviewing all materials that are provided in advance of the meetings;
>
> - ensuring other existing and future commitments do not materially interfere with their service as a director; and

- meeting as frequently as necessary to discharge their responsibilities

84. Under the heading "Standards of Business Conduct," the Governance Guidelines state the following:

> Directors will comply with the Company's Standards of Business Conduct (the "Standards of Business Conduct"), which affirm the Company's high standards of business conduct and ethics. The Standards of Business Conduct are part of the Company's continuing effort to comply with all applicable laws, provide an effective program to prevent and detect violations of law, and conduct its business with fairness, honesty and integrity. In the unlikely event of a request for a waiver from compliance, any such request of waiver will be subject to approval by the Board (any director requesting a waiver will not be entitled to vote on such request) and such waiver will be promptly disclosed to stockholders as required by law.

85. The Governance Guidelines outline the function and operations of the Company's committees under the heading "Board Committees." A sub-section under this heading includes "Committee Structure and Charters," in which the Governance Guidelines state the following:

> The Board currently has three standing committees: Audit Committee, Compensation Committee, and Governance Committee. The Board may establish additional committees as necessary or appropriate. Committee members and chairpersons will be appointed by the Board upon the recommendation of its Governance Committee. Each committee will have its own charter setting forth the purpose, membership requirements, responsibilities and procedures of the committee, which shall include an annual self-evaluation.

86. Within the same section, under the sub-heading "Annual Board Performance Evaluation," the Governance Guidelines speak on Company accountability, stating,

> It is expected that the Board will conduct an annual self-evaluation to determine whether it and its committees are functioning effectively.

> It is expected that this process will also include annual self assessments by each Board committee, relying on a review process similar to that used by the Board, with performance criteria for each committee established on the basis of its charter.

87. In violation of the Code of Conduct and the Governance Guidelines, the Individual Defendants, as key officers and as members of the Company's Board, conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## AUDIT COMMITTEE CHARTER

88. The Hertz Global's Audit Committee Charter (the "Audit Committee Charter") defines the oversight responsibilities of the Company's Audit Committee.

89. Per the Audit Committee Charter, the purpose of the Audit Committee is generally to "assist the Board in fulfilling certain of the Board's oversight responsibilities."

90. Specifically, "the primary purpose of the Committee is to assist the Board in overseeing" the following:

- the accounting, financial, and external reporting policies and practices of the Company and the audit of the Company's financial statements;

- the integrity of the Company's financial statements;

- the effectiveness of the Company's systems of internal controls, including operational policies and practices;

- the independence, qualifications and performance of the Company's independent auditor;

- the authority, scope, access and performance of the Company's internal audit function;

- the Company's compliance with legal and regulatory requirements;

- treasury and finance matters; and

- enterprise-wide risk management, including cybersecurity and other technology risks.

In discharging its duties under this Charter, the Committee shall have the authority, in its sole discretion, to select, retain, terminate and obtain the advice of any independent legal, accounting, or other advisors as it deems necessary or appropriate to fulfill its duties and responsibilities. The Committee shall approve the terms of any engagement, including compensation, and oversee the work, of any such independent legal, accounting, or other advisors. The Company shall provide appropriate funding, as determined by the Committee, for payment of (i) compensation to the independent accountants for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company and to any advisors employed by the Committee; and (ii) ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties. Any accounting, legal or other consultant retained by the Committee may, but need not, be, in the case of an outside accountant, the same accounting firm employed by the Company for the purpose of rendering or issuing an audit report on the Company's annual financial statements or, in the case of an outside legal or other advisors, otherwise engaged by the Company for any other purpose.

91. The Audit Committee Charter lists, under the heading "Responsibilities" the following, in relevant part:

> 1. *Oversight of Financial Reporting, Disclosure and Internal Controls*
>
> a. Review any significant additions or changes to the Company's existing policies or practices as they apply to accounting, financial reporting, external reporting, and asset-safeguarding.
>
> b. Discuss generally the Company's earnings reports, as well as any written financial information and earnings guidance provided to analysts and ratings agencies. The Committee need not discuss in advance each earnings release or each instance in which the Company may provide earnings guidance.
>
> c. Review and discuss with management and the independent auditor the quarterly, unaudited financial statements, including disclosures made in management's discussion and analysis of financial condition and results of operations, major underlying issues and the results of the independent auditor's review prior to filing each quarterly report on Form 10-Q.
>
> d. Review and discuss with management and the independent auditor the annual audited financial statements, including disclosures made in management's discussion and analysis of financial condition and results of operations, and major underlying issues prior to filing each annual report on Form 10-K.
>
> e. Review and discuss with the Chief Executive Officer (the "CEO") and the Chief Financial Officer (the "CFO") the procedures undertaken in connection with the CEO and CFO certifications in periodic reports, including their evaluation of the Company's disclosure controls and procedures and internal controls.
>
> f. Prepare the report required by the rules of the SEC to be included in the Company's annual Proxy Statement.

*     *     *

h. Review and discuss quarterly reports from the independent auditor on all critical accounting policies and practices to be used; all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

i. Review and discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles, any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies.

* * *

m. Discuss with management the Company's major financial

risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies.

92. The Audit Committee Charter, under the heading "Responsibilities," in the section, "Oversight of Independent Auditor," states the following, in relevant part:

d. Review the conduct and results of the audit of the consolidated financial statements and solicit concerns from the independent auditor, including any audit problems, difficulties encountered in the course of audit work, including any restrictions on the scope of activities or access to requested information, disagreements with management and management's response and communications between the audit team and the audit firm's national office with

> respect to difficult auditing or accounting issues presented by the engagement.
>
> * * *
>
> g. Obtain and review a report from the independent auditor at least annually detailing: (i) the independent auditor's internal quality-control procedures; (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the independent auditor, or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; and (iii) all relationships between the independent auditor and the Company.

93. The Audit Committee Charter, under the heading "Responsibilities," in the section, "Oversight of Internal Audit," states the following, in relevant part:

> c. Review, in consultation with the CAE, the annual internal audit scope and riskbased plan, performance related to the plan and any changes required during the year.
>
> d. At least quarterly, review internal audit results, including any difficulties encountered in the course of internal audit activities, and management's responses thereto.

94. The Audit Committee Charter, under the heading "Responsibilities," in the section, "Oversight of Compliance, Legal and Regulatory Matters," states the following, in relevant part:

> a. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or audit matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters. This includes overseeing management's arrangements for the prevention and deterrence of fraud.

> b. Conduct any investigation that the Committee deems appropriate, with full access to all of the Company's records, facilities, personnel and outside advisors. This includes ensuring that appropriate action is taken against known perpetrators of fraud or related misconduct.

95. The Audit Committee Charter, under the heading "Responsibilities," in the section, "Oversight of Compliance, Legal and Regulatory Matters," states the following, in relevant part:

> a. Review, as appropriate, the Company's and its subsidiaries' capital markets and financing plans consistent with the prior approvals of the Board, including with respect to the Company's debt, equity or other financing arrangements (including re-financings);
>
> b. Review, as appropriate, the material terms and conditions of the Company's long-term debt financings and its subsidiaries' long-term debt and equity issuances consistent with the prior approvals of the Board, including with respect to bank loans, letter of credit facilities, securitization facilities (including medium term note issuances and variable funding note issuances), collateral security or pledge agreements, promissory notes, commercial paper, and guarantees;

96. The Audit Committee Charter, under the heading "Responsibilities," in the section, "Oversight of Risk," states the following, in relevant part:

> a. Oversee, review and discuss with management, including the CAE, the Company's enterprise-wide risk management process including management's implementation and maintenance of an appropriate risk governance structure, risk assessment and risk management practices and guidelines.
>
> b. Oversee, review and discuss with management, including the senior technology officer, the quality, effectiveness and matters related to the Company's security of information technology systems, capabilities for disaster recovery, data

protection, cyber threat detection and cyber incident response, and management of technology-related compliance risks.

c. Provide oversight on significant risk exposures and control issues, including fraud risks, governance issues, and other matters needed or requested by senior management and the Board. This includes considering the effectiveness of the Company's control framework, including information technology security and control.

d. Provide oversight of the adequacy of the combined assurance being provided.

e. Oversee, review and provide advice on the risk management processes established and maintained by management and the procedures in place to ensure that they are operating as intended.

97. In violation of the Audit Committee Charter, the Individual Defendants (as key officers, and members of the Company's Board) conducted little, if any oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations Section 14(a) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Company Background

98. Hertz Global is a Delaware corporation based in Estero, Florida which provides ICE and EV rental services from Company-operated, licensee, and franchisee locations. The Company operates through two business segments: Americas Rental Car ("RAC") and International RAC, with Americas RAC covering operations in the U.S., Canada, Latin America and the Caribbean, and International RAC covering operations in other international locales. Hertz Global is one of the largest international vehicle rental companies and has garnered significant global recognition over time.

99. The Company's two business segments both engage primarily in vehicle rentals, as well as sales of vehicles and value-added services. Additional operations of the Company include corporate operations regarding performance assessment and resource allocations based upon the financial information provided for Hertz Global's operating segments.

100. Hertz Global's two business segments are primarily operated through the Company's three largest brands – Hertz, Dollar, and Thrifty. Hertz provides several options of brands for customers to choose from, so customers have a full range of rental services at different price points, levels of service, offerings, and products. The Company recognizes Hertz as its top-tier brand, claiming it offers premium customer service and multiple innovative offerings. The Company recognizes Dollar as its smart value brand, marketed as a smart choice for fiscally

conscious travelers looking for a dependable and affordable rental vehicle. Additionally, the Company recognizes Thrifty as its deep value brand, considering it the most cost-effective offering for travelers.

101. The Company claims to generate synergies among its brands by using a shared fleet and centralized fleet management, along with consolidated functions such as vehicle maintenance, cleaning, and back-office operations where applicable. Hertz Global's profitability largely depends on the volume, mix, and pricing of rental transactions, vehicle utilization rates, the cost of vehicle ownership, and other operational expenses.

102. Additionally, Hertz Global partners with select rideshare companies to offer vehicle rentals to drivers in specific cities across North America and Europe through its Ride Share Program. This program allows for longer-term rentals compared to traditional business rentals and is promoted by Hertz Global as part of its broader strategy to play a key role in the evolving mobility landscape.

103. Hertz Global also operates a "corporate operations" segment, which is responsible for evaluating Company performance and allocating resources based on financial data from its operating divisions.

104. According to CW1 and CW2, Hertz Global is structured into five regional divisions: (1) the West, which includes parts of California, Oregon, Washington, and Hawaii; (2) the Southwest, covering Nevada down through Texas; (3) the Midwest, encompassing Arkansas, Missouri, Indiana, Ohio, West Virginia, Virginia, Kentucky, Michigan, Wisconsin, Minnesota, Kansas, Iowa, and

Oklahoma; (4) the Northeast, spanning from Maine to North Carolina; and (5) the Southeast, which includes Georgia, Florida, Louisiana, Mississippi, Tennessee, and South Carolina. Each region is managed by a regional manager who oversees a team of approximately six to seven revenue analysts.

105. The Company supposedly carefully balances supply and demand when it determines the stock for its fleet. For the year ending December 31, 2023 (the "2023 Fiscal Year"), Hertz Global operated a peak rental fleet of approximately 467,000 vehicles in its Americas RAC segment and about 124,600 vehicles in its International RAC segment. To maintain the right mix of vehicles, Hertz Global must invest heavily in vehicle acquisitions, which requires substantial liquidity. The Company claims to fund these purchases through a combination of ongoing global borrowing programs and cash generated from operations.

106. Hertz Global offers a mix of ICE vehicles—powered by liquid fuels such as gasoline or diesel—and EVs. In managing its fleet, Hertz Global asserts that it aims to strike a proper balance between supply and demand. As Defendant Scherr stated, "Regardless of vehicle prices, we will always keep our commitment to fleeting within the confines of demand."

107. Hertz Global also partners with select rideshare companies to offer EVs to drivers using those platforms. For instance, Uber drivers, who previously needed to own or lease their own vehicles, can now rent an EV directly from Hertz Global.

***The Individual Defendants Supposedly Evaluate Hertz Global's Financial Performance and Profitability by Analyzing Key Performance Indicators***

108. According to the Form 10-Ks filed by Hertz Global with the SEC for the fiscal year ended December 31, 2022 (the "2022 Fiscal Year") and the 2023 Fiscal Year (respectively, the "2022 10-K" and the "2023 10-K"), the Individual Defendants regularly track several key performance indicators ("KPIs"), including Vehicle Utilization, Total Revenue Per Transaction Day, Total Revenue Per Unit Per Month, and Transaction Days.

109. The 2023 Form 10-K describes Vehicle Utilization as a critical metric for both management and investors, representing the proportion of the rental fleet actively generating revenue compared to the total rentable fleet capacity. Higher Vehicle Utilization indicates a greater percentage of vehicles being used to earn income. Hertz Global utilization in its Americas RAC segment at 79% for both 2021 and 2022, and 81% in 2023. Although Hertz Global does not report utilization by vehicle type (*e.g.*, EVs versus ICE), as discussed further below, overall utilization remained flat through 2023 and 2024, despite an increase in total fleet size, primarily due to reduced EV utilization.

110. Hertz Global defines Total Revenue Per Transaction Day ("Total RPD") as a KPI for both management and investors, as it reflects changes in rental pricing and includes pricing components that management can directly influence. This metric provides insight into trends in the Company's vehicle rental pricing strategy.

111. In the Americas RAC segment, Hertz Global reported a 40% increase in Total RPD for 2021, a 5% increase in 2022, and a 5% decline in 2023. The sharp slowdown in Total RPD during 2022 and the decline in 2023 align with accounts from CWs indicating consistently low EV utilization during this time. The decline is also attributed to Hertz Global reducing EV rental prices in an effort to stimulate demand.

112. Total Revenue Per Unit Per Month ("Total RPU") is described by Hertz Global as a key performance metric for both management and investors, as it measures revenue productivity relative to the size of the rental fleet—whether the vehicles are owned or leased—referred to as "Average Rentable Vehicles."

113. For the Americas RAC segment, the Company reported a 94% increase in Total RPU in 2021, a 5% increase in 2022, and a 3% decrease in 2023. The sharp slowdown in growth in 2022 and the decline in 2023 align with the CWs' accounts that EV utilization remained low. Despite expanding its EV fleet, Hertz Global generated less monthly revenue per vehicle due to underutilized EVs and the need to reduce EV rental rates to stimulate demand.

114. The Company also tracks Transaction Days per year, defined as an "important key metric to management ad investors as it represents the number of revenue generating days ('volume')" and "is used as a component to measure Total RPD and Vehicle Utilization."

115. Each of these metrics was reported in all of the Company's earnings calls before, during, and after the wrongful course of conduct as described herein.

***Hertz Global Utilizes Internal Systems, Data, and Reports to Assess Demand Needs at Its Rental Locations***

116. The Company utilizes various internal systems to allegedly ensure that Hertz Global maintains the appropriate mix of vehicles in its fleet, effectively balancing supply and demand across rental locations. These systems include a combination of Tableau, CapGuard, the Rate Management System ("RMS"), and the Vehicle Admission Website ("VAW").

117. CW1 explained that the Revenue Management Department across all regions used the Tableau system, which provided real-time data on the size and composition of the rental fleet at each location, as well as reservations made. This allowed CW1's team to ensure each location had enough inventory to fulfill reservations. For example, if a location had 10 SUV reservations but only 5 SUVs available, it was CW1's responsibility to transfer SUVs from other locations to meet the demand.

118. CW1 recalled that both CW1 and all regions within the Revenue Management Department used the CapGuard system to monitor live reservations and available vehicles in the fleet. They also used the VAW to track the number of vehicles in maintenance, on the road, and at specific locations. According to CW1, the RMS was utilized to set rental prices based on factors such as competitor pricing, seasonality, and demand. CW1 explained that revenue analysts, including CW1, were able to adjust rates within the RMS system, but only within certain predefined limits established by management.

119. CW2 also relied daily on information from the RMS and VAW systems. According to CW2, all fleet utilization data was integrated into VAW, while RMS contained pricing data.

120. CW2 met bi-weekly with their manager, Defelicio dos Santos ("dos Santos"), to discuss various markets, including those facing challenges with utilization. To address these issues at specific locations, adjustments to pricing were sometimes implemented.

***Beginning in 2022, Hertz Global Pursued Aggressive Expansion of Its EV Fleet Aiming to Build One of the Largest EV Rental Fleets Globally***

121. On October 25, 2021, Hertz Global issued a press release titled "Hertz Invests in Largest Electric Vehicle Rental Fleet and Partners with Seven-Time Super Bowl Champion Tom Brady to Headline New Campaign," announcing its plans to launch the largest EV rental fleet in North America, and one of the largest in the world. As part of this initiative, Hertz Global revealed it had placed an initial order for 100,000 Tesla EVs, expected to be delivered by the end of 2022. The Company also committed to building out EV charging infrastructure across its global operations. This Tesla order was projected to make up roughly 20% of Hertz Global's broader goal of creating a fleet in which 25% of the vehicles would be electric.

122. Then-interim CEO Defendant Fields stated, "The new Hertz is going to lead the way as a mobility company, starting with the largest EV rental fleet in

North America and a commitment to grow our EV fleet and provide the best rental and recharging experience for leisure and business customers around the world."

123. On April 4, 2022, the Company issued a press release entitled "Hertz and Polestar Announce Global Strategic Partnership to Accelerate Electric Vehicle Adoption." In the press release, it was announced that the Company agreed to purchase 65,000 EVs from Polestar over the next five years. In connection to this announcement, Defendant Scherr stated during an April 4, 2022 interview with Bloomberg, in relevant part:

> [W]e're looking to build out, uh, the largest electric fleet in North America. Uh, this adding to what we have purchased from and will be continuing to purchase from Tesla, you know, puts us on this journey. Uh, Polestar has really developed a, uh, a very, uh, impressive automobile. And to add 65,000 over the next several years will really put us on a position where we can diversify the fleet and really meet what, uh, our customers are looking for. Whether they're individuals, corporates who are looking to fulfill their own carbon footprint objectives, and then fleets like Uber who want to put their, uh, riders into, uh, into EVs.

124. The Company's proxy statement filed on Schedule 14A with the SEC on April 8, 2022 (the "2022 Proxy Statement"), stated the Company's commitment to EVs, in pertinent part:

> We made a commitment to position ourselves at the center of modern mobility and entered into new and expanded relationships around EV and technology. We are also investing in new EV infrastructure across our global operations by installing a combination of Level 2 and Level 3 DC fast chargers throughout our network. We also entered into a partnership with Uber to provide EVs to drivers using the Uber network that can further accelerate the adoption of EVs.

125. Defendant Scherr also claimed there was strong demand for EVs, stating, "Now companies want their, their employees in electric vehicles."

126. On September 20, 2022, Hertz Global issued a press release titled "Hertz and GM Plan Major EV Expansion," announcing its intent to purchase an additional 175,000 EVs from General Motors over the next five years. The planned acquisition included a variety of EV models from Chevrolet, Buick, GMC, Cadillac, and BrightDrop, with availability expected to begin in the first quarter of 2023. The release noted that the purchase would span "a wide range of vehicle categories and price points."

127. In a November 4, 2022 interview with CNN, Defendant Scherr highlighted Hertz Global's aggressive push into EVs, stating the Company was "taking a number of bold initiatives, particularly around electric vehicles," and calling its EV fleet "a very distinguishing characteristic." He emphasized that Hertz Global was offering customers more opportunities than any competitor to choose an EV, positioning the Company as a leader in EV options. Defendant Scherr further noted that Hertz Global aimed to have EVs make up approximately 25% of its fleet by the end of 2024. He also promoted the Company's expansion into the rideshare space, highlighting that EVs were being made available to Uber and Lyft drivers through Hertz Global's rental programs.

***EV Demand Rapidly Declined Due to Charging Infrastructure Limitations and Customer Reluctance to Use EVs***

128. CW1 stated that Hertz Global began introducing EVs to its fleet in late 2021 or early 2022, primarily consisting of Teslas. Although the Company later added EVs from General Motors, CW1 estimated that during their tenure, Teslas made up approximately 60% of the EV fleet.

129. According to CW1, demand for EV rentals started to decline within the first six months of their rollout, as many customers were unwilling to rent them. One major factor, CW1 explained, was the lack of adequate charging infrastructure. Some Hertz Global locations had only one or two charging stations, while others had none at all due to limitations with the local power grid. Additionally, there were not enough staff members available to take the EVs offsite for charging. CW1 also noted that some sites only had access to Level 1 chargers, which could take several hours to fully charge a vehicle, further discouraging customers from choosing EVs.

130. CW1 recalled that another major reason customers were reluctant to rent Tesla EVs specifically was their dissatisfaction with the driving experience. Roughly a year after Hertz Global began offering Teslas in its rental fleet, CW1 heard reports that customers were involved in more accidents, which were attributed to the way Teslas handled on the road.

131. As a result, CW1 noted that EV utilization began to decline approximately six months after their initial rollout, as customers increasingly avoided renting them. According to CW1, this trend persisted throughout their

time at Hertz Global, with EV utilization consistently remaining about 20 to 25% lower than that of ICE vehicles.

132. CW1 also stated that the EV utilization decline was noted in Tableau and CapGuard by the end of 2022 and into 2023.

133. Further, CW2 recalled the Company's acquisitions of EVs at the start of 2022. According to CW2, largescale deployment of EVs began in the early parts of the second quarter 2022 and prior, there had been some smaller deliveries of EVs.

134. CW2 recalled that by the summer of 2022, there was virtually no demand for EVs. Initially, starting in 2022, Hertz Global aimed to rent EVs at Tier 6 or Tier 7 pricing levels, which were considered "above-average" rates typically reserved for luxury or high-demand vehicles. However, due to the lack of customer interest, those price points quickly became unsustainable.

135. When demand failed to materialize within six to eight weeks, CW2 began adjusting EV rental rates downward. Following instructions from dos Santos, CW2 first reduced EV rental rates to the "standard car price," which corresponded to Tier 3. Even then, the EVs continued to sit unrented, forcing CW2 to lower rates further, sometimes dropping prices to as low as $20 to $25 per day to try to generate demand.

136. In the summer of 2022, CW2 participated in a site visit to Hertz Global's Minneapolis airport location as part of an initiative known as "Extra Hands." According to CW2, these visits took place annually during the peak

summer season and involved Revenue Management staff assisting operations at the Hertz Global's top 20 airports within their region. At the Minneapolis site, CW2 observed that a large number of Teslas had recently been delivered but were sitting idle in the lot. Site personnel told CW2 that the EVs had "terrible utilization." As part of the visit, CW2 was instructed to offer customers an upgrade to an EV at the best available rental price. However, once customers learned the vehicles were electric, most declined the offer.

137. CW2 noted that throughout their time at Hertz Global, the Company continued adding more EVs to the fleet, despite the clear lack of demand. Even after significantly lowering rental prices well below Hertz Global's original targets, CW2 was still unable to get many of the EVs rented.

138. CW2 confirmed that throughout their time at Hertz Global, EV utilization in their region never exceeded 55% to 60%, and this trend was consistent in roughly 70% to 75% of other regions across the country. In some cases, EV utilization dropped even further to as low as 30% to 35%.

139. CW2 stated that "everyone" reported to dos Santos that the EVs weren't being rented and were simply "sitting on the lots." Concerned about the continued purchasing of EVs despite the lack of demand, CW2 questioned dos Santos about why Hertz Global kept acquiring more when the existing fleet was underutilized. According to CW2, dos Santos responded with a directive to just make it work.

140. CW2 also confirmed that Hertz Global's EV charging infrastructure was severely lacking. Many rental locations had received EVs before any charging systems were installed. For example, the St. Louis location had no onsite charging capabilities, forcing the General Manager to send staff offsite to charge each vehicle, which was a process that could take between an hour to an hour-and-a-half per car. CW2 said multiple General Managers contacted them via phone or email expressing frustration over the lack of infrastructure, noting they had to spend extra money and time sending employees to charge EVs offsite. CW3 corroborated these concerns, adding that while charging infrastructure was eventually installed, it often came several months after the EVs had already been delivered.

141. CW3 supported the accounts of CW1 and CW2, stating that it was clear EVs were not being rented throughout 2022 and 2023 because large numbers of them consistently sat idle on the lots. Similar to CW1 and CW2, CW3 observed that many customers were reluctant to rent EVs due to unfamiliarity with how to operate or charge them. CW3 noted that for customers who had never driven an EV, there was a learning curve and a general sense of hesitation or fear surrounding the experience.

142. Around February 2023, during the monthly Revenue Management All Hands meeting, Brady instructed CW1's team to raise rental prices on EVs because Hertz Global was not generating sufficient revenue from them. CW1 understood that this directive originated from Arrington and a VP from Finance. According to

CW1, this price increase negatively impacted overall EV utilization, as customers were unwilling to pay the higher rates.

143. To boost EV rentals, CW1's team was instructed throughout much of CW1's tenure to rent customers an EV even if they had originally requested an ICE vehicle, so that Hertz Global could report higher numbers of EVs in use. CW1 knew this because the Tableau system tracked, by location, which vehicles customers actually reserved versus what was on the road.

144. CW1 also recalled receiving numerous complaints from customers who had reserved ICE vehicles but were given EVs instead, often because the EV was not fully charged or because customers were unhappy being assigned Tesla EVs due to their driving experience. CW1 learned about these complaints through Operations Managers, who sometimes forwarded the customer feedback directly to CW1. CW1 communicated with the Operations Managers several times daily regarding customer complaints, as well as issues with demand, maintenance, staffing, and ensuring EVs were charged and ready to rent.

145. By the time CW1 departed from Hertz Global, EVs were primarily utilized only at airports, very small locations, and for Ride Share purposes.

146. The Board were also aware of these issues causing a decline in EV demand. For example, on October 5, 2023, the Board were shown a presentation which, among other things, noted that [redacted]. Later in that same Board presentation, the

Board were informed that [redacted]. The Board's minutes from this meeting also reflect that the Board discussed the [redacted]

147. Following this, the Board were continuously made aware of, and discussed, how the [redacted]

***Hertz Global Sells Off One-Third of Its Unprofitable EV Fleet Due to Weak Demand and Initiates Executive Leadership Restructuring***

148. According to CW3, Hertz Global began ramping up its EV sales around April 2023. In 2022, CW3 estimated that only about 15 EVs were listed for sale. However, by April 2023, that number had grown to approximately 1,500. CW3 noted that from that point forward, the volume of EVs for sale continued to rise each month. By November and December 2023, Hertz Global had roughly 3,000 EVs available for sale, with EVs (primarily Teslas) making up 80% to 90% of all vehicles listed. CW3 further recalled being told by colleagues that by February or March 2024, the number of EVs listed had reached between 4,000 and 5,000.

149. CW3 confirmed that the increasing pace of EV sales throughout 2023 and into 2024 was driven by the fact that the vehicles simply weren't being rented.

150. According to CW3, selling the EVs was challenging because Hertz Global had set the prices too high in an effort to minimize financial losses. During CW3's time at the Company, EVs were generally listed at $1,500 to $3,000 above market value. Although Remarketing Representatives were permitted to offer up to a $600 discount per EV, the pricing still remained too high, and dealers consistently told CW3 that Hertz Global's asking prices were unrealistic. By April 2023, CW3 recalled that some EVs were overpriced by as much as $5,000 to $10,000.

151. During a December 2023 Board meeting, it was revealed that [redacted] Despite being internally made aware of this, it was not disclosed to the market. Furthermore, the Board were made aware during this same meeting that [redacted] While this fact likely prompted the decision to increase the number of EVs being sold, it continued to be concealed from the market.

152. It wasn't until January 11, 2024, that the Individual Defendants publicly admitted Hertz Global was selling 20,000 EVs, or roughly one-third of its electric fleet, due to insufficient demand. Shortly thereafter, Hertz Global disclosed a substantial $245 million write-off to adjust the EVs' book value down to market value. The Individual Defendants had been aware of this issue as early as April

2023, when dealers repeatedly told Hertz Global's sales team the vehicles were priced well above market rates.

153. Just four days later, on January 15, 2024, Defendant Nedelman notified Hertz Global of his decision to resign from the Board of Directors, effective January 19, 2024. Soon after, on March 15, 2024, the Company announced that Defendant Scherr would be stepping down as CEO, with West set to assume the role effective April 1, 2024. No explanation was offered for either departure.

## <u>FALSE AND MISLEADING STATEMENTS</u>

### ***January 6, 2023 CNBC Interview***

154. On January 6, 2023, Defendant Scherr was interviewed by CNBC on its program "Squawk on the Street" (the "January 2023 CNBC Interview"). During the January 2023 CNBC Interview, Defendant Scherr was asked, "what is the demand for, for EV rentals." In response, Defendant Scherr stated, "***EV rental demand is very strong and strong across all aspects of our business***."

155. CNBC uploaded the recorded video onto its website and captioned it, "Hertz CEO Stephen Scherr EV rental demand is strong across all aspects of our business."

156. This, however, directly contrasts with the information the Board were given during its January 26, 2023 meeting wherein the Board were informed that [redacted]

### ***February 7, 2023 Q422 Earnings Call***

157. On February 7, 2023, the Company held an earnings call with analysts and investors in order to discuss its financial results for the fourth quarter of the 2022 Fiscal Year (the "Q422 Earnings Call"). On the Q422 Earnings Call, Defendant Scherr made false assurances to investors, such as, "***we will always remain attentive to customer preference***."

158. Furthermore, Defendant Scherr claimed, in relevant part:

> As we pursue growth, fleet and cost management remain our key levers should demand soften. ***While we are not seeing demand reduction today, we are positioned to confront that challenge should it materialize***.

159. On the same Q422 Earnings Call, the Defendant Scherr further assured investors that, "***[r]egardless of vehicle prices, we will always keep our commitment to fleeting within the confines of demand.***"

160. During the question-and-answer portion of the Q422, Defendant Scherr was specifically asked about demand for corporate business, to which he falsely represented:

> In terms of the corporate business, I would say that January equally sort of told you of the continuation in demand. Demand was up 28% over January, again, with corporate demand coming back now closer to where we saw it. Importantly, I would tell you that if you look at contract renewals, and I made a comment to this in the prepared remarks, we're seeing near 100% contract renewal on our corporates[.] Importantly, they're getting renegotiated at higher prices. ***Obviously, corporates are focused on EVs as an alternative to put their employees in to satisfy their own ESG commitment, but the corporate business is feeling quite good, very strong.***

* * *

> ***One last point on corporate, I would raise with you, and that is if you look at the pattern of corporate demand, it too is changing for the better for us***, meaning, over the course of 2022, we saw an increase by about 20% for about 1.5 days to the duration of a corporate rental.

***February 7, 2023 CNBC Interview***

161. On February 7, 2023, Defendant Scherr was interviewed by CNBC for its segment "Squawk on the Street" (the "February CNBC Interview").

162. During the February CNBC Interview, Defendant Scherr responded to a question regarding what he was "seeing in terms of both leisure and corporate demand," to which Defendant Scherr stated, "part of what's happening is that ***demand is not lessening at all***."

163. These statements made in February 2023 regarding demand not falling are plainly false because, [redacted]

***April 4, 2023 CNBC Interview***

164. On April 4, 2023, Defendant Scherr was interviewed by CNBC for its segment "Squawk on the Street" (the "April CNBC Interview").

165. During the April CNBC Interview, Defendant Scherr was asked about the current demand, to which Defendant Scherr assured that market worries were "misplaced," and there would be "continued strength and demand," as well as "accelerated bookings" for rental cars in 2023 across "***all markets***." The interview proceeded, in relevant part:

Interviewer:

What are you seeing on demand? It feels like the market is starting to worry that, that this boom cannot hold up forever, especially given some of the big economic headwinds.

Scherr:
Well, as we look forward to the summer, I think ***that concern is misplaced. I mean, what we're seeing coming out of the first quarter is continued strength and demand, uh, and accelerant into bookings, uh, and, uh, you know, strong, uh, price support, uh, in terms of where we are renting cars. And I would say that's across all markets***. (emphasis added). ***Leisure has been strong, continues to be strong. Uh, the corporate business continues to play strongly***.

***April 5, 2023 Proxy Statement***

166. On April 5, 2023, the Company filed the 2023 Proxy Statement with the SEC. Defendants Bermanzohn, Farmer, Feikin, Fields, Intrieri, Nedelman, Scherr, Shannahan, Vougessis, and Wagner solicited the 2023 Proxy Statement pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

167. The 2023 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Feiken, Fields, and Vougessis to the Board; (2) ratify the appointment of Ernst & Young LLP ("E&Y") as the Company's independent registered public accounting firm for the 2023 Fiscal Year; (3) approve, on a non-binding advisory basis, certain executive compensation; and (4) approve, on a non-binding advisory basis, the frequency of future votes on executive compensation.

168. Regarding the Board's role in "Risk Oversight," the 2023 Proxy Statement stated the following:

> Our senior leadership is responsible for identifying, assessing, and managing our exposure to risk. The Board and its committees play an active role in overseeing management's activities and evaluating whether management's plans are balanced from a risk/reward perspective. The Board and its committees perform this oversight through a variety of mechanisms.
>
> The Board regularly reviews our progress with respect to our strategic goals, the risks that could impact the long-term sustainability of our business and the related opportunities that could enhance our long-term sustainability. The Board oversees these efforts in part through its various committees based on each committee's responsibilities and expertise.

169. Regarding the Code of Conduct, the 2023 Proxy Statement stated the following:

> To help resolve ethical issues in an increasingly complex global business environment, we maintain our Standards of Business Conduct (our "Code"), which applies to all employees, officers and directors of the company and our subsidiaries. The Code covers topics such as conflicts of interest, insider trading, competition and fair dealing, discrimination and harassment, confidentiality, interactions with government personnel, anti-boycott laws, employee complaint procedures, and anti-money laundering. Copies of our Code are available without charge on the "Investor Relations" portion of our website at *ir.hertz.com/about/corporate-governance*.

170. Defendants Bermanzohn, Farmer, Feikin, Fields, Intrieri, Nedelman, Scherr, Shannahan, Vougessis, and Wagner caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Individual Defendants materially overstated the market demand for EVs; (2) the Individual Defendants' purchases of vehicles failed to match the confines of the actual demand; (3) the capacity of Hertz Global's electric vehicle charging infrastructure was inadequate; and (4) the Company failed to maintain internal controls. As a

result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

171. The 2023 Proxy Statement also was false and misleading because it failed to disclose that: (1) through the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

172. As a result of Defendants Bermanzohn, Farmer, Feikin, Fields, Intrieri, Nedelman, Scherr, Shannahan, Vougessis, and Wagner causing the 2023 Proxy Statement to be false and misleading, shareholders voted to, *inter alia*, reelect re-elect Defendants Feiken, Fields, and Vougessis to the Board to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, and to appoint E&Y as the Company's independent registered public accounting firm for the 2023 Fiscal Year.

***April 27, 2023 Q123 Earnings Call***

173. On April 27, 2023, the Company held an earnings call with analysts and investors in order to discuss its financial results for the first quarter of the 2023 Fiscal Year (the "Q123 Earnings Call"). During the Q123 Earnings Call, Defendant Scherr stated that the Company was seeing "continued growth" across

all customer segments. This included a projected growth in EV rentals of five times more than 2022. Defendant Scherr stated, in relevant part:

> Hertz posted strong results in the first quarter, ***reflecting continued growth in demand across our customer segments*** and a stable pricing environment in both the U.S. and abroad.
>
> * * *
>
> Our fleet acquisition costs are generally aligned with vehicle delivery timing. As a result, we have been benefiting from recent price declines from EV OEMs. ***We are forecasting nearly 2 million EV rentals in 2023, approximately 5x the number of the prior year***.

174. Also, during the Q123 Earnings Call, Defendant Scherr represented, in relevant part:

> In terms of charging, ***our proprietary network of charging stations continues to grow, so as to service our fleet***. Through our partnership with bp Pulse, we are accelerating the build-out of EV charging infrastructure at Hertz locations in major U.S. cities to serve both our customers and the driving public.

175. Further, on the same Q123 Earnings Call, Defendants Scherr and Brooks represented to analysts and investors that the Company intended to keep fleet size within the expected demand curves:

> <u>Defendant Scherr</u>: That said, ***we remain committed to our strategy of growing fleet to sit inside expected demand*** and underwriting investment decisions through the lens of returns over the prescribed period of car ownership.
>
> * * *
>
> <u>Defendant Brooks</u>: With regards to fleet, average fleet size grew to 505,000 vehicles in the quarter as we began to gear up for the expected spring and summer demand, ***always with the intention of maintaining fleet inside the demand curve***. Net DPU for the

> quarter was $252 which was below the low end of the range we quoted on our last earnings call of $300.

***July 27, 2023 Q223 Earnings Call***

176. On July 27, 2023, the Company held an earnings call with analysts and investors in order to discuss its financial results for the second quarter of the 2023 Fiscal Year (the "Q223 Earnings Call").

177. During the Q223 Earnings Call, Defendant Scherr represented that there was more fleet available to capable of serving the demand across new ventures. Defendant Scherr stated, in relevant part:

> Staying with fleet for a moment, we are benefiting from increased operational productivity as evidenced by a material reduction in out-of-service and more efficient maintenance turns. But simply, we are making more fleet available for more revenue earning activities, which better enables us to serve ***base demand as well as demand across our new ventures***, including rideshare and our revitalized value brands. Think of lower out of service is helping to fund growth in the business. ***As we open the third quarter, there is no current evidence of softening demand***.

178. During the same Q223 Earnings Call, Defendant Scherr was asked by an analyst about July demand trends, to which Defendant Scherr stated that overall demand was "very strong." This exchange during the Q223 Earnings Call included, in pertinent part:

> Question: Hi, good morning. Thank you. I think you gave a little bit of color of the trends that you were seeing in July, but maybe if we could just flesh that out a little bit. If you could just touch on the demand trends you've seen in July and how that's compared to maybe normal seasonality?
>
> Defendant Scherr: [] I think ***overall, very strong demand***, of which we're going to find other channels to feed it even more and

> continued strength in price, again, in a very stable rate environment relative to

179. On the Q223 Earnings Call, Defendant Scherr also represented that utilization was elevated throughout the whole business. Defendant Scherr stated, in relevant part:

> Question: And of course, your thoughts with how you see what looks to be a lot of pent-up demand, but certainly, the last segment to recover with respect to travel playing out into the back half?
>
> Defendant Scherr: Sure. Great. So just as a baseline, okay? It's important to realize that we've been -- we ran in Q2 at an 82% utilization. And ***we are signaling to you that we will take that even higher in the context of our fleet. And that's not price driven, as I said, that's fleet driven. So we calibrate the fleet, and we'll take it down to sort of maintain very high levels of utilization***, so as to maintain price and the like. ***I raised that because across the whole of the business, all geographies are contributing to an elevated level of view.***

***July 27, 2023 CNBC Interview***

180. On July 27, 2023, Defendant Scherr was interviewed by CNBC for its segment "Squawk on the Street" (the "July CNBC Interview").

181. During the July CNBC Interview, Defendant Scherr was asked about the Company's positive outlook for the second half of 2023. The interview proceeded, in relevant part:

> Interviewer: I mean, on the call you said, you know, on rate for the balance of 20, uh, 23 is for year over year comparisons to improve sequential uptick in both rate and demand into Q3. So what are you seeing, uh, that gives you a more positive outlook for the second half of the year?
>
> Defendant Scherr: Well, good to be with you, David. I mean, what ***we're seeing is just continued strength in the in demand***, and it's not just here in the us, it's equally in Europe. Uh, and um, part

> of that is a function of, uh, greater confidence among the consumer. You heard it yesterday in some of the Fed discussion, uh, disinflation and the consumer sort of playing strong. Uh, and ***so we continue to see considerable demand, you know, such that this doesn't appear to be kind of a momentary surge or a revenge, if you will, coming out of Covid. There's something that feels a bit more permanent to this*** . . . .

***August 10, 2023 J.P. Morgan Investor Conference***

182. On August 10, 2023, the Company presented at the J.P. Morgan Investor Conference (the "Investor Conference"). During the Investor Conference, Defendant Scherr represented, in relevant part:

> ***Well, I would say that at a headline demand remains very strong***. We don't see through the lens of our business weakness in the consumer . . . .
>
> * * *
>
> ***The cliff, if you will, that everybody had assumed the consumer was going to fall off, and we would see demand sort of fall away has simply not happened***.
>
> * * *
>
> And obviously, as I mentioned here, we're using the opportunity of strong demand to take rate up. So I think we're in a period of stability around rate. ***We continue to see strong demand to sort of feed it. We are running our fleet at an elevated level of utilization against historical standards***, yet we're running fleet at a very tight tolerance as is the industry to where a sellout situation exists. It's not as acute as it was in '22, but the industry is not running at a fleet size that's 30%, 20%. It's low single digits above that, which the industry would otherwise be in a sold-out position. You've heard me on cost.

183. During the Investor Conference, Defendant Scherr responded to an inquiry about corporate demand for EVs. He stated, in pertinent part:

> The other thing I would say about our corporate business, perhaps uniquely is that ***we're seeing continued growth in the utilization of electric vehicles in the corporate space***. This is where companies are looking to satisfy not just the base need for an employee to be in a rental car, but satisfying certain sustainability objectives that they have and putting their employee in an electric vehicle.
>
> I'll just tell you, anecdotally, we engaged, I engaged in a series of letters and e-mails with the CEOs of most of our major corporate clients. And in that, I engage them in the proposition that, in fact, the EV did present an interesting opportunity for them to sort of satisfy sustainability objectives, which have been always elusive and the SEC has obviously been on everyone on the veracity of those claims, but this was a very real way to satisfy that. And I think ***without exception, we have seen in companies with whom we've engaged, a pickup, literally just in the last month or 2 around the take-up of EVs in the component of business***. And so I think that's an edge that ***we will continue to sort of pursue in the growth in our corporate business***.

***August 16, 2023 CNBC Interview***

184. On August 16, 2023, Defendant Scherr was interviewed by CNBC for its segment "Power Lunch with Phil Lebo and General Motors CEO Mary Barra" (the "August CNBC Interview").

185. During the August CNBC Interview, the interviewer asked Defendant Scherr, "what kind of demand are you seeing from Hertz customers when it comes to renting an electric vehicle?" Defendant Scherr responded, in relevant part:

> ***[W]e're seeing demand in a number of areas of our business. First, we're seeing it in leisure. We're also seeing it in the corporate business where corporate customers of ours want to put their employees into electric vehicles to satisfy some of their own sustainability objectives***. And we're obviously renting electric vehicles to Uber, Lyft, and other ride share drivers with this turns out to be a very profitable but venture both for us and for them, uh, where drivers can make considerably

> more money on a weekly basis, renting an electric vehicle. And we're just very excited to be engaged with GM and starting to take delivery on the 175,000 cars that we intend to buy.

186. Also during the August CNBC Interview, Defendant Scherr was asked about potential troubles the Company was facing regarding renting EVs due to the lack of charging stations. The interview proceeded as follows, in relevant part:

> Lebo: Steven, speaking of adopting electric vehicles or being more exposed to them, um, one of the big concerns that I hear from people, whether they're renting from Hertz, whether they're driving an electric vehicle that they own, is public charging stations. JD Power out with a report today saying people are more dissatisfied than ever before when it comes to public charging stations. Um, *are you concerned that this is a limiting factor that might make people think twice before they rent an ev?*
>
> Defendant Scherr: ***I wouldn't say I'm concerned so much as we're focused on it. I mean, we have about 3000 of our own proprietary chargers, which are meant to keep our fleet running***, but we're in partnership with BP, as you know, uh, ***to help develop and roll out, uh, charging stations all across the country. … We obviously have locations in proximity to about 90% of the US population. We're putting those locations to work***. We obviously have the cars. We know where they're going, we know where they're dwelling, and we have an opportunity to grow this out. And we're partnering with cities all across the US as part of a Hertz electrifies program, Houston, Atlanta, Orlando, and we hope to announce others soon Denver as well, all with an effort to sort of grow our charging stations. But I, I will tell you, having been an observer of the market for a long, long time, you know, ***to the extent that we continue to see growth in ev sale rental utilization,*** you can be assured that capital follows and we get inbounds all the time from infrastructure funds and other sources of capital to put against this opportunity. ***And so I'm sure it will come as it is coming now.***

187. The statements referenced in ¶¶ 154-155, 157-162, 164-165, 173-186 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the

Individual Defendants failed to disclose, *inter alia*, that: (1) the Individual Defendants materially overstated the market demand for EVs; (2) the Individual Defendants' purchases of vehicles failed to match the confines of the actual demand; (3) the capacity of Hertz Global's electric vehicle charging infrastructure was inadequate; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Starts Emerging as**
**False and Misleading Statements Continue**

***October 26, 2023 Earnings Call***

188. On October 26, 2023, the Company held an earnings call with analysts and investors in order to discuss its financial results for the third quarter of the 2023 Fiscal Year (the "Q323 Earnings Call"). On the Q323 Earnings Call, Defendant Scherr conceded that the Company, "underperformed in Q3 relative to our expectations and [Hertz Global] must correct the issues that weighed on [its] results." The Company attributed the underperformance, in part, to a small demand for EVs.

189. During the Q323 Earnings Call, Defendant Scherr explained that Hertz Global shifted its EVs from the rideshare segment to the leisure segment due to "higher incidents of damage among EV rideshare drivers." However, this reallocation was made without considering actual demand, leading to an oversupply of EVs in the leisure segment and a subsequent decline in RPD for those

vehicles. As a result, Defendant Scherr acknowledged that Hertz Global needed to "tighten the EV supply in that channel" and better align the fleet with demand.

190. On the Q323 Earnings Call, Defendant Scherr admitted, in pertinent part:

> Our recent progress is reassuring as earlier in 2023 and occasion by higher incidents of damage among EV rideshare drivers, we took steps to moderate our rideshare growth and re-underwrite the rideshare driver base. This meant purposely slowing the supply of EVs into rideshare and moving more electric vehicles into the leisure channel to facilitate their ongoing utilization. With hindsight, ***this left leisure over fleeted with EVs. As a result, RPD for our electric vehicles in leisure drop***, which contributed to the lower RPD performance for the company in the quarter. As you would expect, we have been parsing the data on damage and actively remediating the causals.
>
> And during Q4, we are more confident in the quality of demand in rideshare, buffeted by enhanced processes to better underwrite drivers and to improve the mix of more experienced higher length of keep drivers. This is enabling us to return confidently to a strategy of growing the level of our existing electric fleet that is allocated to this business. Over the next several quarters, we expect to move an increasing number of our current electric vehicles into the rideshare fleet, supplementing the several thousand EV on rents made in just the last several months. ***As we pull these cars from leisure, we are simultaneously tightening the EV supply in that channel and more accurately matching the fleet to demand in effect seeking to reverse the issue that pressured the quarter and adhering to our ROA mentality***. We're also continuing to take steps to rectify the issue of elevated EV damage costs broadly, which we had thought would come down more quickly than they have.

191. Also during the Q323 Earnings Call, Defendant Scherr stated that as a result of the lack of demand and unprofitable margins, the Company planned to purchase EVs at a slower rate. Defendant Scherr disclosed, in relevant part:

> We know the challenges at hand and are working to remedy that, which we can. And we'll pace ourselves accordingly ***with an expectation that our in-fleeting of EVs will be slower than our prior expectations***, but we will be stronger for having begun the journey when we did.
>
> Looking past our results in Q3, I want to close my remarks with a few comments about our expectations on the forward. 2023 has become a transitional year for the company, where we continue to fix and improve the foundational elements of the business from basic technology and field capability through to product offerings and brand strengthening.

192. During the question-and-answer portion of the Q323 Earnings Call, an analyst asked Defendant Scherr about the economics of EVs and whether they would improve over time. In response, Defendant Scherr admitted that the Company would "pace ourselves" going forward and "watch what demand looks like" in order to avoid a supply and demand imbalance, similar to the one the Company experienced in 2023.

193. When an analyst from Oppenheimer & Co. inquired about the proportion of EVs in Hertz Global's fleet made up of Teslas, Defendant Scherr disclosed that EVs accounted for approximately 11% of the total fleet—down from 20–25% at the start of the year—with Teslas comprising 80% of that EV segment. Defendant Scherr also confirmed that, moving forward, Hertz Global planned to purchase most of its vehicles from General Motors at significantly lower price points.

194. In response to a question from a Jefferies LLC analyst about whether reallocating Teslas to the leisure segment had increased RPD, Defendant Scherr

explained that shifting EVs into the leisure market had created a mismatch in demand, resulting in more EVs being available than were needed in that segment. He stated, in pertinent part:

> So on the electric vehicles in leisure, I think ***on the forward, our view is that we need to bring supply in line with natural demand that's being expressed***. And as we've always said, ***we want to bring our fleet inside the demand curve***. ***That same holds true in terms of electric vehicles in leisure***. And there are a number of sort of parts to the demand equation on the RAC side. Leisure, of course, being one where people have a natural desire and interest in driving an EV.

195. As such, during the Q223 Earnings Call, Defendant Scherr noted that the Company no longer expected to reach its goal of having 25% of its fleet be EVs by 2024:

> I think it's also important to say that I'm not out to achieve a fixed percentage of our fleet being electric by date and time, meaning much as we had initially targeted to get to 25% of our fleet being electric by the end of 2024.

196. On this news, the Company's stock price fell $1.08 per share, or approximately 10.68%, from a closing price of $10.12 per share on October 25, 2023, to close at $9.04 per share on October 26, 2023, and continued to decline to $8.62 per share on October 27, 2023.

***January 11, 2024 Form 8-K***

197. On January 11, 2024, three weeks before the Company would file its fourth quarter and full year 2023 press release, the Individual Defendants issued a press release and Form 8-K, announcing the Company would be selling one-third of its EV fleet, or approximately 20,000 EVs, and replacing them with ICE vehicles

to balance against a reduced EV demand (the "January 2024 Form 8-K"). The January 2024 Form 8-K stated, in relevant part:

> Hertz Global Holdings, Inc. (the "Company" or "Hertz") has made the strategic decision to sell approximately 20,000 electric vehicles ("EVs") from its U.S. fleet, or about one-third of the global EV fleet. These vehicle dispositions, which were initiated in December 2023 and are expected to take place in an orderly fashion over the course of 2024, will cover multiple makes and models. EVs held for sale will remain eligible for rental within the Company's fleet during the sales process. The Company expects to reinvest a portion of the proceeds from the sale of EVs into the purchase of internal combustion engine ("ICE") vehicles to meet customer demand.
>
> The Company's decision to reduce its EV fleet will result in the recognition, during the fourth quarter of 2023, of approximately $245 million of incremental net depreciation expense related to the sale. This non-cash charge represents the write down of the EVs' carrying values as of December 31, 2023 to their fair values, less related expenses associated with the disposition of the vehicles.
>
> *        *        *
>
> The Company expects this action to better balance supply against expected demand of EVs. This will position the Company to eliminate a disproportionate number of lower margin rentals and reduce damage expense associated with EVs.

198. The January 2024 Form 8-K also represented that the Company would be able to more effectively manage the size of its EV fleet and its allocation among various business segments:

> Going forward, the Company will continue to actively manage the total size of its EV fleet, as well as the allocation of EVs among customer segments, including leisure, corporate, government and rideshare. It is expected that the planned reduction in the EV fleet and reinvestment in additional ICE vehicles will improve Adjusted Corporate EBITDA across 2024, as vehicles are rotated, and in 2025, by which time all of the vehicles included in this plan are expected to be sold.

199. The January 2024 Form 8-K also disclosed upcoming negative financial results because of depreciation and market-to-market to reduce the carrying values of EVs, stating, in relevant part:

> The Company expects to report financial results for the fourth quarter ended December 31, 2023 on February 6, 2024. Consistent with expectations, the Company expects to report revenue for the fourth quarter of 2023 in the range of $2.1 billion to $2.2 billion, in line with historical seasonality relative to its third quarter. Adjusted Corporate EBITDA for the fourth quarter of 2023 will be negatively impacted by the incremental net depreciation expense associated with the EV sales plan, and further burdened by higher depreciation expense in the ordinary course as residual values for vehicles generally fell throughout the quarter greater than previously expected… The Company expects to report a negative Adjusted Corporate EBITDA (excluding the impact of the non-cash charge related to the EV sales plan) for the fourth quarter in the range of ($120 million) to ($130 million).

***January 11, 2024 CNBC Interview***

200. On January 11, 2024, Defendant Scherr was interviewed by CNBC for its segment titled, "Squawk on the Street" (the "January 2024 CNBC Interview").

201. During the January 2024 CNBC Interview, Defendant Scherr represented that the sale of one-third of the Company's EV fleet was a response "to the reality" of the actual demand for EVs. The interview proceeded, in relevant part:

> Defendant Scherr: Well, I think, look, we, we took a bold move and are making a, a strategic adjustment to our fleet to take 20,000 electric vehicles [out of] the fleet. Uh, it's really to respond to the reality, which is we're trying to bring supply in line with demand . . . .
>
> Interviewer: That's interesting. That's different from demand or behavioral friction when someone comes to the counter. Because

originally the case, the thinking was this will be a nice way to, for people to experiment. Did that happen or did it not?

Defendant Scherr: It did happen. And it is happening. It's just not happening at a level of demand that justifies us maintaining a fleet of this size at this moment in time. You know, Carl, the one thing I would say is that at some point the reality of EVs and Teslas being the best selling car will at some point render them the best rental car. It's not yet. ***So we may have been ahead of ourselves in the context of how quickly that will happen***, but that will happen.

202. On this news, the Company's stock price fell $1.01 per share, or approximately 10.81%, from a closing price of $9.35 per share on January 10, 2024, to close at $8.34 per share on January 12, 2024. However, the Individual Defendants continued to obfuscate the truth regarding the demand for the Company's EVs.

***February 6, 2024 Q423 Press Release and Earnings Call***

203. On February 6, 2024, the Company issued a press release discussing its financial results for the fourth quarter of the 2023 Fiscal Year (the "Q423 Press Release"). The Q423 Press Release reported a revenue of $2.2 billion and an "Adjusted Corporate EBITDA of negative $382 million, a negative 17% margin, including recognition of $245 million of net depreciation expense related to the previously announced sale of electric vehicles ('EV')."

204. That same day, the Company hosted an earnings call with analysts and investors to discuss its financial results for the fourth quarter of the 2023 Fiscal Year (the "Q423 Earnings Call").

205. During the Q423 Earnings Call, Defendant Scherr reiterated, despite earlier statements to the contrary, that the Company planned to have 25% of its fleet be comprised of EVs by the end of 2024, and that 2024 would be a "transitional" year for Hertz Global.

206. The statements referenced in ¶¶ 202-205 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Individual Defendants materially overstated the market demand for EVs; (2) the Individual Defendants' purchases of vehicles failed to match the confines of the actual demand; (3) the capacity of Hertz Global's electric vehicle charging infrastructure was inadequate; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***April 9, 2024 Proxy Statement***

207. On April 9, 2024, the Company filed its annual proxy statement for the 2024 Fiscal Year with the SEC (the "2024 Proxy Statement"). Defendants Farmer, Feikin, Fields, Intrieri, O'Hara, Scherr, Shannahan, Vougessis, and Wagner solicited the 2024 Proxy Statement pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

208. The 2024 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Farmer and Shannahan to the Board; (2)

approve, on a non-binding advisory basis, certain executive compensation; (3) and ratify the appointment of Ernst & Young LLP ("E&Y") as the Company's independent registered public accounting firm for the 2024 Fiscal Year.

209. Regarding the Board's role in "Risk Oversight," the 2024 Proxy Statement stated the following:

> Our senior leadership is responsible for identifying, assessing, and managing our exposure to risk. The Board and its committees play an active role in overseeing management's activities and evaluating whether management's operating and financial plans are balanced from a risk/reward perspective. The Board and its committees perform this oversight through a variety of mechanisms. For example, at the full Board level, the Board receives a strategic plan presentation from management each year, and this presentation generally covers management's expectations for the upcoming three-year period. The Board also reviews management's proposed annual operating plan each year. By engaging with management on both strategic and annual planning, the Board can evaluate risk across multiple time-horizons, including long-term (e.g., risks and opportunities related to the future of mobility generally), medium term (e.g., risks and opportunities across the rolling three-year periods generally aligned with our strategic planning cycle), and shorter periods (e.g., risks and opportunities more relevant to our current year plans).
>
> Presentations from and discussions with management are the primary means by which the Board oversees risk. However, the Board also engages in discussions with outside advisors from time-to-time. The Board also relies on the work of its various committees, where more focused risk oversight can occur. Additional detail on the role of the Board's committees in risk oversight follows.

210. Defendants Farmer, Feikin, Fields, Intrieri, O'Hara, Scherr, Shannahan, Vougessis, and Wagner caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Individual Defendants materially overstated the market demand for EVs; (2) the Individual Defendants'

purchases of vehicles failed to match the confines of the actual demand; (3) the capacity of Hertz Global's electric vehicle charging infrastructure was inadequate; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

211. The 2024 Proxy Statement also was false and misleading because it failed to disclose that: (1) through the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

212. As a result of Defendants Farmer, Feikin, Fields, Intrieri, O'Hara, Scherr, Shannahan, Vougessis, and Wagner causing the 2024 Proxy Statement to be false and misleading, shareholders voted to, *inter alia*, reelect Defendants Farmer and Shannahan to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company, and to appoint E&Y as the Company's independent registered public accounting firm for the 2024 Fiscal Year.

**The Truth Fully Emerges**

***April 25, 2024 Press Release and Earnings Call***

213. On April 25, 2024, before the market opened, the Company disclosed its financial results for the first quarter of the 2024 Fiscal Year in (the "Q124 Press Release").

214. The Q124 Press Release revealed that vehicle depreciation rose by $339 per unit during the quarter, with $119 of that increase attributed to declining residual values of EVs held for sale—vehicles that Hertz Global had acquired at high prices despite weak demand. Additionally, the Q124 Press Release reported a $195 million depreciation charge to write down the value of EVs remaining in inventory at quarter-end to their fair market value and to account for losses incurred on EVs sold during the period due to overfleeting.

215. On that same day, before the market opened, the Company held an earnings call with investors and analysts to announce the first quarter of the 2024 Fiscal Year financial outcomes (the "Q124 Earnings Call"). During the Q124 Earnings Call, West, the Company's new CEO, recognized "upfront that this was a challenging quarter" for the Company. Specifically, he stated in relevant part:

> As I'm settling into my new role, there are a number of key priorities I'm focused on. ***It starts with having the right fleet. So balancing short-term decisions with long-term implications to drive a better return on assets. This includes making sure that we have the right supply and demand balance of our fleet, at the appropriate capital cost***. Decisions around our fleet are based on return on assets and the discipline of fleeting inside the projected demand curve to ensure we achieve favorable revenue per day and revenue per unit performance, along with better managing our residual value risk.

216. On the Q124 Earnings Call, the Company's Chief Operating Officer ("COO"), Justin Keppy ("Keppy"), repeated the need to decrease the Company's fleet size to rid the Company of excess EV inventory that came at a higher cost. Specifically, he stated, in relevant part:

> Turning to EVs. We previously announced our plan to reduce the EV fleet by 20,000 units. And by the end of Q1, we sold about half of them. ***Given this progress, we increased the EV disposal plan by another 10,000 units, bringing the combined reduction to 30,000 vehicles, which we expect to complete by the end of the year. Upon completion, we anticipate that the remaining EV fleet will be better aligned with attractive demand for EVs*** with a priority on our rideshare business. Alex will discuss the impact of these sales during the financial overview.

217. On the Q124 Earnings Call, Arrington, Hertz Global's Executive VP of Revenue Management and Fleet Operations responded to an analyst question, admitting that the Company needed to balance supply and demand as well as improve EV utilization. Specifically, he stated, in relevant part:

> We also -- what I'd say on the fleet, you asked how do we get there? ***We're selling EVs***. Are we replacing them one for one? ***We're not replacing them one for one as we take them out of the fleet. We realized lower utilization than what we really want to be at on the EV fleet that we have***. And so as we think about the rotation of EVs out of the fleet, ***which were producing lower utilization and replacing that with an ICE car, which we believe will run higher utilization on,*** we do not need to replace them one for one. We also receive a cap cost benefit from doing that as the prevailing cost on EVs are higher than what they would be on a replacement ICE car.

218. In response to an analyst's question regarding the Company's strategic plan moving forward, West stated, in relevant part:

> But then we also need to continue to work on the demand side of that and improve our product market fit. So we're -- as Darren alluded to, we've got to optimize our EV allocations really into the right segments. So we're fortunate, and we'll optimize those in terms of ride-hail business, off airport operations, and then airport, really in that order. ***And then we've got to continue to optimize our fleet mix more in line with the core customer demand as we rotate out the fleet***. . . .

219. On this news, the price of Hertz Global's common stock fell $1.12 per share, or approximately 19.31%, from a closing price of $5.80 per share on April 24, 2024, to close at $4.68 per share on April 25, 2024.

## SUBSEQUENT DEVELOPMENTS

220. On June 3, 2024, the Company announced its appointment of Scott M. Haralson as CFO, to replace Defendant Brooks, who supposedly was "leaving the Company to pursue other opportunities but will remain until the end of the month to ensure an orderly transition."

221. On June 20, 2024, the Company issued a press release (the "June 2024 Press Release"). In the June 2024 Press Release, the Company announced that its wholly owned subsidiary, The Hertz Corporation, planned to offer $500 million in aggregate principal amount of First Lien Senior Secured Notes due 2029 and $250 million in aggregate principal amount of Exchangeable Senior Second-Lien Secured PIK Notes due 2029 through private placements. According to the June 2024 Press Release, "Hertz Corp. intends to use the net proceeds of the offerings to pay down a portion of its $2.0 billion committed revolving credit

facility," in an effort to enhance liquidity. The following day, Hertz Global disclosed that Hertz Corp. would increase the total offering to $1 billion.

222. On July 8, 2024, the Company announced purported "key appointments that will strengthen its leadership team and sharpen the Company's focus on driving enhanced profitability through operational excellence, superior customer service, strategic fleet management, cost control, and premium revenue." The release stated, in pertinent part:

> Sandeep Dube will join Hertz as Executive Vice President, Chief Commercial Officer on July 22, 2024, and Katherine Lee Martin, who currently serves as Hertz's Interim General Counsel, will be appointed to Executive Vice President, General Counsel, and Corporate Secretary, effective immediately.
>
> In addition, the following leaders are joining Hertz this month: Henry Kuykendall as Executive Vice President, North America Operations; Greg May as Executive Vice President, Fleet Management; and Mike Moore as Executive Vice President, Technical Operations. Each executive will report to Hertz Chief Executive Officer Gil West.

223. During an earnings call hosted on August 1, 2024, West stated that the Company reduced its EV fleet to less than 10% of the Company's total fleet due to the lack of demand. West also stated, "in terms of how our EV fleet looks going forward, the ins and out of that, ins and outs of that, then we'll just look to ensure that our fleet matches that natural demand and adjust accordingly in that -- that will just be a normal course of business for us going forward."

## HARMFUL SHARE REPURCHASES

224. While engaging in the above-described wrongful conduct, the Individual Defendants caused the Company to initiate repurchases of its common

stock that substantially damaged the Company. In total, the Company spent an aggregate amount of ***over $290.9 million*** to repurchase approximately 19,381,160 shares of its own common stock at artificially inflated prices from January 2023 through December 2023.

225. According to the Form 10-Q the Company filed with the SEC on April 27, 2023 (the "Q123 10-Q"), between January 1, 2023 and January 31, 2023, the Company purchased 1,259,972 shares of its common stock for approximately $20,965,934, at an average price of $16.64 per share.

226. As the Company's stock was actually only worth $4.68 per share, the price of closing on April 25, 2024, the Company overpaid by approximately $15,069,265 for repurchases of its own stock between January 1, 2023, and January 31, 2023.

227. According to the Q123 10-Q, between February 1, 2023 and February 28, 2023, the Company purchased 1,668,208 shares of its common stock for approximately $31,495,767, at an average price of $18.88 per share.

228. As the Company's stock was actually only worth $4.68 per share, the price of closing on April 25, 2024, the Company overpaid by approximately $23,688,554 for repurchases of its own stock between February 1, 2023 and February 28, 2023.

229. According to the Q123 10-Q, between March 1, 2023 and March 31, 2023, the Company purchased 2,807,468 shares of its common stock for approximately $47,558,508, at an average price of $16.94 per share.

230. As the Company's stock was actually only worth $4.68 per share, the price of closing on April 25, 2024, the Company overpaid by approximately $34,419,558 for repurchases of its own stock between March 1, 2023 and March 31, 2023.

231. According to the Form 10-Q the Company filed with the SEC on July 27, 2023 (the "Q223 10-Q"), between April 1, 2023, and April 30, 2023, the Company purchased 3,940,251 shares of its common stock for approximately $61,389,111, at an average price of $15.58 per share.

232. As the Company's stock was actually only worth $4.68 per share, the price of closing on April 25, 2024, the Company overpaid by approximately $42,948,736 for repurchases of its own stock between April 1, 2023, and April 30, 2024.

233. According to the Q223 10-Q, between May 1, 2023, and May 31, 2023, the Company purchased 1,330,688 shares of its common stock for approximately $21,291,008, at an average price of $16.00 per share.

234. As the Company's stock was actually only worth $4.68 per share, the price of closing April 25, 2024, the Company overpaid by approximately $15,063,388 for repurchases of its own stock between May 1, 2023, and May 31, 2023.

235. According to the Q223 10-Q, between June 1, 2023, and June 30, 2023, the Company purchased 995,668 shares of its common stock for approximately $17,334,580, at an average price of $17.41 per share.

236. As the Company's stock was actually worth $4.68 per share, the price of closing April 25, 2024, the Company overpaid by approximately $12,674,854 for repurchases of its own stock between June 1, 2023, and June 30, 2023.

237. According to the Form 10-Q the Company filed with the SEC on October 26, 2023 (the "Q323 10-Q"), between July 1, 2023, and July 31, 2023, the Company purchased 873,550 shares of its common stock for approximately $15,872,404, at an average price of $18.17 per share.

238. As the Company's stock was actually worth $4.68 per share, the price of closing April 25, 2024, the Company overpaid by approximately $11,784,190for repurchases of its own stock between July 1, 2023, and July 31, 2023.

239. According to the Q323 10-Q, between August 1, 2023, and August 31, 2023, the Company purchased 1,079,722 shares of its common stock for approximately $18,279,693, at an average price of $16.93 per share.

240. As the Company's stock was actually worth $4.68 per share, the price of closing April 25, 2024, the Company overpaid by approximately $13,226,595 for repurchases of its own stock between August 1, 2023, and August 31, 2023.

241. According to the Q323 10-Q, between September 1, 2023, to September 30, 2023, the Company purchased 1,069,113 shares of its common stock for approximately $15,919,093, at an average price of $14.89 per share.

242. As the Company's stock was actually worth $4.68 per share, the price of closing April 25, 2024, the Company overpaid by approximately $10,915,644 for repurchases of its own stock between September 1, 2023, and September 30, 2023.

243. 150. According to the 2023 10-K, between October 1, 2023, and October 31, 2023, the Company purchased 1,649,589 shares of its common stock for approximately $17,320,685, at an average price of $10.50 per share.

244. As the Company's stock was actually worth $4.68 per share, the price of closing April 25, 2024, the Company overpaid by approximately $9,375,546 for repurchases of its own stock between October 1, 2023, and October 31, 2023.

245. According to the 2023 10-K, between November 1, 2023, and November 30, 2023, the Company purchased 2,367,562 shares of its common stock for approximately $20,455,736, at an average price of $8.64 per share.

246. As the Company's stock was actually worth $4.68 per share, the price of closing April 25, 2024, the Company overpaid by approximately $9,375,546 for repurchases of its own stock between November 1, 2023, and November 30, 2023.

247. According to the 2023 10-K, between December 1, 2023, and December 31, 2023, the Company purchased 339,369 shares of its common stock for approximately $3,054,321, at an average price of $9.00 per share.

248. As the Company's stock was actually worth $4.68 per share, the price of closing April 25, 2024, the Company overpaid by approximately $1,466,074 for repurchases of its own stock between December 1, 2023, and December 31, 2023.

249. Thus, in total, the Company overpaid for repurchases of its own stock by ***over $200.2 million***.

**INDIVIDUAL DEFENDANTS' KNOWLEDGE**

250. The Individual Defendants had access to information regarding the lack of demand for EVs and the inadequacy and insufficiency of the Company's EV infrastructure charging stations such that they knew or recklessly disregarded that their statements were materially false and misleading when made.

***Electric Vehicles Were Central to Hertz Global's Ambitious Growth Strategy to "Lead the Way" and Become the Largest EV Rental Fleet in North America***

251. In late 2021, Hertz Global unveiled its strategy to become the leading provider of EV rentals. The Individual Defendants represented to investors that Hertz Global was executing an aggressive expansion plan for its EV fleet, with the goal of having EVs comprise 25% of the Company's total fleet by the end of 2024.

252. As then-interim CEO Defendant Fields stated in an October 25, 2021 press release, "[t]he new Hertz is going to lead the way as a mobility company, starting with the largest EV rental fleet in North America and a commitment to grow our EV fleet and provide the best rental and recharging experience for leisure and business customers around the world."

253. Defendant Scherr reiterated this plan in an April 4, 2022 interview with Bloomberg, stating that Hertz Global was "looking to build out . . . the largest electric fleet in North America." He further explained that the Company aimed to "diversify the fleet and really meet what . . . our customers are looking for," including individual renters, corporate clients seeking to meet their own carbon reduction goals and rideshare platforms like Uber looking to transition their drivers to EVs.

254. CW1 and CW2 both confirmed that EV growth, utilization, and profitability were a major focus for the Individual Defendants throughout CW1's tenure at the Company. According to both witnesses, the status of the EV fleet, including the number of EVs acquired, was a regular topic of discussion at every quarterly Global Townhall meeting.

255. CW1 attended quarterly Global Townhall meetings held in Hertz Global's corporate headquarters cafeteria in Estero, Florida, which took place on the same day Hertz Global released its quarterly earnings to the market. According to CW1, everyone at the Company could join and participate either in person or via video. CW1 remembered that during these meetings, the Individual Defendants consistently addressed the status and profitability of Hertz Global's EV fleet, given its significance to the Company. CW1 also recalled that the CEO delivered a presentation displayed on a large screen, sharing financial data as well as specific information about the EV fleet's utilization for that quarter.

256. CW1 recalled that at every quarterly Global Townhall meeting in 2023, Defendant Scherr spoke about Hertz Global's ongoing purchase of more EVs. CW1 and the Revenue Management team found this puzzling because they were already struggling to get the existing EVs on the road, let alone manage additional ones.

257. Similarly, CW2 also attended these Company-wide Global Townhall meetings held in the Hertz Global headquarters cafeteria in Florida, where senior executives, including Defendant Scherr, addressed employees. CW2 remembered that at each Global Townhall during their tenure, Defendant Scherr consistently

framed EVs as a "great initiative" for the Company. However, by the second quarter of 2022 and continuing through CW2's time there, it became evident to CW2 that the EV program was not going well, and they felt the CEO's positive remarks at the Global Townhalls conflicted with the reality CW2 was seeing firsthand.

258. Therefore, given the Individual Defendants' intense focus on the acquisition, demand, and utilization of Hertz Global's EV fleet, they would have been fully informed about all matters related to the EV fleet, including its demand, utilization, and revenue.

***Individual Defendants' Admissions that Hertz Global Failed to Manage Its Fleet Based on Demand***

259. The Individual Defendants' own admissions that they recklessly acquired EVs without considering actual demand to meet Hertz Global's target of having 25% of its fleet consist of EVs strongly suggest scienter. In fact, the Individual Defendants acknowledged that they were forced to sell off 50% of Hertz Global's EV fleet to "tighten[] the EV supply," "bring supply in line with natural demand," and "bring our fleet inside the demand curve." Additionally, the Individual Defendants admitted intentionally slowing the allocation of EVs to the Ride Share segment due to higher damage rates among EV rideshare drivers, subsequently shifting EVs to the leisure market, which resulted in the leisure segment being overstocked with EVs.

260. The Individual Defendants also acknowledged that because Hertz Global's supply of EVs exceeded demand, EV utilization was too low. As a result,

the Individual Defendants planned to replace some of its excess EVs with ICE vehicles, stating:

> ***We're not replacing [EVs] one for one as we take them out of the fleet. We realized lower utilization than what we really want to be at on the EV fleet that we have.*** And so as we think about the rotation of EVs out of the fleet, ***which were producing lower utilization and replacing that with an ICE car, which we believe will run higher utilization*** on.

261. Accordingly, the Individual Defendants admitted that Hertz Global's aggressive EV purchasing strategy to reach 25% of its fleet by 2024 was not reasonably supported, and therefore, Hertz Global was no longer committed to achieving a fixed percentage of EVs by a specific date. As Defendant Scherr conceded, in relevant part:

> I would say that at some point the reality of EVs and Teslas being the best selling car will at some point render them the best rental car. It's not yet. So ***we may have been ahead of ourselves in the context of how quickly that will happen***, but that will happen.

***The Individual Defendants Were Aware from Internal Company Reports That Hertz Global Was Not Experiencing Demand for EVs***

262. The Individual Defendants had access to Hertz Global's internal systems that tracked fleet composition, performance, demand, utilization, and revenue, which showed that EV demand and utilization were consistently declining and remained depressed.

263. According to CW1 and CW2, the Tableau system provided real-time, detailed data on Hertz Global's entire fleet, including specifics such as car type, features, and individual vehicle utilization. It also generated broader reports

comparing EV utilization versus ICE vehicles, both regionally and company wide. Tableau tracked key metrics such as vehicle demand (rentals versus available inventory), utilization rates, revenue per day, and rental pricing. CW1 stated that executives, including the CEO and CFO, had access to Tableau, which would have revealed that by early to mid-2022, demand and utilization for EVs were declining and that EV inventory significantly exceeded demand, leading to lower EV utilization.

264. CW1 also noted that Tableau was used to generate a wide variety of detailed reports. These reports could provide granular information such as car type and class, the percentage of the fleet made up of EVs versus ICE vehicles, utilization rates by car, car type, location, region, cancellations, and more.

265. CW2 also confirmed that the Revenue Management Analyst team also used Tableau to produce reports, which could be tailored to show utilization rates for specific car classes and fleet pools over specific time periods.

266. CW2 further confirmed that Hertz Global's senior leadership had full access to Tableau, enabling them to view all KPIs and related data.

267. According to CW1, Hertz Global also utilized the CapGuard system to monitor reservations, available vehicles, and fleet utilization. CW1 recalled that Hertz Global's revenue analysts generated reports from CapGuard on vehicle utilization and other key metrics, which were then distributed to managers, directors, and VPs.

268. CW2 confirmed that CapGuard provided a graphical overview of utilization levels for specific fleet categories, such as ICE and EV vehicles, with its data sourced from Hertz Global's RMS. CW2 prepared a bi-weekly "CapGuard" report, which was then sent to their manager, dos Santos, as well as to other General Managers in the field. Dos Santos, who serves as Hertz Global's Inbound Revenue Manager and reports to Brady, also distributed additional reports weekly and required any updates or changes to CapGuard be completed by a certain deadline to ensure timely circulation to Hertz Global's leadership. The reports included detailed KPIs down to the individual car, pool, and regional levels, covering metrics such as revenue per unit, revenue per day, utilization, and revenue per transaction.

269. Therefore, the Individual Defendants had access to, and likely received, CapGuard reports on Hertz Global's EV fleet performance, which by mid-2022 would have reflected similarly negative trends in EV demand and utilization as those shown in Tableau.

270. CW1 confirmed that the top three metrics analyzed and monitored by their department were utilization, vehicles "on rent," and rate per day. Arrington, the Company's Executive Vice President of Revenue Management & Fleet Acquisition, would set quarterly targets for each metric and communicate those targets to CW1, which CW1's team was then tasked with meeting

271. CW1 would attend twice-weekly team meetings where the group discussed the current market conditions, opportunities, vehicle utilization, pricing

rates, strategic changes, and other relevant topics. These meetings were typically attended by the analysts on CW1's team and their direct manager, though occasionally a higher-level manager overseeing the Western, Southwestern, and Midwest regions also participated.

272. CW1 also participated in monthly regional meetings called Revenue Management All Hands, which included analysts and managers from all five regions as well as Brady. Prior to these meetings, slide decks containing KPIs prepared by the Data Visualization team and data from other departments were distributed. CW1 noted that these KPIs included utilization and vehicles on rent, among others. The slide decks were presented by senior leaders such as Brady, who reviewed each region's progress toward meeting their goals, market developments, and overall Company performance. After the meetings, CW1 recalled that the slide decks were emailed to management for further review.

273. CW2 confirmed CW1's description of the monthly Revenue Management All Hands meetings, which were attended by Regional Revenue Management Analyst groups from all regions as well as General Managers from each location. According to CW2, these meetings covered topics such as the top ten airports and "off-airport" locations for utilization, the highest revenue per unit per day, and broader discussions about whether strategies were proving effective. The meetings were overseen by Natalie Rodriguez[3], with Brady also in attendance.

---

[3] Natalie Rodriguez has been an employee at Hertz Global since July 2004. She was Senior Director Revenue Management from November 2016 to January

CW2 confirmed that slide decks were presented during the meetings and then emailed to attendees afterward.

274. CW2 also noted that Hertz Global tracked revenue, utilization, and other KPIs across four customer categories: leisure, corporate, government, and rideshare. Leisure represented the largest segment, making up about 45% of Hertz Global's rentals, followed by corporate (30%), government (15%), and rideshare (10%). CW2 noted that both leisure and corporate customers generally showed little interest in EVs, and government agencies refused to rent EVs entirely. CW2 was specifically instructed by Tamera Branham not to rent EVs to government agencies.[4]

275. CW2 confirmed that tracking KPIs was "a part of the job" for a Revenue Management Analyst. During CW2's time in this role, they monitored metrics such as Utilization, Revenue per Transaction, Revenue per Unit, Revenue per Day, and Net Promoter Score—which measured customer satisfaction and the likelihood of customers renting from Hertz Global again. CW2 was required to meet quarterly targets set by Arrington and Hertz Global's three North American Operations Leaders. CW2 understood that Arrington reported the results of these quarterly goals to senior management, including the CEO, likely using PowerPoint slide decks throughout CW2's tenure.

---

2023, and since January 2023, she has been Vice President Management Operations.

[4] Tamera Branham is the Director of Transportation at Hertz Global.

276. CW3 explained that to identify which vehicles were available for sale, they accessed a corporate server and downloaded a daily Excel spreadsheet listing all vehicles designated for sale by the Outside Wholesale Remarketing team. Sales were tracked in real time, so the spreadsheet, which was accessible Company-wide, was updated daily. Each morning, the updated file was distributed via email to a broad list of recipients, including sales representatives, their managers, and others across the organization. As a result, CW3 and other remarketing reps, including those in the Nationals group, had daily visibility into EV inventory available for sale. Given that the spreadsheet was hosted on a shared Company server, CW3 believed that senior executives also had access to this information.

277. The Individual Defendants acknowledge that they tracked this data. In fact, during an April 4, 2022 Bloomberg interview, Defendant Scherr confirmed that the Individual Defendants closely monitored internal data related to demand for Hertz Global's fleet:

> [A] lot of what mobility is going to be driven off of is data. We sit on a lot of it. We know where cars are going, we know where people are going. We know where things are going. And so there's an a real opportunity for Hertz to kind of take the hill, if you will, in the context of how mobility is gonna play out.

278. CEO West reiterated these remarks during the August 1, 2024 earnings call, stating, "we certainly see the booking patterns of our customers. We, of course, measure their desires in terms of fleet preferences."

279. Therefore, the Individual Defendants openly acknowledged that they monitored and analyzed data on EV fleet demand, utilization, revenue, and

profitability at least monthly and quarterly, and as a result, were aware that EV demand was declining and remained low.

***The Individual Defendants Were Aware of Lack of EV Demand Through Internal Company Meetings***

280. CW1 and CW2 attended the quarterly Global Townhall meetings held by the Individual Defendants in Hertz Global's cafeteria at the corporate headquarters in Estero, Florida, which took place on the same days Hertz Global released its quarterly earnings. According to CW1, these meetings were open to all employees, who could participate either in person or via video.

281. CW1 recalled that during the Global Townhall meetings, the Individual Defendants consistently addressed the status and profitability of Hertz Global's EV fleet, emphasizing its importance to the Company. CW1 remembered the CEO and CFO presenting financial data on a large screen, including specific information about the EV fleet's utilization for that quarter.

282. The Individual Defendants likely reviewed and understood these topics before the meetings and therefore were aware that EV demand and utilization had declined and remained low.

283. Concerns about the lack of EV demand were repeatedly discussed during the monthly Revenue Management All Hands meetings. Attendees included CW1, CW2, dos Santos, all VPs and Senior Managers in Revenue Management, as well as Arrington, who reported directly to Defendant Scherr. According to CW2, key reasons customers were unwilling to rent EVs included

unfamiliarity with the technology, uncertainty about how and where to charge the vehicles, and concerns about charging time. Additionally, in many regions, charging an EV was actually more expensive than refueling a traditional gas-powered car.

284. CW3 had monthly one-on-one meetings with their manager, LaRosa, to review the status and profitability of car sales. CW3 believed these meetings were intended to help LaRosa prepare for his own monthly meetings with senior executives, including the CEO, where they would discuss the overall performance and profitability of Hertz Global's company-wide vehicle sales.

285. Additionally, CW3 confirmed that their manager, LaRosa, provided the Individual Defendants, especially Defendant Scherr, with monthly reports on EV sales from at least April 2023 through the end of 2023. These reports indicated that EVs were listed as available-for-sale due to supply exceeding demand, and that Hertz Global faced challenges selling EVs because the sale prices were set too high.

286. Therefore, the Individual Defendants' participation in these internal Company meetings further supports an inference of scienter.

***The Board and Audit Committee Discussed the Lack of EV Demand at Meetings***

287. Further, internal Company documents demonstrate that [redacted]

[redacted]

288. For example, on January 26, 2023, the Board held a meeting. A presentation delivered in connection with the Board meeting reflects that [redacted]. The pages following this that were produced to Plaintiffs are redacted, however, it is reasonable to infer that the Board reviewed and discussed the Company's increased adoption of EVs and the effect of vehicle depreciation on the Company, among other things, because these are things that go to the Company's core operations. [redacted]

[redacted]

289. The foregoing demonstrates that [redacted].

290. On October 5, 2023, the Board held a meeting. A Board presentation produced to Plaintiffs reveals that [redacted]

[redacted] The majority of pages produced to Plaintiffs were redacted; however, it is reasonable to infer that the Board discussed the demand for EVs and the impact thereof on the Company's finances.

[redacted]

[redacted]

291. As such, by October 2023, the Board were aware of [redacted] which would, in turn, have an adverse impact on the Company.

292. Later in that same October 2023 presentation, the Board were shown the following [redacted]

[redacted]

293. Board minutes[5] from this October 2023 meeting reveal the following discussion was had, [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

5 The Board minutes produced to Plaintiffs are also heavily redacted, but it is reasonable to infer that the minutes detail the attendees of these Board meetings and that, absent further information, the entire Board, CEO, and CFO, among other senior executives, attended these meetings.

294. On December 11, 2023, the Board held a meeting. A Board presentation shows that, during this meeting, [redacted]

[redacted]

295. Pertinently, this Board presentation reveals that in [redacted]. Despite this, the Board and management sat silent and failed

to disclose these issues to the public for several more months or cause the Company to take any immediate remedial steps.

296. The Board presentation produced to Plaintiffs further reveals that [redacted]

297. Board minutes from this meeting also reveal that [redacted] Despite being internally made aware of this, it was not disclosed to the market. [redacted]

298. Despite being made aware of [redacted]

[redacted]

299. On December 12, 2023, the Audit Committee held a meeting. During that meeting, the Audit Committee identified [redacted]

300. Evidently, through a series of informative Board presentations, the Board were aware that [redacted] These are issues that go to the heart of the Company's operations and future success, but which were causing significant harm to the Company and would continue to cause harm to the Company. Yet, these internal documents further reveal that the Board knew that [redacted]

[redacted] Despite all of this, the Board failed to take any action to protect the Company, [redacted], or to even cause the Company's public statements regarding EVs and its finances to not be false and misleading, as alleged herein. This demonstrates the Board's wilful and conscious abdication of their fiduciary duties to Hertz.

301. Then, on January 30, 2024, the Audit Committee held a meeting. During this meeting, the Audit Committee discussed [redacted]

302. During this Audit Committee meeting, the Audit Committee had an opportunity to [redacted]

[redacted]

303. On April 4, 2024, the Board held a meeting. The minutes from that meeting reflect that [redacted]

304. As these later documents from January 2024 onwards reveal, although the truth regarding the excessive EV inventory and concomitant harm was were being partially disclosed to the market through the initial disclosure of the sale of certain EVs, the Board were nevertheless kept apprised of the financial impact of the EV fleet and EV sales, yet continued to keep this material information from the market.

***The Individual Defendants Were Aware That the Carrying Values of Hertz Global's EV Fleet Were Overstated Because Hertz Global Could Not Sell the EVs at Those Elevated Book Values***

305. As detailed above, in order to rapidly expand Hertz Global's fleet and establish itself as a leader in the EV rental market, the Individual Defendants paid premium prices to acquire Tesla EVs.

306. However, as CW3 confirmed, just over a year after introducing EVs into Hertz Global's rental fleet, the Individual Defendants were compelled to start selling the vehicles due to insufficient demand. CW3 verified that Hertz Global began selling EVs in April 2023, with the volume of EVs available for sale steadily

increasing throughout 2023 and into 2024. CW3 also confirmed that Hertz Global's resale prices were excessively high, resulting in dealers' reluctance to purchase the vehicles at those inflated prices.

307. The Individual Defendants were aware that Hertz Global began attempting to sell off its EVs starting in the second quarter of 2023 and that these vehicles were not selling at the higher prices from April 2023 onward. This knowledge came from the Excel spreadsheets stored on Hertz Global's internal server, to which they had access, as well as from monthly meetings involving CW3's manager, LaRosa, along with other managers and VPs, during which the status and profitability of EV sales were discussed. CW3 knew about these meetings because their manager informed them, and CW3 understood that the materials they reviewed with LaRosa were used to prepare for LaRosa's monthly meetings with Defendants.

***Suspiciously Timed Changes in Hertz Global's Senior Management Support a Strong Inference of Scienter***

308. Throughout and immediately following the Class Period, Hertz Global underwent notable executive turnover, including the following.

309. On March 27, 2023, Kenny Cheung unexpectedly resigned and was succeeded by Defendant Brooks, Hertz Global's Chief Accounting Officer at the time, who assumed the role of interim CFO effective April 1, 2023, coinciding with the Individual Defendants' initiation of EV price increases in response to weak demand.

310. On September 13, 2023, Paul Stone, COO and President, unexpectedly resigned without explanation, effective September 30, 2023, just two weeks before the end of the third quarter of 2023, during which Hertz Global reported disappointing results partly attributed to weak EV demand.

311. On January 15, 2024, Defendant Nedelman unexpectedly resigned from the Board of Directors, effective January 19, 2024, just four days after Hertz Global's preliminary announcement of its fourth quarter 2023 results and the decision to sell off 20,000 EVs, representing one-third of its EV fleet.

312. On March 15, 2024, shortly after Hertz Global disclosed the significant sell-off of one-third of its EV fleet, the Company announced that Defendant Scherr would be stepping down as CEO, to be succeeded by West, effective April 1, 2024.

313. On June 3, 2024, Defendant Brooks resigned from her CFO role and was replaced by Scott M. Haralson, shortly after Hertz Global reported disappointing first quarter 2024 financial results, which included the announcement that an additional 10,000 EVs would be sold, bringing the total to 30,000 EVs.

314. The multiple executive departures occurring at suspicious times bolster the inference of scienter.

***The Individual Defendants Were Driven to Make False Statements to Prevent Hertz Global from Breaching Its Debt Covenants and to Secure Crucial Funding to Update Its Aging Fleet***

315. In its race to become a "first mover" in the EV rental market, Hertz Global paid premium prices to rapidly build an EV fleet, primarily consisting of Tesla vehicles, financed through increased borrowing. Hertz Global's debt agreements included financial covenants, such as leverage ratio requirements, that mandated the Company maintain specified Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") levels, among other conditions.

316. In January 2023, Tesla reduced the prices of certain EV models by at least 20% to stimulate sales, which caused the residual values of Hertz Global's EV fleet to drop accordingly. However, the Individual Defendants did not record any impairment charges against earnings at that time to reflect this decline in value. Even after CW3's manager began informing the Individual Defendants in April 2023 that the resale prices of Hertz Global's EVs were too high, the Individual Defendants still failed to record a charge against earnings.

317. Instead, the Individual Defendants were motivated to falsely portray demand for Hertz Global's EV fleet as strong across all segments and to claim that the fleet's size and composition aligned with actual demand. This misrepresentation was intended to avoid impairment charges that would negatively impact EBITDA and risk violating debt covenants, potentially pushing the Company into its second bankruptcy within five years. Additionally, it enabled Hertz Global to raise capital to replace unwanted EVs with ICE vehicles.

318. It was not until the end of the fourth quarter of 2023, when Hertz Global was forced to begin selling off what ultimately became half of its EV fleet due to insufficient demand, that the Company announced two substantial write-downs—one in February 2024 and another in April 2024.

319. On June 20, 2024, Hertz Global announced plans to issue junk bonds to strengthen its balance sheet and fund its vehicle refresh. The offer was subsequently increased to $1 billion in total on June 21, 2024. Hertz Global raised $1 billion in proceeds by issuing $750 million in aggregate principal amount of First Lien Senior Secured Notes due 2029 and $250 million in aggregate principal amount of Exchangeable Senior Second-Lien Secured PIK Notes due 2029. The Individual Defendants stated that the proceeds would be used to repay part of Hertz Global's $2.0 billion committed revolving credit facility and to finance the fleet refresh.

320. In an August 1, 2024 earnings call, CFO Scott Haralson stated, in relevant part:

> The good news is that we believe we have plenty of liquidity to handle this. With our recent capital raise, we have bolstered liquidity to a place where we are comfortable that we can complete the transformation, even if residuals decline at a faster rate than we have conservatively forecasted.

321. Therefore, the Individual Defendants were driven to misrepresent EV demand in order to comply with debt covenants and to allow Hertz Global to secure urgently needed capital to refresh its fleet and reduce $2 billion of its credit line.

***Defendant Scherr's Executive Compensation Agreement Provided Incentives to Artificially Inflate Hertz Global's Stock Price***

322. Defendant Scherr was incentivized to artificially boost Hertz Global's stock price because his compensation package was heavily tied to the Company's stock performance. Under his Employment Agreement dated February 3, 2022, Defendant Scherr received a base salary of $1.5 million and was eligible for the Company's annual incentive program, with a target bonus equal to 160% of his base salary. However, instead of participating in the Company's long-term incentive program, Defendant Scherr was granted three equity awards that collectively gave him the opportunity to earn shares representing 2% of the Company's fully diluted shares. These performance-based awards were specifically structured to align Defendant Scherr's compensation with Hertz Global's stock price.

323. Central to Defendants Scherr's sign-on package, which made up over 50% of his total awards, were 6,539,378 performance-based restricted stock units, representing 1.05% of the Company's fully diluted common shares. These awards vest based on stock price performance, with 20% vesting annually through December 31, 2026, and payouts subject to a time-based vesting schedule that distributes roughly 20% increments over five years. Defendant Scherr earned the first 20% of these shares, which vested on December 31, 2022. The remaining shares will vest evenly on December 31 of 2023, 2024, 2025, and 2026.

324. Indeed, a February 4, 2022 Financial Times article reported that Defendant Scherr was granted a total of 12.5 million Hertz Global shares upon becoming CEO and could earn at least $250 million depending on Hertz Global's stock performance. The article noted, "[i]f that ***windfall*** materializes, Scherr, who was once considered a potential candidate to lead Goldman Sachs as chief executive before he left the bank last year, may see his pay exceed that of the investment bank's current leader, David Solomon."

325. Therefore, Defendant Scherr was highly motivated to issue false statements to inflate the Company's stock price.

## DAMAGES TO HERTZ GLOBAL

326. As a direct and proximate result of the Individual Defendants' conduct, Hertz Global has lost and expended, and will continue to lose and expend, many millions of dollars.

327. Such expenditures include, but are not limited to, legal fees, costs and any payments for resolution of or to satisfy a judgement associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

328. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

329. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defendant any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

330. Such losses include the Company's overpayment of more than $200.2 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

331. As a direct and proximate result of the Individual Defendants' conduct, Hertz Global has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

332. Plaintiffs bring this action derivatively and for the benefit of Hertz Global to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as officers and directors of Hertz Global, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

333. Hertz Global is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

334. Plaintiffs are, and have been at all relevant times, shareholders of Hertz Global. Plaintiffs will adequately and fairly represent the interests of Hertz Global in enforcing and prosecuting its rights, and to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

335. Plaintiffs incorporate by reference and re-allege each and every allegation stated above as if fully set forth herein.

336. A pre-suit demand on the Board of Hertz Global is futile and, therefore, excused. At the time of filing of this amended consolidated complaint, the Board consists of the following eleven individuals: Defendants Farmer, Feikun, Fields, Intrieri, O'Hara, Shannahan, Wagner, and Vougessis ("Director-Defendants"), along with non-parties West, Lucy Clark Dougherty, and Francis S. Blake (together with the Director-Defendants, the "Directors"). Plaintiffs need only to allege demand futility as to six of eleven Current Directors who are on the Board at the time this amended consolidated complaint is filed.

### *Demand is Excused as to the Director-Defendants as Each of them Face a Substantial Likelihood of Liability*

337. Demand is excused as to all the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material facts, and as a

result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by over $200.2 million for its own common stock. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

338. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein. Specifically, the Director-Defendants knowingly or recklessly made material misrepresentations and/or omissions for the purpose and effect of concealing Hertz Global's financial well-being and prospects from the investing public and supporting the artificially inflated price of Hertz Global's securities. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. Defendants Farmer, Feikin, Fields, Intrieri, Shannahan, Vougessis, and Wagner solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Feiken, Fields, and Vougessis to the Board, allowing them to continue breaching their fiduciary duties to the Company. In addition, the Director-Defendants solicited the 2024 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Farmer and Shannahan, allowing them to continue to breach their fiduciary duties to the Company. As a result of the foregoing, demand would be futile, and thus excused, as to all the Director-Defendants, since

they all breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested.

***Demand is Further Excused as to Non-Party West as He Lacks Independence and Could Not Consider a Demand***

339. Non-Party West's principal professional occupation is his employment with Hertz Global, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above. Accordingly, West lacks independence from the other members of the Board due to his interest in maintaining his executive position at Hertz Global, as well as the substantial compensation he receives therefrom. This lack of independence renders Non-Party West incapable of impartially considering a demand to vigorously prosecute this action

340. Also, as CEO of Hertz Global, Non-Party West fails the Nasdaq bright-line independence test and cannot, therefore, be considered independent, as admitted by the Company in its 2025 Proxy Statement. As such, Non-Party West could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Non-Party West is therefore futile.

***Demand is also Excused Because Defendants Wagner, Shannahan, O'Hara, and Farmer Are Conflicted***

*Defendants Wanger and Shannahan*

341. Defendants Wagner and Shannahan are irreconcilably conflicted and could not consider a demand to sue one another by virtue of their longstanding professional and personal relationship built upon mutual respect.

342. ***First***, Defendants Wagner and Shannahan have built a professional relationship since 2008 when Defendant Shannahan began working for Defendant Wagner at Knighthead Capital Management, LLC ("Knighthead"). Accordingly, Defendant Shannahan is unlikely to consider a demand to sue his employer, from whom he has gained further opportunities (such as serving on other private boards). Nor is Defendant Wagner likely to consider a demand to sue Defendant Shannahan who has worked in an integral role at Knighthead since 2008 and has thus contributed to the ongoing success of Knighthead, and who Defendant Wagner has likely come to rely upon.

343. ***Second***, by virtue of their roles at Knighthead, Defendants Wagner and Shannahan have also joined each other in other ventures, underscoring their strong professional and personal ties with one another, thereby making demand on either of them futile. Among their joint ventures, Defendants Shannahan and Wagner acquired a majority ownership share of English soccer team Birmingham City Football Club and also recently acquired significant share of English cricket club Birmingham Phoenix for £40 million. By jointly entering these international ventures together, Defendants Wagner and Shannahan have demonstrated their reliance on one another.

344. This irreconcilable conflict created by their close personal and professional friendship was recently showcased in April 2025 when Defendant Wagner gave a speech following Birmingham City Football Club's league win, stating: "I want to thank Andrew Shannahan who doesn't get a lot of credit for

being ***a phenomenal right-hand man***."[6] Indeed, Defendant Wagner cannot reasonably be expected to investigate and commence action against his "right-hand man."

345. Accordingly, Defendants Wagner and Shannahan are incapable of considering a demand to sue one another, thus demand is excused as to each of them.

*Defendants O'Hara and Farmer*

346. Much like Defendants Wagner and Shannahan, *supra*, Defendants O'Hara and Farmer are also incapable of considering a demand to sue one another because they have a longstanding personal and professional relationship that is built upon years of mutual respect. Pertinently, Defendant Farmer works as a Senior Managing Director & Head of Management Committee at Certares Management LLC ("Certares"), the investment services firm co-founded and managed by Defendant O'Hara.

347. As a result, Defendant Farmer is unlikely to consider a demand to sue his employer, for whom he has worked since 2014, nor is Defendant O'Hara likely to consider a demand to sue Defendant Farmer who has, and continues to, serve in an integral role at Certares and is thus responsible for Certares' continued success.

---

[6] Alex Dicken, *Meet Tom Wagner's 'right-hand man' at Birmingham City with growing influence*, Birmingham Live (Jul. 20, 2025), https://www.birminghammail.co.uk/sport/football/football-news/meet-tom-wagners-right-hand-32075547

348. Defendant O'Hara and Farmer also concurrently served on the boards of private companies with one another, including Internova Travel Group and Mystic Invest. As such, Defendant O'Hara's and Defendant Farmer's mutual respect for one another is evident, thus rendering demand futile as to each of them.

*Defendants Wagner, Shannahan, Farmer, and O'Hara*

349. In addition to the foregoing, Defendants Wagner, Shannahan, Farmer, and O'Hara are all irreconcilably conflicted and could not consider a demand to sue one another because in 2021 both Knighthead and Certares jointly closed the CK Opportunities Fund. This was the first co-managed fund for Certares and Knighthead, and reportedly "represents a powerful partnership between the two firms."[7]

350. Accordingly, because of this "powerful partnership" and thus strong business relationship between Knighthead and Certares, it is unlikely that Defendants Wagner, Shannahan, Farmer, or O'Hara would consider a demand to sue one another because doing so could damage the "powerful partnership" and the mutual respect that exists between these Defendants. As such, demand is futile as to each of them.

351. Furthermore, Defendants Wagner, Shannahan, O'Hara, and Farmer could not consider a demand to sue the Individual Defendants, nor could the

---

[7] *Certares and Knighthead close inaugural co-managed travel, tourism and hospitality fund at USD 1.5bn*, Hedge Week (May 21, 2021), https://www.hedgeweek.com/certares-and-knighthead-close-inaugural-co-managed-travel-tourism-and-hospitality/

Directors independently consider a demand to sue Defendants Wagner, Shannahan, O'Hara, and Farmer. That is because, as noted in the Company's 2025 Proxy Statement, the Company's Chapter 11 plan of reorganization was sponsored by a group comprised of, among others, Certares and Knighthead. Through the plan of reorganization, CK Amarillo LP ("CK Amarillo"), an entity that Knighthead and Certares act as investment managers for, obtained 41% of the Company's shares of common stock.[8] Following this, Defendants Wagner, Shannahan, O'Hara, and Farmer were nominated to the Board. Accordingly, Defendants Wagner, Shannahan, O'Hara, and Farmer are each intertwined with the Company and hold significant support through CK Amarillo's shareholding. As such, the Directors are unlikely to take action against Defendants Wagner, Shannahan, O'Hara, and Farmer who are supported by the Company's majority shareholder, CK Amarillo. Defendants Wagner, Shannahan, O'Hara, and Farmer are also unlikely to consider a demand to sue the Individual Defendants which could impact the Company and, in turn, CK Amarillo.

[8] According to the Company's 2025 Proxy Statement, CK Amarillo now owns 58.9% of Hertz Global, thus rendering Hertz Global a "controlled company." Accordingly, given that Defendants Wagner, Shannahan, O'Hara, and Farmer serve as CK Amarillo's investment managers and CK Amarillo's control and ability to determine the outcome of shareholder votes, it is unlikely that the Directors will consider a demand to sue Defendants Wagner, Shannahan, O'Hara, or Farmer who, with the backing of CK Amarillo, may be seen as untouchable at the Company.

352. Also, the Company reports a number of related party transactions with entities that are owned by or affiliated with Certares and/or Knighthead, as follows:

(a) "We are a party to a sponsorship agreement with GT Racing, which owns a race car team with two cars competing in the FIA World Endurance Championship circuit. The sponsorship agreement grants Hertz commercial, partnership, and branding opportunities. GT Racing is owned by [Defendant] Wagner. During fiscal year 2024, Hertz paid GT Racing approximately $12.1 million in connection with the sponsorship";

(b) "Under the agreements, Amex GBT offers our vehicle rentals through its travel service platform, and in return, we pay Amex GBT fees based on the resulting revenue. Amex GBT is partially owned by Certares. [Defendant] O'Hara serves as Amex GBT's Chair. During fiscal year 2024, gross revenue generated pursuant to the agreements was approximately $157.3 million";

(c) "Internova provides us with rental referrals through associated entities throughout North America. In exchange for these referrals, we pay commissions and fees based on rental volume delivered. Internova is partially owned by Certares, and Internova's CEO is the brother of [Defendant] O'Hara. In addition, [Defendant] Farmer serves on Internova's board. During fiscal year 2024, gross revenue

generated pursuant to this agreement was approximately $12.3 million"; and

(d) "Pursuant to our Fixed-Base Operator ("FBO") Concession Agreement with Wheels Up, Certares and Knighthead, through their CK Opportunities Fund, of which Certares and Knighthead are co-investment managers and of which Certares and Knighthead affiliates are general partners, set up an entity, CK Wheels LLC, which owns a significant equity interest in Wheels Up. In addition, certain Certares and Knighthead executives are members of the Wheels Up board. Pursuant to the FBO Concession Agreement, Wheels Up refers rental customers flying into a certain airport to Hertz in exchange for concession fees. During fiscal year 2024, gross revenue generated pursuant to this agreement was approximately $2.2 million."

353. Accordingly, Defendants Wagner, Shannahan, O'Hara, and Farmer are unlikely to consider a demand and take action against the Individual Defendants which, in turn, could have an adverse impact on the above-referenced transactions and thus their personal and professional interests.

***Demand is Further Excused as to Defendants Intrieri, Feikin, and Vougessis***

354. Defendants Intrieri (as Chair), Feikin, and Vougessis served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and

accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the wrongful course of conduct described herein, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty; failing to adequately exercise their risk management and risk assessment functions; and failing to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, Defendants Intrieri, Feikin, and Vougessis breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

***Demand is also Excused Because Defendants Feiken, Fields, Vougessis, Farmer, and Shannahan Benefitted from the False Proxy Statements***

355. As noted *supra*, the Director-Defendants issued false and misleading proxy statements and solicited shareholder approval for, among other things, the election of certain Directors to the Board which, in turn, gave those Directors a substantial benefit from their director fees and stock awards but also enabled those Directors to continue breaching their duties to the Company and thus cause harm to the Company as described herein.

356. Specifically, the 2023 and 2024 Proxy Statements which contained false and misleading statements sought to elect Defendants Feiken, Fields, Vougessis, Farmer, and Shannahan to the Board. On the basis of the false

information, Company shareholders voted in favor of the re-election of Defendants Feiken, Fields, Vougessis, Farmer, and Shannahan. As such, Defendants Feiken, Fields, Vougessis, Farmer, and Shannahan each received a personal benefit from the false and misleading Proxy Statements, namely their re-election to the Board. This personal benefit was undoubtedly material to each of them because it gave them a position of control and power over Hertz Global and further gave them significant compensation in the form of cash fees and stock awards.

357. Thus, demand is excused as to each of Defendants Feiken, Fields, Vougessis, Farmer, and Shannahan.

***Demand is Also Excused as to the Initial Board***

358. In the event the court determines that demand futility should be analyzed with respect to the membership of the Company's Board on August 14, 2024 (the "Initial Board"), the date that the case was initiated, demand would nonetheless be excused as futile.[9]

359. A pre-suit demand on the Initial Board is futile and, therefore, excused. At the time of filing on August 14, 2024, the Initial Board consisted of nine individuals: non-party West and the Director-Defendants (collectively, the "Initial Directors"). Plaintiffs need only allege demand futility as to five of the nine Initial Directors who were on the Initial Board.

---

9 Demand futility is examined with respect to the membership of the Board at the time the amended consolidated complaint is filed unless the asserted terms are "validly in litigation" at the time of the original complaint. *Braddock v Zimmerman*, 906 A.2d 776, 778-79 (Del. 2006).

360. Accordingly, because demand is excused as to the current Board, which includes the members of the Initial Board, demand would also be excused on the Initial Board for the same reasons as detailed herein.

***Additional Reasons that Demand is Futile***

361. In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. In addition, the Director-Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

362. Hertz Global has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Hertz Global any part of the damages Hertz Global suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

363. The acts complained of herein constitute violations of fiduciary duties owed by Hertz Global's officers and directors, and these acts are incapable of ratification.

364. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's Audit Committee Charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

365. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Hertz Global. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers

of Hertz Global, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

366. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Hertz Global to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

367. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Directors cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

368. Similarly, for all of the reasons set forth above and if the Court so chooses, all of the Director-Defendants, and, if not all of them, at least five of the Initial Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Initial Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of Section 14(a) of the Exchange Act

369. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

370. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

371. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

372. Under the direction and watch of the Individual Defendants, the 2023 and 2024 Proxy Statements failed to disclose that: (1) through the Company claimed its officers and directors adhered to the Code of Conduct, the Individual

Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 and 2024 Proxy Statements' descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

373. The 2023 and 2024 Proxy Statements failed to disclose that: (1) the Individual Defendants materially overstated the market demand for EVs; (2) the Individual Defendants' purchases of vehicles failed to match the confines of the actual demand; (3) the capacity of Hertz Global's electric vehicle charging infrastructure was inadequate; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

374. In exercise of reasonable care, Defendants Bermanzohn, Farmer, Feikin, Fields, Intrieri, Nedelman, Scherr, Shannahan, Vougessis, and Wagner, should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading.

375. The Company was damaged as a result of Defendants Bermanzohn, Farmer, Feikin, Fields, Intrieri, Nedelman, Scherr, Shannahan, Vougessis, and Wagner material misrepresentations and omissions in the 2023 Proxy Statement.

376. In exercise of reasonable care, Defendants Farmer, Feikun, Fields, Intrieri, O'Hara, Shannahan, Wagner, and Vougessis, should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading.

377. The Company was damaged as a result of Defendants Farmer, Feikun, Fields, Intrieri, O'Hara, Shannahan, Wagner, and Vougessis material misrepresentations and omissions in the 2024 Proxy Statement.

## SECOND CLAIM

## Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

378. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

379. The Individual Defendants, by virtue of their positions with Hertz Global and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Hertz Global and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Hertz Global to engage in the illegal conduct and practices complained of herein.

## THIRD CLAIM

## Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

380. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

381. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Hertz Global. Not only is Hertz Global now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Hertz Global by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused by the Company to repurchase approximately 19.4 million of its own shares at artificially inflated prices, damaging Hertz Global.

382. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Hertz Global not misleading.

383. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers and directors of the Company, the Individual Defendants were able to and did control the conduct

complained of herein and the content of the public statements disseminated by Hertz Global.

384. The Individual Defendants acted with scienter in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

385. By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

386. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

387. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Hertz Global's business and affairs.

388. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

389. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Hertz Global.

390. In breach of their fiduciary duties owed to Hertz Global, the Individual Defendants willfully or recklessly made and/or caused the Company to make materially false and misleading statements that failed to disclose, *inter alia*, that: (1) the Individual Defendants materially overstated the market demand for EVs; (2) the Individual Defendants' purchases of vehicles failed to match the confines of the actual demand; (3) the capacity of Hertz Global's electric vehicle charging infrastructure was inadequate; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

391. The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, thus rendering them personally liable to the Company for breaching their fiduciary duties.

392. Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

393. In yet further breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed.

394. The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

395. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

396. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Hertz Global has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## FIFTH CLAIM

## Against the Individual Defendants for Unjust Enrichment

397. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

398. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Hertz Global.

399. The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Hertz Global that was tied to the performance or artificially inflated valuation of Hertz Global, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

400. Plaintiffs, as shareholders and representatives of Hertz Global, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

## SIXTH CLAIM

## Against the Individual Defendants for Waste of Corporate Assets

401. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

402. As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

403. In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

404. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

**<u>SEVENTH CLAIM</u>**

**Against the Individual Defendants for Abuse of Control**

405. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

406. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Hertz Global, for which they are legally responsible.

407. As a direct and proximate result of the Individual Defendants' abuse of control, Hertz Global has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary

obligations of candor, good faith, and loyalty, Hertz Global has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## EIGHTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

408. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

409. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Hertz Global in a manner consistent with the operations of a publicly held corporation.

410. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Hertz Global has sustained and will continue to sustain significant damages.

411. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiffs may maintain this action on behalf of Hertz Global, and that Plaintiffs are adequate representatives of the Company;

(b) Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Hertz Global;

(c) Determining and awarding to Hertz Global the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Hertz Global and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Hertz Global and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Hertz Global to nominate at least six candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding Hertz Global restitution from Individual Defendants,

and each of them;

(f) Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

Respectfully submitted this 15 day of August, 2025.

**EGGNATZ | PASCUCCI**
7450 Griffin Rd, Ste. 230
Davie, FL 33314
Tel: (954) 889-3359
Fax: (954) 889-5913
Email: JEggnatz@JusticeEarned.com
Email: Mpascucci@JusticeEarned.com

***/s/ Joshua H. Eggnatz***
Joshua H. Eggnatz, Esq.
Fla. Bar No.: 0067926
Michael J. Pascucci, Esq.
Fla. Bar No.: 0083397

and

**THE BROWN LAW FIRM, P.C.**
Timothy Brown

767 Third Avenue, Suite 2501
New York, NY 10017
Tel: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

**LAW OFFICE OF JOSE D. SOSA, P.C.**
Jose D. Sosa
Florida Bar No.: 150878
1141 Via Jardin
Palm Beach Gardens, FL 33418
Tel.: (561) 670-8237
E-Mail: pepe@pepesosalaw.com
sosalaw@yahoo.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
260 Madison Ave., 22nd Floor
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Co-Lead Plaintiffs*
*Anand Roy and Davis Aiken Yaun*

Docusign Envelope ID: 0AC337BC-ADA7-4D0C-9C4A-F6D88C95077D


**VERIFICATION**

I, Anand Roy, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 30 day of July, 2025.

DocuSigned by:
Anand Roy
241669D16B9A4F5...

Anand Roy